**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE APPLICATION OF EURASIAN          :
NATURAL RESOURCES CORP. LTD.           :
                                       :        Case No.
                                       :
         Petitioner,                   :
                                       :
                                       :
for an order pursuant to 28 U.S.C. § 1782 to    :
conduct discovery for use in a foreign          :
proceeding.                                     :
                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DECLARATION OF JUSTIN MICHAELSON IN SUPPORT OF
### *EX PARTE* APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO
### CONDUCT DISCOVERY FOR USE IN A FOREIGN PROCEEDING

I, Justin Michaelson, declare the following under penalty of perjury pursuant to 28 U.S.C.

§ 1746:

1.      I am a partner and member in the law firm Fried, Frank, Harris, Shriver &

Jacobson (London) LLP, counsel for Petitioner Eurasian Natural Resources Corporation Limited

("ENRC") in connection with a proceeding that ENRC commenced against Mark Hollingsworth

on October 21, 2019, in the High Court of Justice of England and Wales, claim number BL-

2019-001955 (the "English Proceeding"). Mr. Hollingsworth, a self-described freelance

journalist, is and was at all material times a London-based professional "intermediary" (*i.e.*, an

individual in the private intelligence field who obtains, trades and sells confidential or otherwise

non-public information). In the English Proceeding, ENRC is pursuing a claim against Mr.

Hollingsworth for "breach of confidence," arising out of his alleged unlawful receipt and

dissemination of certain confidential and/or privileged information belonging to ENRC. A true

and correct copy of the Particulars of Claim for the English Proceeding is attached hereto as

Exhibit 1.[1]

2.      I make this declaration in support of ENRC's *Ex Parte* Petition for an Order

Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding (the "1782

Petition"), and to put before the Court information and documents relevant to the 1782 Petition.

I make this declaration based on (1) my personal knowledge of information relevant to the

English Proceeding and the other matters addressed herein; (2) my review of documents relevant

to the English Proceeding and the other matters addressed herein; and (3) my knowledge and

understanding of the approach of Courts of England and Wales (collectively, the "English

Courts") to petitions made pursuant to 28 U.S.C. § 1782.

## BACKGROUND

3.      At all times relevant to this 1782 Petition, ENRC was the parent company of a

diversified natural resources group consisting of numerous subsidiaries and associated entities

operating on an international scale (the "ENRC Group").  ENRC's activities included mining

operations (including extensive mining operations in Kazakhstan), as well as energy, processing,

and logistics operations.

4.      ENRC was founded by three businessmen, Alexander Mashkevich, Alijan

Ibragimov, and Patokh Chodiev.  Messrs. Mashkevich, Ibragimov and Chodiev are sometimes

referred to collectively as the "Trio."  Collectively, they continue to hold a majority ownership

interest in ENRC.

---

[1] For all Exhibits attached hereto, any information that ENRC does not understand to be related
to this Petition has been redacted.  Upon request, ENRC will submit unredacted copies of the
Exhibits.

5.      ENRC has been conducting an investigation into the unlawful acquisition, dissemination, and use of certain confidential and, in some instances, legally privileged information belonging to it and/or relating to its affairs and those of its subsidiaries and affiliates within the ENRC Group, as well as related parties, which ENRC was under a duty to protect (the "ENRC Confidential and Privileged Information").

6.      Much of the ENRC Confidential and Privileged Information consists of information that was obtained directly from ENRC by a computer forensics expert, Robert Trevelyan, who was periodically engaged on behalf of ENRC to perform IT and data collection projects (collectively, the "IT Projects").

7.      Mr. Trevelyan was engaged to perform the IT Projects between approximately 2007 and 2012.  In connection with the IT Projects, Mr. Trevelyan primarily provided his services through a company he founded in mid-2008, Cyntel.

8.      The IT Projects comprised the following:

a.      In or around 2007, Mr. Trevelyan was engaged to conduct a security penetration test on ENRC's IT systems in order to identify security weaknesses.

b.      Also in or around 2007, Mr. Trevelyan conducted a search of employees' desks in ENRC's London offices, in the course of which he copied the contents of an external hard drive found on the desk of the personal assistant to a member of ENRC's senior management.  The hard drive contained approximately 40,000 files, including around 13,000 internal ENRC emails from around the time of ENRC's IPO.

c.      In or around 2008, Mr. Trevelyan was engaged to investigate the suspected misappropriation of ENRC's electronic data by two former employees of

3

ENRC's IT department, shortly after those employees left ENRC and joined one of the company's competitors.

      d.      Starting in or about January 2011, Mr. Trevelyan and Cyntel were engaged to assist in the collection of internal ENRC data for purposes of an internal investigation conducted under the supervision of ENRC's external legal counsel, which was prompted by ENRC's receipt in 2010 of an email sent by an anonymous whistleblower (the "2010 Whistleblower Email") raising concerns in connection with one of ENRC's indirect subsidiaries located in Kazakhstan, JSC Sokolov-Sarybai Mining Production Association ("SSGPO"). In the course of this work, Mr. Trevelyan and/or Cyntel (1) imaged ENRC's servers located in both London, England and Zurich, Switzerland, (2) subsequently re-imaged the servers to account for data omitted during the initial imaging, and (3) forensically imaged 58 computers used by SSGPO employees in Kazakhstan. Through these collections, Mr. Trevelyan and Cyntel obtained approximately 15 terabytes of raw data.

      e.      In or about November 2011, Mr. Trevelyan and Cyntel began assisting ENRC with the collection of data for an internal audit relating to a forensic investigation into allegations regarding misappropriation of funds. In the course of this work, Cyntel obtained forensic images of a large number of USB hard drives located in ENRC's offices in Moscow, Russia.

9.      In the course of performing work for the IT Projects, Mr. Trevelyan was granted access to ENRC's premises and IT systems (or parts thereof) and, in some instances, was permitted to make copies of data stored within ENRC's premises and IT systems for the limited purposes of carrying out the IT Projects.

10.     Mr. Trevelyan, however, retained substantial quantities of such data, containing or comprising ENRC Confidential and Privileged Information, without ENRC's knowledge or authorization (the "ENRC Dataset").

11.     On information and belief, the ENRC Dataset obtained by Mr. Trevelyan in the course of his work on the IT Projects contained numerous categories of information, including (a) documents generated in respect of completed and prospective corporate transactions; (b) due diligence reports; (c) business analysis and strategy reports; (d) internal communications between officers, employees, and agents of ENRC; (e) external communications between officers, employees, and agents of ENRC and third parties (such as suppliers, customers, contractors, business partners, banks, and professional advisors); (f) minutes and records of Board meetings; (g) communications with regulators; (h) financial statements; (i) internal audits, and (j) documents generated for purposes of ongoing or anticipated legal proceedings and/or containing legal advice received by ENRC and its subsidiaries from its legal advisors.  In many cases such information was confidential to ENRC, and in some instances, also legally privileged. Accordingly, on information and belief, the ENRC Dataset contained significant quantities of ENRC Confidential and Privileged Information.

12.     On information and belief (and as supported by the emails and other documents discussed below), from at least 2011 onwards, Mr. Trevelyan disclosed portions of the ENRC Confidential and Privileged Information contained within the ENRC Dataset to Mr. Hollingsworth, the defendant in the English Proceeding (whom I have described in paragraph 1, above).

5

13.     On information and belief, after obtaining ENRC Confidential and Privileged
Information from Mr. Trevelyan, Mr. Hollingsworth further disseminated some or all of that
information to Glenn Simpson, a resident of Saint Leonard, Maryland.

14.     On information and belief, Mr. Hollingsworth also disseminated to Mr. Simpson
additional ENRC Confidential and Privileged Information not derived from the ENRC Dataset
that Mr. Hollingsworth obtained from sources other than Mr. Trevelyan, including other
professional intermediaries and one or more sources within the United Kingdom's Serious Fraud
Office ("SFO").  For example, in or around August 2011, Mr. Hollingsworth acted as a conduit
to pass copies of certain confidential (and, in at least two instances, legally privileged)
documents to a journalist working at *The Times* newspaper of London, in the circumstances set
out in paragraphs 17 and 18 of the Particulars of Claim in the English Proceeding (attached
hereto as Exhibit 1).  Those documents—which initially were leaked by one of ENRC's then
external legal counsel to a third party, for the purpose of procuring their publication, and given to
Mr. Trevelyan, who then passed them on to Mr. Hollingsworth—formed the basis for an article
with the headline "Copper giant calls in outsiders to examine corruption claims," which was
published in *The Times* on August 9, 2011.  Mr. Hollingsworth retained a copy of those
documents (the "2011 Leaked Material") and subsequently disseminated them to Mr. Simpson.
For the avoidance of doubt, and save insofar as the content of the 2011 Leaked Material has
entered the public domain, those documents remain privileged and no reliance is placed on their
substantive content in this 1782 Petition.

15.     On information and belief, from in or about the mid-1990s to in or about 2009,
Mr. Simpson was an investigative reporter for various news outlets, including the *Wall Street
Journal*.  In or about 2009, Mr. Simpson became a partner of a research/business intelligence

firm called SNS Global.  In or about 2010, Mr. Simpson closed SNS Global and founded a new

research/business intelligence firm called Fusion GPS.  Since in or about 2009, through SNS

Global and Fusion GPS, Mr. Simpson has been conducting research—and obtaining

information—for clients of those firms.  On multiple occasions since his founding of Fusion GPS

in or about 2010, Mr. Simpson has actively sought to obtain non-public information concerning

ENRC, its related companies, and/or the Trio.

16.     Through the 1782 Petition, ENRC seeks discovery regarding Mr. Hollingsworth's

dissemination of ENRC Confidential and Privileged Information to Mr. Simpson.  ENRC also

seeks discovery regarding what Mr. Simpson did with the ENRC Confidential and Privileged

Information that he received from Mr. Hollingsworth.  As explained below, the information that

ENRC is seeking through this 1782 Petition is relevant to establishing—and will be used by

ENRC for the purpose of establishing—both liability and damages as to Mr. Hollingsworth in

the English Proceeding.

## ENRC'S LAWSUIT AGAINST MR. HOLLINGSWORTH IN THE UNITED KINGDOM

17.     Based on Mr. Hollingsworth's alleged (1) receipt of ENRC Confidential and

Privileged Information from Mr. Trevelyan and other third parties and (2) dissemination of some

or all of that ENRC Confidential and Privileged Information to various third parties, including

Mr. Simpson, ENRC has filed suit against Mr. Hollingsworth in the English Proceeding for

breach of confidence.

18.     To prevail on its claim for breach of confidence under English law, ENRC must

show:

     a.     That the informational content of the ENRC Confidential and Privileged

Information received by Mr. Hollingsworth from Mr. Trevelyan and other third parties

was confidential in nature.  That is, that the information was in some way inaccessible,

not publicly available, or otherwise not widely known and that the information was of

some value (though not necessarily commercial) to the party claiming confidentiality,

*i.e.*, ENRC.

   b.  That Mr. Hollingsworth knew or reasonably should have known that the

information contained within such parts of the ENRC Confidential and Privileged

Information as were provided to him was confidential.  Such knowledge may have arisen

by virtue of, *inter alia*:  a contractual obligation of confidentiality; specific notice of the

confidential nature of the ENRC Confidential and Privileged Information; the

relationship between Mr. Hollingsworth and the party from whom he received the ENRC

Confidential and Privileged Information; the circumstances in which the ENRC

Confidential and Privileged Information was received by Mr. Hollingsworth; or the

nature of the ENRC Confidential and Privileged Information itself.

   c.  And, that Mr. Hollingsworth, without authorization, disclosed or otherwise

used the ENRC Confidential and Privileged Information, or parts thereof.

  19.  If ENRC prevails on its breach of confidence claim, it will be entitled to relief,

which may include recovery of damages or equitable compensation[2] from Mr. Hollingsworth, or

an account and disgorgement of profits resulting from Mr. Hollingsworth's misuse of the

confidential information.  Damages or equitable compensation are assessed at the time the court

gives judgment, with the benefit of hindsight.  To obtain damages or equitable compensation, the

plaintiff must show that it would not have suffered harm but for the defendant's breach of

---

[2] Equitable compensation is a monetary remedy which may be available in English courts to
compensate a claimant for harm suffered as a result of an equitable wrong, such as a breach of
confidence.

confidence; however, the harm suffered by the plaintiff need not have been a reasonably foreseeable consequence of the defendant's breach of confidence at the time it was committed. Thus, losses caused to a plaintiff as a result of misuse by a third party further down the line, who received the confidential information directly or indirectly from the defendant, in principle are recoverable from the defendant as damages or equitable compensation provided that, with benefit of hindsight and on a common sense basis, they can be said to have been directly caused by the defendant's original breach of confidence.

20.     Accordingly, here, if Mr. Hollingsworth is found liable for breach of confidence, he may in principle be required to compensate ENRC for any harm resulting from his dissemination of ENRC Confidential and Privileged Information to Mr. Simpson, including any harm resulting from Mr. Simpson's use of the information or further dissemination of the information to other third parties.

21.     In connection with the investigation giving rise to the breach of confidence claim asserted in the English Proceeding, a company related to ENRC (the "ENRC Related Company")—and that company's agents including myself and other representatives of my firm—identified, located, and conducted privileged interviews of witnesses with information relevant to the breach of confidence claim.  Those interviews included interviews of Messrs. Trevelyan and Hollingsworth.  Nothing in this 1782 Petition is intended or should be construed as a waiver of privilege in these interviews or other communications with Messrs. Trevelyan or Hollingsworth.

22.     In this regard, the ENRC Related Company entered into agreements with Messrs. Trevelyan and Hollingsworth pursuant to which it retained them as consultants in relation to the foregoing (the "Consulting Agreements").

9

23.     Under the Consulting Agreements, the ENRC Related Company agreed to pay Messrs. Trevelyan and Hollingsworth a set monthly amount in exchange for their cooperation and agreement to assist ENRC in its investigation.  As part of the Consulting Agreements, the ENRC Related Company also agreed (a) to indemnify Messrs. Trevelyan and Hollingsworth against any liability arising out of their consulting work, (b) to release them from any liability that ENRC may have against them, and (c) not to commence legal action against them.

24.     None of the consideration to be provided to Messrs. Trevelyan and Hollingsworth under the Consulting Agreements was in any way contingent on the substance of their assistance, or the outcome of any investigation (or related legal proceeding).

25.     In connection with the Consulting Agreements, Messrs. Trevelyan and Hollingsworth provided information to the ENRC Related Company.

26.     However, the information provided by Mr. Hollingsworth was incomplete and, accordingly, the ENRC Related Company was entitled to—and did—terminate the Consulting Agreement in accordance with its terms.  Accordingly (and in any event), ENRC itself is within its rights to pursue a breach of confidence claim against Mr. Hollingsworth in the English Proceeding.

27.     In support of ENRC's breach of confidence claim against Mr. Hollingsworth in the English Proceeding, ENRC has obtained evidence that (1) Mr. Trevelyan and other third parties acquired ENRC Confidential and Privileged Information; (2) Mr. Trevelyan and other third parties made unauthorized disclosures of ENRC Confidential and Privileged Information to Mr. Hollingsworth; (3) the circumstances under which Mr. Hollingsworth obtained such ENRC Confidential and Privileged Information were such that Mr. Hollingsworth knew or should have known of the information's confidential nature, such that he came under a duty of confidence to

ENRC and was not permitted to disclose or otherwise use the information; and (4) in breach of the aforementioned duty of confidence, Mr. Hollingsworth further disclosed ENRC Confidential and Privileged Information to other parties, including Mr. Simpson.

### MR. HOLLINGSWORTH OBTAINED ENRC CONFIDENTIAL AND PRIVILEGED INFORMATION

28.     Mr. Hollingsworth first met Mr. Trevelyan in or around early 2009.  Over the years, Messrs. Hollingsworth and Trevelyan have both performed work relating to Kazakhstan in general and ENRC in particular, and Kazakhstan and ENRC have been frequent topics of discussion between them.

29.     In the course of Mr. Hollingsworth's discussions with Mr. Trevelyan (if not before), Mr. Hollingsworth became aware that Mr. Trevelyan had performed, or was still performing, IT Projects for ENRC and that Mr. Trevelyan had ongoing access to ENRC Confidential and Privileged Information.

30.     From in or about 2010 onwards, Mr. Hollingsworth (1) regularly met and liaised with Mr. Trevelyan in connection with projects relating to ENRC, its related companies, and/or the Trio that he was undertaking on behalf of clients and/or prospective clients; (2) asked Mr. Trevelyan to provide him with ENRC Confidential and Privileged Information; and (3) provided some or all of the ENRC Confidential and Privileged Information that he obtained from Mr. Trevelyan to his clients, prospective clients, and other third parties, including, on information and belief, Mr. Simpson.

31.     Mr. Hollingsworth took measures to ensure that the identity of Mr. Trevelyan as one of his sources remained covert, including by using pseudonyms to refer to Mr. Trevelyan. For example, in his written communications, Mr. Hollingsworth referred to Mr. Trevelyan as "Magic."

11

32.     In addition to obtaining ENRC Confidential and Privileged Information from Mr. Trevelyan, on information and belief, Mr. Hollingsworth also obtained such information from other third parties.  For example, on information and belief, Mr. Hollingsworth obtained ENRC Confidential and Privileged Information from other professional intermediaries and one or more sources within the SFO.  Indeed, the document attached hereto as Exhibit 2, which Mr. Hollingsworth emailed to Mr. Simpson on July 1, 2013, *see infra* ¶ 56, contains (1) information that, on information and belief, Mr. Hollingsworth could only have obtained from a source within the SFO, including details regarding sources and witnesses relied on by the SFO in connection with an investigation it was conducting into ENRC; and (2) confidential information received from those witnesses about ENRC, its related companies, and the Trio, including information regarding the Trio's personal assets.  Mr. Hollingsworth also obtained a copy of the 2011 Leaked Material (as described in paragraph 14, above) which originally had been leaked by a third party, and was subsequently given to Mr. Trevelyan to pass on to Mr. Hollingsworth with a view to procuring its publication.

## MR. HOLLINGSWORTH DISCLOSED ENRC CONFIDENTIAL AND PRIVILEGED INFORMATION TO MR. SIMPSON

33.     As set forth below, after Mr. Simpson began operating his research/business intelligence firm Fusion GPS in or about 2010, he sought—on multiple occasions—to obtain non-public information concerning ENRC, its related companies, and/or the Trio from Mr. Hollingsworth.

34.     Moreover, as set forth below, during at least the period from in or around 2011 to in or around 2013, Mr. Hollingsworth disclosed ENRC Confidential and Privileged Information to Mr. Simpson.

A.     **In 2011, Mr. Hollingsworth Provided Mr. Simpson with ENRC Confidential and Privileged Information**

35.     By no later than July 2011, Mr. Simpson had asked Mr. Hollingsworth to provide him with a summary of the non-public information to which Mr. Hollingsworth had access relating to ENRC.  Indeed, following a number of meetings, emails, and calls with Mr. Simpson, on July 28, 2011, Mr. Hollingsworth sent an email to Mr. Simpson (in response to a request by Mr. Simpson) attaching "a detailed summary of the documents available on the disc that we discussed last week in London."  The attached "detailed summary" contained a list of 100 items or topics pertaining to ENRC and related matters, including: a "[m]emo detailing assets of ENRC shareholders – Chodiev, Ibragrimov [sic] and Mashkevich"; letters, emails, and communications between current and past employees and members of ENRC's Board of Directors; bank account details and financial documents; internal "policy" and "strategy" documents; and due diligence reports.  True and correct copies of the aforementioned email and attachment are attached hereto as Exhibit 3.

36.     Mr. Hollingsworth's diary reflects that, shortly before he sent his July 28, 2011 email to Mr. Simpson, he met with Mr. Simpson:

a.     Mr. Hollingsworth's diary for July 21, 2011 contains the entries, "E-MAIL . . . GLENN – MEET TODAY"—with a check mark adjacent to it—and "8 – Glenn – Curzon Street," indicating that on July 21, 2011, Mr. Hollingsworth met Mr. Simpson in London.  A true and correct copy of the page from Mr. Hollingsworth's diary for that date is attached hereto as Exhibit 4.

b.     Mr. Hollingsworth's diary for the following day, July 22, 2011, contains the entry, "CALL GLENN SIMPSON," with a check mark adjacent to it.  On that day, Mr. Hollingsworth's diary also records meetings with Mr. Simpson at 2:00 pm and 7:00

pm.  A true and correct copy of the page from Mr. Hollingsworth's diary for that date is attached hereto as Exhibit 5.

  c.  Two days later, on July 24, 2011, Mr. Hollingsworth emailed Mr. Simpson informing Mr. Simpson that he (Mr. Hollingsworth) would "compile a summary of the vast archive of docs and e-mail it to you on Wednesday . . . ." A true and correct copy of the aforementioned email is attached hereto as Exhibit 6.

  d.  Then, four days later (in fact on Thursday), Mr. Hollingsworth sent Mr. Simpson the July 28, 2011 email in which he referenced the ENRC-related documents that he could provide to Mr. Simpson.

  37.  Shortly thereafter, on August 9, 2011, Mr. Hollingsworth emailed Mr. Simpson to direct his attention to an "article on ENRC in the Business section of 'The Times' which was published today" (*i.e.*, the article described in paragraph 14, above). Mr. Hollingsworth then stated, "It's a shame that we missed out, but there is a lot of material that was not published in the story." Mr. Hollingsworth concluded by stating, "Please call me to discuss and let me know when you are next in London because there is lots of other Kazakh business to be done, if you are interested." A true and correct copy of the aforementioned email is attached hereto as Exhibit 7.

  38.  A few weeks later, on August 23, 2011, Mr. Hollingsworth sent an email to Mr. Simpson, titled "Proposal on ENRC," in which Mr. Hollingsworth further detailed the information regarding ENRC that he either had in his possession or could obtain for Mr. Simpson. Notably, Mr. Hollingsworth described the information as being for "a prospective client" of Mr. Simpson. In addition, Mr. Hollingsworth characterized the information in the email as "just a taster," and assured Mr. Simpson that "[t]here is a lot more, but it depends on

what your prospective client is looking for." The text of the August 23, 2011 email contained an itemized list of documents that Mr. Hollingsworth could provide, including: documents pertinent to the "financial affairs" of one of ENRC's shareholders; confidential internal correspondence of ENRC's Board of Directors; "hundreds of pages" of confidential reports by ENRC's external legal counsel regarding an internal investigation; and confidential documents pertaining to ENRC's business activities in Africa. Mr. Hollingsworth attached to this email the same "detailed summary" of documents that he attached to his July 28, 2011 email, as discussed in paragraph 35 above. True and correct copies of the aforementioned email and attachment (with a redaction to avoid disclosing information potentially related to an ongoing law enforcement investigation) are attached hereto as Exhibit 8.

39.     A few weeks later, on September 16, 2011, Mr. Hollingsworth emailed Mr. Simpson to request that they meet or speak regarding ENRC to discuss "some positive developments." Specifically, Mr. Hollingsworth wrote, "If you are meeting the client on ENRC tomorrow (Saturday) or Monday, please can we meet or at least speak before you[r] meeting, because there have been some positive developments that make a three month deal much more attainable." A true and correct copy of the aforementioned email is attached hereto as Exhibit 9.

40.     Approximately two weeks later, Mr. Hollingsworth's diary (for October 3, 2011) contains the note, "EMAIL GLENN SIMPSON – SHOPPING LIST." A true and correct copy of the page from Mr. Hollingsworth's diary for that date is attached hereto as Exhibit 10.

41.     The following day, on October 4, 2011, Mr. Hollingsworth sent Mr. Simpson an email in which he stated, "I will send you the ENRC shopping list today (Tues)." Mr. Hollingsworth confirmed that he had "a complete inside track, including current developments on the board and lots of other juicy material. . . ." Mr. Hollingsworth concluded the email by

requesting that Mr. Simpson "meanwhile please . . . check if the money has arrived." A true and correct copy of the aforementioned email is attached hereto as Exhibit 11.

42.     Later that day, Mr. Hollingsworth sent a follow-up email to Mr. Simpson with the subject "My shopping list," which contained a list of 10 items, including the following documents which constituted or contained ENRC Confidential and Privileged Information:

- A "detailed report on the internal investigations" into an ENRC subsidiary;

- "Copies of . . . reports [of internal investigations] by . . . three major UK law firms";

- A copy of the 2010 Whistleblower Email;

- A copy of a confidential internal e-mail sent by Paul Judge, a director and aspiring chairman of ENRC, to other ENRC directors; and

- "Details of thousands of other internal ENRC documents – 2004-2008."

A true and correct copy of the aforementioned email is attached hereto as Exhibit 11.

43.     Many of the specific categories of information that Mr. Hollingsworth listed in his July 28, August 23, and October 4, 2011 emails (and attachments) appear to match, or be encompassed within, categories of information that would have been included in (1) the ENRC Dataset and/or (2) the 2011 Leaked Material (including with respect to the latter, items 2 and 3 of the above "shopping list"). *Compare supra* ¶¶ 35, 38, *and* 42 *with* ¶¶ 11 *and* 14. Moreover, on their face, most or all of the categories of information that Mr. Hollingsworth listed in his July 28, August 23, and October 4, 2011 emails (and attachments) comprise or contain ENRC Confidential and Privileged Information.

44.     Approximately one week later, on October 12, 2011, Mr. Hollingsworth emailed one of his professional contacts, Alex Yearsley, and informed Mr. Yearsley that "Glenn is close to signing a deal on ENRC. . . ." Mr. Hollingsworth then added, "I will rope you in on that project. Let's talk soon." Like Mr. Hollingsworth, Mr. Yearsley is a professional intermediary

in the private intelligence field.  Messrs. Hollingsworth and Yearsley have been professional

contacts and friends for years.  Over the years, Messrs. Hollingsworth and Yearsley have met

and otherwise communicated with one another frequently in order to (1) discuss intelligence

work that they were undertaking for their respective clients, (2) assist one another on particular

projects, and/or (3) collaborate on particular projects.  A true and correct copy of the

aforementioned email is attached hereto as Exhibit 12.

45.     A few days later, on October 19, 2011, Mr. Simpson emailed Messrs.

Hollingsworth and Yearsley to inform them that the ENRC "project is on hold," to which Mr.

Hollingsworth responded by email dated October 20, 2011, stating, "That's a real shame because

I have an inside track with documents and we could clean up. . . . Please let me know when you

are ready to roll . . . ."  True and correct copies of the aforementioned emails are attached hereto

as Exhibit 13.

46.     On October 21, 2011, however, Mr. Hollingsworth emailed Mr. Yearsley, stating

"It appears that Glenn's case on ENRC is now back on . . . ."  A true and correct copy of the

aforementioned email is attached hereto as Exhibit 14.

47.     On information and belief (and as supported by the emails and diary entries

described below), (a) Mr. Simpson thereafter engaged Mr. Hollingsworth to provide him with

non-public information regarding ENRC, its related companies, and/or the Trio; and (b) in

connection with that engagement, Mr. Hollingsworth provided Mr. Simpson with ENRC

Confidential and Privileged Information.

a.      On October 25, 2011, Mr. Hollingsworth emailed Mr. Simpson thanking

him "for [his] message," stating that what Mr. Simpson had conveyed in his message was

17

"great news," and suggesting that they "talk on the phone today." A true and correct copy of the aforementioned email is attached hereto as Exhibit 15.

b.    Mr. Hollingsworth's diary for the following day, October 26, 2011, contains an entry, "CALL . . . GLENN SIMPSON – ENRC," with a check mark adjacent to it. A true and correct copy of the page from Mr. Hollingsworth's diary for that date is attached hereto as Exhibit 16.

c.    Mr. Hollingsworth's diary reflects that two weeks later, on November 16, 2011, he met Mr. Simpson at the Mayfair Hotel in London. A true and correct copy of the page from Mr. Hollingsworth's diary for that date is attached hereto as Exhibit 17.

d.    Mr. Hollingsworth's diary for November 28, 2011 contains a note stating "E-MAIL GLENN – BANK," which upon information and belief, refers to payments from Mr. Simpson to Mr. Hollingsworth in exchange for ENRC Confidential and Privileged Information. Mr. Hollingsworth's diary for the following day, November 29, 2011, contains an entry stating, "SCAN DOC → GLENN," with a check mark adjacent to it. True and correct copies of the pages from Mr. Hollingsworth's diary for those dates are attached hereto as Exhibits 18 and 19.

e.    The next day, on November 30, 2011, Mr. Simpson sent an email to Mr. Hollingsworth in which he stated, "I have to brief client orally on Monday morning in DC. Need a current roundup, including especially whatever we have on Felix." Two days later, on December 2, 2011, Mr. Hollingsworth emailed Mr. Simpson back, stating, "I will e-mail you the current round-up plus Felix material at about 4 pm-ish UK time i.e., 11 am your time." On information and belief, the reference to "Felix" was to Felix

Vulis, ENRC's then Chief Executive Officer. True and correct copies of the aforementioned emails are attached hereto as Exhibit 20.

  f.  Mr. Hollingsworth's diary contains an entry for December 2, 2011, stating, "E-MAIL GLENN SIMPSON – INTERIM REPORT." A true and correct copy of the page from Mr. Hollingsworth's diary for that date is attached hereto as Exhibit 21.

  g.  Shortly thereafter, on December 10, 2011, Mr. Hollingsworth emailed Mr. Simpson again, stating, "*I hope you were satisfied with all my material and the documents and we have now satisfied the mandate. . . .* Please let me know if there is anything else you need for this project . . . ." (Emphasis added). A true and correct copy of the aforementioned email is attached hereto as Exhibit 22.

**B. In 2012 and 2013, Mr. Hollingsworth Continued to Provide Mr. Simpson with ENRC Confidential and Privileged Information**

  48. In 2012 and 2013, Mr. Simpson continued to request—and receive—non-public information from Mr. Hollingsworth regarding ENRC, its related companies and/or the Trio. For example, on January 8, 2012, Mr. Simpson emailed Mr. Hollingsworth to inform him, "We are discussing next steps. The priority remains [F]elix. Let me know if you have any ideas." The next day, January 9, 2012, Mr. Hollingsworth emailed Mr. Simpson back, stating, "I have some interesting new material on this case but very little – if at all – relates to Felix. But please call me any time so we can brainstorm this one. A lot depends on your client's priorities and focus." True and correct copies of the aforementioned emails are attached hereto as Exhibit 23.

  49. Approximately one week later, however, on January 19, 2012, Mr. Hollingsworth sent Mr. Simpson a follow-up email stating, "Hi Glenn. Our mutual friend Magic has obtained new documents on Felix Vulis which detail his finances and payments he has received from ENRC, his CV and also a copy of his service agreement and employment contract, although it is

not signed. If Felix is still of interest of [sic] you, please call me to discuss how to proceed." On information and belief, the reference to "Magic" was a reference to Mr. Trevelyan, and the "new documents" are likely to have been extracted from the ENRC Dataset. Based on Mr. Hollingsworth's description, those "new documents" constituted or contained ENRC Confidential and Privileged Information. A true and correct copy of the aforementioned email is attached hereto as Exhibit 23.

50.      Thereafter, on March 14 and 15, 2013, Mr. Hollingsworth emailed Mr. Simpson inquiring if Mr. Simpson could help him obtain a letter that Mr. Hollingsworth apparently believed the SFO had sent to ENRC. In the March 14, 2013 email, Mr. Hollingsworth separately mentioned that he had "obtained a report by [ENRC's then counsel] to [the] SFO dated July 2012 about their internal investigation into corruption." Mr. Hollingsworth added that the "report" "has been leaked and is not in the public domain." True and correct copies of the aforementioned emails are attached hereto as Exhibits 24 and 25.

51.      In response to Mr. Hollingsworth's March 14, 2013 email, Mr. Simpson requested—by email dated March 18, 2013—that Mr. Hollingsworth "send [him] a copy of that report." A true and correct copy of the aforementioned email is attached hereto as Exhibit 24.

52.      Mr. Hollingsworth's diary for the following day, March 19, 2013, contains entries to "CALL GLENN SIMPSON" and "Scan + Email Report to Alex and Glenn," references, on information and belief, to Messrs. Yearsley and Simpson. A true and correct copy of the page from Mr. Hollingsworth's diary for that date is attached hereto as Exhibit 26.

53.      The next day, March 20, 2013, Mr. Hollingsworth sent Mr. Simpson an email to which he attached a document titled "ENRC Presentation to the SFO" which, on information and belief, was the "report" to which he had made reference in his earlier email. A true and correct

copy of the aforementioned email is attached hereto as Exhibit 27; the attachment, a privileged

document, has not been included.  Mr. Hollingsworth's diary for March 20, 2013 also contains

an entry to "Scan ENRC Report to Alex + Glenn."  A true and correct copy of the page from Mr.

Hollingsworth's diary for that date is attached hereto as Exhibit 28.

      54.     Mr. Hollingsworth's diary for March 22, 2013—two days after Mr. Hollingsworth

sent Mr. Simpson the above-mentioned "report"—includes the entry, "Glenn Simpson –

SFO/Prince AA – Budget – Trio" with a check mark adjacent to it.  A true and correct copy of

the page from Mr. Hollingsworth's diary for that date is attached hereto as Exhibit 29.

      55.     On information and belief (and as supported by the emails and diary entries

described below), Mr. Hollingsworth also disclosed ENRC Confidential and Privileged

Information to Mr. Simpson from at least in or about late April 2013 to at least in or about early

July 2013.

      a.     On April 29, 2013, Mr. Hollingsworth sent Mr. Simpson an email "to brief

[him] on [the] latest intrigue for our projects. . . ."  Under the heading "ENRC," Mr.

Hollingsworth informed Mr. Simpson, among other things, that "[t]he Guardian [would] .

. . be running a story about [a] lawsuit filed by Eurochem [a company unrelated to

ENRC] against Shaft[] Sinkers plc and IMR (regarded as fronts for [the] Trio)."  Mr.

Hollingsworth invited Mr. Simpson to "let [him] know if [he] need[ed] more details on

this case."  A true and correct copy of the aforementioned email is attached hereto as

Exhibit 30.

      b.     Mr. Hollingsworth's diary for May 31, 2013—approximately one month

later—contains entries stating "REPORTS FOR GLENN SIMPSON – ENRC[]" and

"GLENN SIMPSON – PROJECTS + PAYMENT."  Both entries have check marks

adjacent to them.  A true and correct copy of the page from Mr. Hollingsworth's diary for that date is attached hereto as Exhibit 31.

      c.     Mr. Hollingsworth's diary for June 13, 2013 contains another entry indicating that he sent Mr. Simpson information relating to ENRC.  It states, "E-MAIL . . . GLENN SIMPSON – REPORTS" with a check mark adjacent to it.  Mr. Hollingsworth's diary for June 14, 2013 contains another entry with identical text.  True and correct copies of the pages from Mr. Hollingsworth's diary for those dates are attached hereto as Exhibits 32 and 33.

      d.     Mr. Hollingsworth's diary for June 17, 2013, three days later, contains a similar entry, "E-MAIL . . . GLENN SIMPSON . . . ENRC."  A true and correct copy of the page from Mr. Hollingsworth's diary for that date is attached hereto as Exhibit 34.

      e.     Mr. Hollingsworth's diary for June 24, 2013 and June 27, 2013, contains entries stating "ENRC REPORTS . . . [call] GLEN [sic]" and "CALL . . . GLENN SIMPSON – DOCS," respectively.  Both entries have check marks adjacent to them.  True and correct copies of the pages from Mr. Hollingsworth's diary for those dates are attached hereto as Exhibits 35 and 36.

56.     Thereafter, on July 1, 2013, Mr. Hollingsworth sent Mr. Simpson an email stating, "Glenn, Attached is a new report on ENRC, Trio and SFO.  I hope it's useful."  A true and correct copy of the aforementioned email and attachment are attached hereto as Exhibit 2.

57.     Mr. Hollingsworth's diary for July 8, 2013—approximately one week later— contains an entry stating, "E-MAIL . . . IMR ASSETS – []GLENN."  On information and belief, the reference to "IMR" refers to International Mineral Resources B.V., a company related to

ENRC, and the reference to "GLENN" refers to Mr. Simpson.  A true and correct copy of the page from Mr. Hollingsworth's diary for that date is attached hereto as Exhibit 37.

58.      Accordingly, from at least 2011 onwards, Mr. Hollingsworth provided Mr. Simpson with ENRC Confidential and Privileged Information.

## THE REQUESTED DISCOVERY

59.      ENRC's 1782 Petition seeks a deposition of Mr. Simpson in the city and state where he resides, Saint Leonard, Maryland, as well as certain documents relating to ENRC to the extent they are in Mr. Simpson's possession, custody or control.

60.      The deposition of Mr. Simpson would cover the following topics:

- the extent to which Mr. Simpson obtained information relating to ENRC, its related companies, the Trio, or their respective business interests from Mr. Hollingsworth, including a complete accounting of what he obtained, when, for what purpose, what he did with it, and what any third parties who received the information from him may have done with it;

- whether Mr. Simpson obtained information relating to ENRC, its related companies, the Trio, or their respective business interests from anyone other than Mr. Hollingsworth, including Messrs. Trevelyan and Yearsley, and if so, what he obtained, when, for what purpose, what he did with it, and what any third parties who received the information from him may have done with it; and

- whether Mr. Simpson currently has any documents in his possession, custody or control relating to ENRC, its related companies, the Trio, or their respective business interests, and if so, what documents, who he obtained

23

them from, when, for what purpose, what he has done or anticipates doing with them, and what any third parties who received the documents from him may have done with them.

61.     The documents that ENRC is seeking from Mr. Simpson comprise the following categories:

- emails or other communications between Messrs. Simpson and Hollingsworth relating to ENRC, its related companies, the Trio, or their respective business interests;

- documents relating to ENRC, its related companies, the Trio, or their respective business interests that Mr. Simpson obtained from Mr. Hollingsworth;

- documents reflecting Mr. Simpson's use or further dissemination of documents or information relating to ENRC, its related companies, the Trio, or their respective business interests that Mr. Simpson obtained from Mr. Hollingsworth, as well as documents reflecting how any third parties who received such documents or information from Mr. Simpson used or further disseminated them.

- documents relating to ENRC, its related companies, the Trio, or their respective business interests that Mr. Simpson obtained from anyone other than Mr. Hollingsworth, including Messrs. Trevelyan or Yearsley, as well as documents reflecting how and from whom Mr. Simpson obtained any such documents; and

- documents reflecting Mr. Simpson's use or further dissemination of documents or information relating to ENRC, its related companies, the Trio, or their respective business interests that Mr. Simpson obtained from anyone other than Mr. Hollingsworth, as well as documents reflecting how any third parties who received such documents or information from Mr. Simpson used or further disseminated them.

62.     To the best of my knowledge and belief, the testimony and documents sought from Mr. Simpson will be admissible in the English Proceeding. As discussed above, such testimony and documents will be relevant to and used for purposes of establishing liability, as well as ENRC's entitlement to damages or equitable compensation in the English Proceeding. For example, evidence that Mr. Simpson obtained ENRC Confidential and Privileged Information from Mr. Hollingsworth would be relevant to establishing that Mr. Hollingsworth is liable for breach of confidence. Moreover, evidence that Mr. Simpson either used or further disseminated ENRC Confidential and Privileged Information that he obtained from Mr. Hollingsworth would be relevant to determining (a) the extent of the harm caused by Mr. Hollingsworth's breach of confidence, and thus (b) the relief due to ENRC for the breach of confidence. In addition, evidence that Mr. Simpson also obtained ENRC Confidential and Privileged Information from someone other than Mr. Hollingsworth would potentially be relevant to, among other things, the extent of the harm caused by Mr. Hollingsworth's breach of confidence. In any event, whether admissible or not, ENRC will use the information obtained through the requested discovery (a) to inform the nature and scope of the discovery it ultimately seeks in the English Proceeding—including from Mr. Hollingsworth—and potentially (b) to question Mr. Hollingsworth and other witnesses in the English Proceeding.

63.     I am not aware of any reason why the English Court adjudicating the English

Proceeding would be offended by ENRC's effort to obtain the discovery sought from Mr.

Simpson.  In principle, English Courts are receptive to the use of 28 U.S.C § 1782 as a means for

parties to English proceedings to obtain discovery.  The leading authority is the decision of the

House of Lords in *South Carolina Co v Assurantie NV [1986] 3 WLR 398*, in which it was held

that an application for relief under 28 U.S.C § 1782 was not in principle objectionable and that

the English Courts would not seek to restrain such an application unless it could be shown to be

"unconscionable."  "Unconscionable" conduct was held to include "oppressive or vexatious

conduct which interferes with the due process of the Court."  A true and correct copy of the

*South Carolina* decision is attached hereto as Exhibit 38.

64.     To the best of my knowledge and belief, this instant 1782 Petition is

distinguishable from previous cases in which the English Courts have characterized Section 1782

petitions as unconscionable.

65.     There are two cases of which I am aware in which an English Court has found an

application for relief pursuant to 28 U.S.C § 1782 to be unconscionable.  In the first case,

*Bankers Trust International Plc v PT Dharmala [1996] CLC 252*, the English Court found the

Section 1782 petition to be improper (and distinguishable from *South Carolina*, in which, as

stated above, the English Court found the use of Section 1782 discovery to be appropriate) on the

basis that:

    (i)     The petition sought discovery from the opposing party in the English litigation

           (unlike in *South Carolina*, where the subjects of the petition were third parties);

    (ii)    The petition was made after the trial of the English action had ended (unlike in

           *South Carolina*, where the petition was made at an early stage with a view to

           producing evidence at trial);

(iii)   The petitioners had already unsuccessfully sought disclosure of documents in the English proceeding, and the same discovery was subsequently sought through the petition (unlike in *South Carolina*, where the disclosure sought had not previously been refused by the English Court);

(iv)   The proposed discovery sought in the petition was not admissible in the English proceeding, and was expansive and speculative, such that compliance with the petition was likely to require the opposing party to spend significant time and costs to respond, because the petitioner sought "a large-scale investigation" into the party's business (unlike in *South Carolina*, where there was no suggestion that the material sought in Section 1782 discovery would be irrelevant or incapable of being used in the English proceeding).

A true and correct copy of the decision in *Bankers Trust* is attached hereto as Exhibit 39.

66.   The 1782 Petition brought by ENRC here is akin to the circumstances in *South Carolina*, and distinguishable from *Bankers Trust*. First, Mr. Simpson is not a party to the English Proceeding. Second, the English Proceeding against Mr. Hollingsworth is at an early stage, with no disclosure having yet taken place, no hearing date set, and the discovery from Mr. Simpson being sought well in advance of any trial. Third, no disclosure has been sought involving Mr. Simpson in the English Proceeding. Additionally, Mr. Simpson is outside the jurisdictional reach of the English Court; accordingly, ENRC likely will be unable to obtain the requested discovery absent approval of the 1782 Petition. Fourth, the discovery sought by ENRC is not expansive or speculative. Rather, as set forth above, it is narrowly-tailored to matters directly relevant to ENRC's breach of confidence claim against Mr. Hollingsworth— namely, Mr. Hollingsworth's liability for breach of confidence, and the resulting damages/equitable compensation to which ENRC is entitled as a result of the breach of confidence. Moreover, ENRC has strong evidence (as set forth above) that Mr. Simpson obtained ENRC Confidential and Privileged Information from Mr. Hollingsworth.

27

67.     In the second case, *Omega Group Holdings Ltd v Kozeny [2002] CLC 132*, the English Court found the Section 1782 discovery sought to be improper because it involved proposed depositions of witnesses who were intended to be called to give evidence in the English proceeding.  Accordingly, the Court determined that the petition would cause those witnesses to be subject to unwarranted repeated cross-examination which would duplicate evidence given in the English proceeding.  A true and correct copy of the English Court's decision in *Omega Group* is attached hereto as Exhibit 40.

68.     ENRC does not intend to call Mr. Simpson as a witness in the English Proceeding.  Moreover, even if ENRC wanted to call Mr. Simpson as a witness, ENRC could not compel his appearance given that they he is outside of the jurisdiction of the English Court.  In any event, the discovery ENRC is seeking through this 1782 Petition will likely obviate any potential need for ENRC to attempt to procure the appearance of Mr. Simpson in the English Proceeding.

69.     As demonstrated by the following statement by the English Court in *Royal Bank of Scotland v Hicks [2011] EWHC 287 (Ch)*, the above cases in which English Courts have restrained a petitioner's use of 28 U.S.C. § 1782 are the exception, not the norm:

> Generally speaking, the English Court does not exercise control over the manner in which litigants choose to obtain the evidence which they need to support their case: see the speech of Lord Brandon or Oakbrook in *South Carolina Co. v Assurantie Maatschappij 'De Zeven' Provincien N.V.* [1987] 1 AC 24 at 41G-42C.  It is true that on occasion the English Court has said 'No thank you' in respect of such proffered assistance, and granted an injunction to restrain such orders being obtained or worked through: see for example *Bankers Trust International v PT Dharmala Sakti Sejahtera* [1996] C.L.C. 252; *Omega Group Holdings Ltd v Kozeny* [2002] CLC 132.  It has done so, however, where the procedure was likely to burden English proceedings with excessive or unnecessary disclosure or pre-trial depositions.

A true and correct copy of the decision in *Royal Bank of Scotland* is attached hereto as Exhibit 41.

70.     I hereby confirm that the instant 1782 Petition is not an attempt to circumvent evidence-gathering restrictions in or policies of the English Court adjudicating the English Proceeding.  I have no reason to believe that the English Court adjudicating the English Proceeding would object to the discovery sought from Mr. Simpson.

71.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: December 5, 2019
          London, United Kingdom

_____
                         Justin Michaelson