# Exhibit 1

Claim No. BL-2019-001955

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>BUSINESS & PROPERTY COURTS OF ENGLAND & WALES</u>

<u>BUSINESS LIST (ChD)</u>

B E T W E E N :

EURASIAN NATURAL RESOURCES CORPORATION LIMITED

<u>Claimant</u>

- and -

MARK HOLLINGSWORTH

<u>Defendant</u>

PARTICULARS OF CLAIM

## A. PARTIES

### (i) The Claimant

1.      The Claimant is a private limited company incorporated in England (Company Number 06023510) with its registered office address at 8th Floor, 20 Farringdon Street, London, EC4A 4AB. At all material times, the Claimant was the parent company of a diversified natural resources group consisting of numerous subsidiaries and associated entities operating on an international scale (collectively the **"ENRC Group"**). In addition to extensive mining interests which are operated in Kazakhstan and Africa, the ENRC Group also maintains substantial integrated energy, processing and logistics operations.

2.      Between 12 December 2007 and 25 November 2013 (when it was delisted), shares in the Claimant (then a public limited company) were admitted to trading on the Main Market of the London Stock Exchange. The Claimant was a constituent of the FTSE 100 from 12 March 2008.

3.      The ultimate majority owners of the ENRC Group are three businessmen and investors, with connections to Kazakhstan: Alexander Mashkevich, Patokh Chodiev and Alijan Ibragimov. During the time when shares in the Claimant were publicly traded, Messrs Mashkevich, Chodiev and Ibragimov held collectively the largest minority shareholding in the Claimant (the Claimant's and ENRC Group's **"ultimate owners"**).

4.      The Claimant is and was at all material times the owner of, or otherwise has a responsibility to protect, information of a confidential character, the known sources and nature of which is more fully described in Sections C and D below, concerning:

(a)      Its business activities, internal affairs, management and ownership;

    (b)    The business activities, internal affairs, management and ownership of companies within the ENRC Group.

**(ii) The Defendant**

5.    The Defendant, Mark Hollingsworth, is a self-described freelance journalist who is and was at all material times a London-based 'intermediary' (*i.e.* a conduit or trader who acquires and sells confidential and sensitive information within the private intelligence community).  For at least the past 15 years, he has relied on work in the private intelligence field as his principal source of income and a focus of that work has been Kazakhstan.

**B. SUMMARY**

6.    As set out below,[1] from at least 2010 onwards, the Defendant (in his role as a professional intermediary) conspired with a series of third parties in order to acquire, trade and disclose confidential and privileged information belonging to the Claimant. As the Defendant well knew, that information had been unlawfully misappropriated from the Claimant, including as a result of it having been:

    (a)    Unlawfully obtained from the Claimant's IT systems;

    (b)    Disclosed in highly irregular and improper *"off-the-record"* briefings which the Defendant regularly held on a covert basis with senior officials in the Serious Fraud Office (the **"SFO"**);

    (c)    Deliberately leaked by an individual who wanted to create a pretext for the SFO to intervene in the Claimant's business and affairs, notwithstanding that such intervention was unwarranted. The individual responsible was Neil Gerrard, a partner at Dechert LLP (**"Dechert"**), the law firm overseeing an Internal Review (as defined in Paragraph **11(a)(ii) PoC**, below) that was being carried out on behalf of the Claimant at the time, in an attempt to expand the scope of his firm's retainer, and increase the fees which he and his firm were able to charge the Claimant.

7.    As the Defendant also well knew, a main aim of many of the third parties to whom he disclosed this confidential and privileged information was to use it in order to inflict serious damage on the Claimant's business, share price and reputation.

8.    The third parties to which the Defendant sold, traded or otherwise disclosed the Claimant's confidential and privileged information included the following:

    (a)    The SFO, which announced that it had opened a formal investigation into the Claimant on 25 April 2013 (the **"Investigation"**), having previously been in communication with the Claimant in relation to the latter's own Internal Review (as defined in Paragraph **11(a)(ii) PoC**, below). The Claimant has brought separate proceedings against the SFO (Claim No. BL-2019-000613) on the basis that its conduct of the Investigation and during its earlier engagement with the Claimant in connection with the Internal Review *inter alia* involved wholesale contraventions of its statutory powers and public duties such as to amount to misfeasance in public office; and that it unlawfully induced or procured Mr Gerrard and Dechert to breach their contractual and fiduciary duties by way of at least 26

---

[1]    In these Particulars of Claim and its Annexes, references to the numbered paragraphs within the main body of the Particulars of Claim are in the format 'Paragraph # PoC'. References to numbered paragraphs within the Annexes identify both the number of the paragraph within that Annex and the identifier for the Annex itself.  For instance, a reference to the first numbered paragraph within Annex 1 would be in the format 'Paragraph **1 Annex A.1**'.

unauthorised contacts with Mr Gerrard, in the course of which he disclosed sensitive and privileged information to the SFO.

    (i)   The Defendant played an important role in the latter enterprise, arranging for confidential and privileged documents to be leaked to a journalist at *The Times* in or around August 2011 in the circumstances described in Paragraphs **17-18 PoC** below, giving effect to part of the scheme devised by Mr Gerrard to create a pretext for the SFO to engage with the Claimant, notwithstanding that the SFO's Chief Investigator had previously concluded that such a step was not warranted.

    (ii)   Moreover, since 2012, the Defendant has been part of an illicit two-way exchange of information with the SFO, which involved him surreptitiously disclosing further unlawfully obtained, confidential and privileged information belonging to the Claimant to senior SFO investigators in an attempt to sustain and prolong the SFO's engagement with the Claimant, to the advantage of his clients and those of his associates.  In return, senior SFO investigators have unlawfully leaked highly sensitive and confidential information about the progress of their Investigation, and the Claimant's communications and interaction with it, to the Defendant.  It is inferred that they did so in the knowledge that the Defendant would then further disseminate that information to other interested parties, including to his contacts in the media, and thereby cause damage to the Claimant.

(b)   A large number of other 'intermediaries' and private intelligence firms whose own clients had commercial, political and/or legal reasons to seek to damage the Claimant's business, including by deploying the said confidential information and documents in selective and misleading ways.  Those clients are known, or suspected, to have included:

    (i)   Commercial rivals of the Claimant, including those engaged in ongoing legal disputes with the Claimant and its related companies, who it is inferred used the said confidential and privileged information both to inform their own position in respect of relevant proceedings and also to undermine the Claimant's negotiating position, including by leaking partial and misleading parts of that information into the public domain.  In each case, the ultimate goal was to exert pressure on the Claimant to compromise the underlying litigation on unfavourable terms in an attempt to stem the damage caused by such adverse publicity to its business and the associated damage to its reputation. In this regard, in the circumstances further described in Annex **A.1**, in late-2011 the Claimant ultimately agreed to pay some $1.25bn to settle a dispute with the Anglo-Canadian mining company, First Quantum Minerals Limited (**"FQM"**), following a campaign of sustained and illegitimate pressure instigated by the latter.

    (ii)   Hedge funds and other financial investment firms, who it is inferred sought to acquire confidential information about the Claimant and its ultimate owners with a view to profiting financially from the same, including by leaking selected and misleading information with a view to inducing a sharp decline in the Claimant's share price (having previously taken positions which reflected the likely impact of such public disclosures).

9.    In return for his part in these disclosures, the Defendant acquired substantial financial rewards, which are likely to have amounted to tens of thousands of pounds.

10.    Pending disclosure and the provision of further information in this action, the Claimant does not know and cannot particularise (a) the full extent or precise nature of the confidential and privileged information which the Defendant was able to obtain in respect of its affairs;  (b) the use to which he, and those to whom he disclosed it, subsequently put the same; (c) the full extent of the benefits which the Defendant, and those with whom he collaborated, were able to acquire from the illegal trade in the Claimant's confidential and privileged information; or (d) the nature and extent of the damage which the Defendant's disclosures have caused to its business. Notwithstanding these constraints, the best particulars which the Claimant can presently give as to the confidential information which the Defendant has misappropriated and misused are as set out in Sections C, D and E below and the accompanying Annexes to these Particulars of Claim.

## C.   THE DEFENDANT'S MISAPPROPRIATION OF THE CLAIMANT'S CONFIDENTIAL INFORMATION

11.    The Defendant relied on several sources in order to obtain confidential information belonging to the Claimant and/or relating to its affairs, including in particular:

(a)    Robert Trevelyan, a computer forensics expert, who:

(i)    Was engaged, periodically, on behalf of the Claimant to undertake IT projects, in the course of which he had access to its IT systems and servers, and provided ENRC Confidential and Privileged Information to the Defendant as set out at Paragraphs **12-16 PoC** below.

(ii)   Acted as a conduit, passing on documents and information that had been leaked by Mr Gerrard. The latter was originally a partner of DLA Piper UK LLP (**"DLA Piper"**), which was instructed by the Claimant to advise in relation to issues arising from an anonymous whistle-blowing email (**"the 2010 Whistle-Blowing Email"**) which the Claimant had received in relation to one of its indirect subsidiaries, JSC Sokolov-Sarybai Mining Production Association (**"SSGPO"**). The Claimant subsequently instigated an internal review, to be overseen by Mr Gerrard and DLA Piper, into the allegations made in the 2010 Whistle-Blowing Email, along with two further discrete issues identified by the Claimant's internal affairs department and auditors (the **"Internal Review"**). The retainer to advise the Claimant moved with Mr Gerrard when he left DLA Piper in acrimonious circumstances to join Dechert in April 2011 (the **"Retainer"**). The Retainer was terminated by the Claimant on 27 March 2013.

(b)    Other 'intermediaries' in the private intelligence sector who, like the Defendant, acquire, disclose and trade confidential information for financial, personal and political gain and with whom the Defendant had longstanding and mutually beneficial professional relationships.

(c)    Senior sources, who the Defendant cultivated within the SFO and who leaked confidential information and documents relating to the Claimant's affairs and its interactions with the SFO in connection with the Internal Review and/or the ensuing Investigation to the Defendant as part of a mutually beneficial exchange of information (as to which Paragraphs **22-23 PoC**, below, are repeated).

**(i) Acquisition of information from Robert Trevelyan**

12.    Between approximately 2007 and 2012, Mr Trevelyan was periodically engaged by Bridge2 Limited (**"Bridge2"**), an IT and security consultancy, to conduct a number of IT and forensic data collection projects on behalf of the Claimant. Mr Trevelyan primarily provided his services through a company (**"Cyntel"**),

which he founded in mid-2008. In each case, Mr Trevelyan was granted access to the Claimant's premises and/or IT systems (or parts thereof) for this work and, in some instances, was permitted to make copies of certain data stored within those IT systems for the limited purposes of carrying out testing or other analysis.

(a)    In or around 2007, Mr Trevelyan was engaged to conduct a security penetration test ('pentest') on the Claimant's IT systems in order to identify security weaknesses.

(b)    Also in or around 2007, Mr Trevelyan and his colleagues conducted a search of employees' desks in the Claimant's London office premises in the course of which Mr Trevelyan made a copy of the contents of an external hard drive found on the desk of the personal assistant to a member of the Claimant's senior management. The hard drive contained approximately 40,000 files, including around 13,000 of the Claimant's internal emails from around the time of its IPO (the **"PA Data"**).

(c)    In or around 2008, Mr Trevelyan was engaged to investigate the suspected misappropriation of the Claimant's electronic data by two former employees of the Claimant's IT department, shortly after they left the Claimant to join a competitor (the **"IT Employee Data"**). It is suspected that Mr Trevelyan and Cyntel retained some of the IT Employee Data after the relevant project concluded.

(d)    From January 2011 onwards, Mr Trevelyan and Cyntel were engaged to assist with the collection of data for the purposes of the Internal Review. To this end:

(i)    In January 2011, Cyntel carried out the forensic imaging of computer servers in the Claimant's London and Zurich office premises;

(ii)    On 31 May 2011, Mr Trevelyan travelled to Kazakhstan with Mr Gerrard, where Mr Trevelyan and a colleague undertook the forensic imaging of a further 58 desktop computers used by employees of SSGPO;

(iii)    In 2011 or 2012, Cyntel repeated the imaging of the Claimant's London and Zurich servers, to address deficiencies in the January 2011 data collection process, which had resulted in 'archived' data being omitted.

The information and documents accessed and obtained by Mr Trevelyan and Cyntel from these collection exercises (the **"Review Data"**) totalled some 15TB of data prior to being processed. It was subsequently uploaded on to an e-discovery platform and made available to the Claimant's legal counsel in connection with the Internal Review.

(e)    From November 2011, Mr Trevelyan and Cyntel were engaged to assist the Claimant with an internal audit (**"the Audit"**) relating to a forensic investigation into allegations regarding misappropriation of funds. In the course of this work, Cyntel employed local agents to make forensic images of a large number of USB hard drives in the Claimant's office premises in Moscow, Russia (the **"Audit Data"**).

13.    In each case, without the Claimant's knowledge or authorisation, Mr Trevelyan retained a copy of the PA Data, the IT Employee Data, the Audit Data and the Review Data, or parts thereof (collectively, the **"ENRC Dataset"**) after his work on the mandates in question had come to an end.

*The Defendant's relationship with Mr Trevelyan*

14.     Mr Trevelyan first met the Defendant in or around early 2009 when the latter sought Mr Trevelyan's help to 'clean' his online profile by preventing information and websites which painted the Defendant in a negative light from appearing in online search engine results.  The pair quickly became close professional associates and regularly discussed the nature of their work with one another, including instances where that work overlapped.  A particular focus of their discussions centred on their longstanding interests in respect of the Claimant and Kazakhstan.

15.     The Defendant was aware of Mr Trevelyan's notable expertise in the field of IT and communications forensics at all material times.  Moreover, in the course of their discussions (if not before), he also became aware of the nature of the various IT projects which Mr Trevelyan had undertaken, or was still undertaking, on behalf of the Claimant and the fact that Mr Trevelyan had ongoing access to confidential documents and information belonging to the Claimant as a consequence of that work (including the extracted material which ultimately constituted the ENRC Dataset).

16.     From at least 2010 onwards, the Defendant:

    (a)     Regularly met and liaised with Mr Trevelyan in connection with projects which he was undertaking on behalf of clients and/or prospective clients and/or other intermediaries;

    (b)     Asked Mr Trevelyan to search the ENRC Dataset and/or otherwise to exploit his mandated access to the Claimant's IT systems and employees in order to obtain information and documents about the affairs of the Claimant and its subsidiaries, including by way of keyword searches, which were then disclosed to those clients and/or other third parties;

    (c)     Exploited Mr Trevelyan's working relationship with the Claimant and its professional advisors in connection with the Internal Review, the Audit and (ultimately) the SFO's formal Investigation, in order to obtain information about the Claimant's engagement and dealings with the SFO and the status of the Investigation.

**(ii) Acquisition of information from Neil Gerrard**

17.     In about July 2011:

    (a)     The SFO's Chief Investigator, Keith McCarthy, was tasked by Richard Alderman, the then Director of the SFO, with reviewing material and intelligence which the SFO held about the Claimant, including apparently certain statutory 'suspicious activity reports' ("**SARs**") which had been filed by the Claimant and its professional advisors in accordance with the Proceeds of Crime Act 2002 in connection with certain corporate transactions in 2009 and 2010.

    (b)     Simultaneously, Mr Gerrard (who was a long-term associate of Mr Alderman) was exerting ever increasing pressure on the Claimant to expand the scope of its Internal Review, including in particular into the Claimant's assets and operations in Africa.  By so doing, Mr Gerrard, who had recently moved firms, hoped that he and his new firm would benefit from the very substantial fees which he hoped to generate from a more wide-ranging investigation.

(c)     By the end of July 2011, Mr McCarthy had reported to Mr Alderman that the reviewed material did not provide a sufficient basis to justify opening a criminal investigation into the Claimant under the SFO's statutory powers.

18.    At or around the same time, Mr Gerrard made contact with Cameron Findlay, a business and security consultant at Bridge2, who was working with Dechert for the Claimant.  Mr Gerrard informed Mr Findlay that he wished to leak sensitive information to the press in order to *"kick start"* an expansion of the scope of the Retainer.  In this regard, Mr Gerrard hoped that this leak would create a pretext for the SFO to intervene in the Internal Review, thereby further increasing his ability to generate fees in respect of his firm's conduct of that process.

(a)     Mr Findlay in turn sought the assistance of Mr Trevelyan.  Mr Trevelyan was aware of the Defendant's past work as a freelance journalist and his ongoing access to press contacts. Accordingly, Mr Trevelyan made contact with the Defendant to discuss whether the Defendant could assist in arranging the leak.

(b)     On both 1 and 4 August 2011, the Defendant met with David Robertson, a journalist employed by *The Times* at the latter's Wapping offices.

(c)     On 9 August 2011, an article was published by Mr Robertson in *The Times* under the headline *"Copper giant calls in outsiders to examine corruption claims."*  This article disclosed *"three external investigations"* which the Claimant was reported to have commissioned in the previous four years and was based on at least the following documents, the existence and contents of which were (save for the first document identified) confidential to the Claimant and, in the case of the second and fourth documents, also legally privileged:

(i)     An *"Investigation Report"* dated 25 September 2007 by Herbert Smith LLP, which was marked *"private and confidential"* and *"Legally Privileged – prepared for the purpose of obtaining legal advice"*;

(ii)    A *"Report on Findings in Relation to SSGPO and AOK"* dated 11 March 2010 by Peters & Peters Solicitors LLP and a firm called Risk Advisory, marked *"Strictly Private & Confidential"* and *"Subject to Legal Professional Privilege"*;

(iii)   The 2010 Whistle-Blowing Email;

(iv)    A letter headed *"SSGPO Investigation Plan"* dated 29 March 2011 from DLA to the Claimant's Audit Committee, marked *"Privileged & Confidential"*,

(collectively the **"2011 Leaked Documents"**).  For the avoidance of doubt, and save insofar as the content of the documents referenced in Paragraphs **(ii)** and **(iv)** above have entered the public domain, those documents remain privileged and no reliance is placed on their substantive content in these proceedings.

(d)     The 2011 Leaked Documents had been provided to Mr Robertson by the Defendant.

(i)     Mr Gerrard orally instructed Mr Findlay to collect a package from the reception of Dechert's offices. Mr Gerrard told Mr Findlay that it would contain the documents he wanted to be leaked

to the press. Mr Findlay went to Dechert's offices and collected a sealed envelope from reception.

(ii) Having collected the envelope, Mr Findlay then met Mr Trevelyan in a park near the Claimant's offices (where he was then working) and gave him the sealed package.

(iii) Mr Trevelyan then passed the unopened envelope to the Defendant, who made copies of the documents which it contained before passing those documents to Mr Robertson.

19. On 10 August 2011, the day immediately after the publication of *The Times* article, the SFO formally wrote to the Claimant, referring to *"recent intelligence and media reports"*. The SFO's letter, which had been prepared with unusual speed and with apparent advance notice of either the 2011 Leaked Documents itself or the substance of the confidential and privileged matters addressed in the 9 August *Times* article, highlighted the SFO's self-reporting guidance and urged the Claimant to consider it carefully when undertaking any internal investigations on this matter.

20. On 19 August 2011, the Claimant responded to the SFO saying that it was very happy to meet and to discuss its governance and compliance programme and its response to the allegations in the press. A meeting was scheduled for 3 October 2011. At the same time, the Retainer was expanded to include Dechert and Mr Gerrard providing advice on the Claimant's response to, and engagement with, the SFO's intervention.

**(iii) Acquisition of data and information from other intermediaries**

21. The Defendant also acquired confidential and privileged information pertaining to the Claimant from a number of other intermediaries in the private intelligence sector who have made lucrative careers from an underground trade in confidential and unlawfully acquired information. In particular, the Defendant exploited longstanding professional and personal relationships with the following intermediaries, whose clients also shared a professional interest in the Claimant's affairs and who were therefore willing to assist the Defendant and/or engage in a mutually beneficial exchange of confidential information:

(a) **Alex Yearsley**, a UK-based 'intermediary' and longstanding personal friend and professional associate of the Defendant, who has worked as a freelance investigator since 2010. As set out in more detail in Annexes **A-D** to these Particulars of Claim, Mr Yearsley worked alongside the Defendant in respect of numerous projects involving the acquisition and trade of the Claimant's confidential and privileged information. For instance:

(i) Mr Yearsley played a central role in helping the Defendant analyse the confidential data and documents which were held on the ENRC Dataset, compiling *"hit lists"* of potentially relevant information, which he and the Defendant could then exploit commercially by approaching clients and contacts with an interest in the Claimant's affairs (approaches which, as Mr Yearsley candidly admitted in one email to the Defendant, involved persuading one client *"to use the dark arts"*).

(ii) In August and September 2011, Mr Yearsley liaised with Mr Simpson to obtain inside information for the Defendant about the confidential circumstances in which an investigation into the Claimant's ultimate owners had been discontinued by the Belgian authorities (see Paragraph **7 Annex B.1**).

(iii)  Mr Yearsley also assisted the Defendant in obtaining confidential information about the SFO's investigation into the Claimant and was intimately involved in the cultivation of covert sources within that organisation (as set out in Paragraph **22 PoC** below).

(b)  **Ake-Jean Qajygeldin** (formerly known as **Akezhan Kazhegeldin**), a former Prime Minister of Kazakhstan who, in addition to being the recipient of confidential information which had been acquired by the Defendant and assisting the Defendant's attempts to sell that information to other interested parties (as set out in Annex **C.1**), was also repeatedly referred to by the Defendant as one of his main *"ENRC sources"*.

(c)  **Glenn Simpson**, a US-based intermediary who, since around 2010 or 2011, has acted as both chief executive and a partner of his own private intelligence firm, Fusion GPS.  In addition to the numerous occasions on which the Defendant disclosed confidential and privileged information relating to the affairs of the Claimant to Mr Simpson and the latter's clients (as set out in Annex **C.2**), the Defendant himself sought such information from Mr Simpson on at least the following occasions:

(i)  Information about the confidential circumstances in which the Belgian investigation referred to in Paragraph **21(a)(ii) PoC** above had been discontinued;

(ii)  On 14 March 2013, the Defendant sought Mr Simpson's assistance in obtaining a copy of a letter which he believed to have been drafted by a senior SFO official to the Claimant's Chief Executive and in which the Claimant was warned that the SFO now intended to launch a formal investigation.  The Defendant sought to acquire that letter in order *inter alia* to leak it to a journalist at the *Financial Times* (as to which see Paragraph **23(a) PoC**, below).

(iii)  In April 2013, the Defendant asked for Mr Simpson's assistance in obtaining inside information about the circumstances which had led to the departure of the Claimant's former Chairman, Mehmet Dalman, and for confidential information on a possible US investigation regarding payments which the Claimant was alleged to have made to Alex Stewart International.  In both instances, the Defendant intended to use the information which he received from Mr Simpson for the purposes of an article which he was proposing to write with the *Guardian* journalist, Simon Goodley.

(d)  **Phillip van Niekerk**, the Managing Partner of Calabar Consulting, a private intelligence firm with a particular focus on Africa (including the circumstances set out in Paragraph **5 Annex C.2**).

**(iv) Acquisition of information from the SFO**

*The Defendant's relationship with the SFO*

22.  Throughout the periods which are material to this action, the Defendant (often acting in conjunction with Mr Yearsley) cultivated senior sources within the SFO in order to acquire access to highly sensitive information pertaining to the status and nature of ongoing and contemplated SFO investigations.  In particular, from at least 2012 onwards, the Defendant has been part of a mutually beneficial two-way exchange of information with the SFO, in which he has acted as a conduit for third parties (including his own clients) surreptitiously to feed confidential information and intelligence about the Claimant to the SFO in circumstances where those disclosures could not lawfully be made and/or accepted by the SFO.  In return, and in breach of the clear duties which they owed as public officers, senior SFO investigators disclosed highly sensitive and confidential information to the Defendant about the progress and course of

9

the SFO's investigations and intelligence.  In support of its case in this regard, the Claimant will rely on the following facts and matters in particular:

(a)     In January and February 2012, if not before, the Defendant was in frequent contact with Mr Yearsley and Tony Farries, an ex-SFO investigator, with a view to offering a monthly or bi-monthly *"newsletter"* to a select group of subscribers (including private intelligence companies and law firms who regularly used their services).

   (i)     The express purpose of that proposed newsletter was to provide *"inside"* information to those clients about *"what is happening inside the SFO in every respect"*.

   (ii)    In an email which he sent to Mr Yearsley on 24 January 2012, the Claimant referred to the need to *"draw up a hit-list of customers"* and proposed that they give the newsletter the working title *"SFO Confidential"*.

   (iii)   Mr Farries also contacted another ex-SFO officer, Julian Parker, who he noted had *"ongoing lines of communication"* into the SFO (a mooted expansion of the project which the Defendant subsequently noted meant that the newsletter would *"need some serious money to make it work, because there are four mouths to feed - you, me, Tony* [Farries]*, and his friend"*).

   (iv)    The Defendant and Mr Yearsley also discussed the possibility of expanding the proposed newsletter to cover the CPS and City of London Police, if sources who had just left or who were still serving in those organisations could be identified.

(b)     In an email to Mr Yearsley of 3 April 2012, the Defendant referred to a need to confirm a forthcoming lunch with Simon Goodley, a journalist for *The Guardian*, on the basis that *"I now have an inside track on the SFO and ENRC which should be of interest to him"* (ostensibly a reference to inside information which SFO sources were then providing him about the SFO's current communications with the Claimant about its Internal Review).

(c)     On 17 September 2012, Mr Lyburn emailed Mr Yearsley requesting *"a favour"* about the likely size of what he had wrongly been led to believe was *"the coming ENRC SFO fine"*.  In the context of asking whether the mooted fine *"will be 100's of millions or tens of millions"*, Mr Lyburn pointedly remarked that, *"Perhaps mark* [i.e. the Defendant] *knows something of it?"* (it is inferred because the Defendant had previously advised Mr Lyburn that he could obtain highly sensitive information from sources inside the SFO, including as to the expected course of the SFO's ongoing inquiries).

(d)     On 27 June 2016, the Defendant emailed Mr Yearsley, accepting an offer which the latter had previously made to introduce the Defendant to a new *"SFO contact"*.  Shortly afterwards, on 20 and 21 July 2016, the Defendant emailed two BBC Panorama journalists with whom he was leaking information about a separate SFO investigation into Rolls Royce to inform them that he had persuaded his *"SFO insider"* (it is inferred a reference to the new contact which Mr Yearsley had introduced) to meet at 5.30pm on 21 July 2016.  The Defendant explained that the time was because his source *"leaves the office at 5pm"* and that he would *"find a pub or hotel bar near to Trafalgar Square which hopefully is not too crowded."*

(e)     On 21 February 2017, the Defendant emailed Mr van Niekerk and attached a report which the Defendant noted contained *"new information on the SFO investigation"*.  In the report itself, the

Defendant expressly confirmed that *"I have a new source inside the SFO who briefs me on existing SFO investigations."*

(f)   In an email sent to Mr Goodley the same day, 21 February 2017, the Defendant clarified that his new source at the SFO was *"a senior investigator on their big cases and talks to me off-the-record."*

(g)   On 17 March 2017, the Defendant contacted a New York attorney, Gretchen King, about various matters which had been revealed to him the previous evening by *"my SFO insider"*, commenting that *"if required, I can get an update on SFO investigation"* and also emphasising the two-way nature of this relationship, noting that *"I have a channel to the SFO investigators if you would like to provide information and documents."*

(h)   Further, in or around June 2017, very senior officials within the SFO approached the Defendant with a view to expanding this unlawful arrangement further. In particular, on 8 June 2017, the Defendant was invited to a meeting with three SFO officers: Grant Cherrington, a senior executive at the SFO, another member of the Intelligence Unit of the SFO named *"Vince"*; and the SFO's Head of Disclosure. In emails which the Defendant sent to Gretchen King and another contact, Richard Hynes, later the same day, he acknowledged that the SFO Intelligence Unit act as *"recipients of intelligence which are given on a confidential basis to the case team."* Nonetheless, he boasted that the purpose of the meeting had been *"mainly to establish the terms of reference for my relationship with the SFO."*

(i)   On 10 January 2018, Mr Cherrington belatedly emailed the Defendant, purportedly by way of response to the proposals discussed between himself and the Defendant some 6 months earlier at the 8 June 2017 meeting. Mr Cherrington thanked the Defendant for the *"report which he had provided on Cottage Consultants et al"* (the latter term implicitly acknowledging that the said report had not been confined to information relating to a separate investigation, involving a company named Cottage Consultants, but that it also covered other matters of interest to the SFO). Mr Cherrington also purported to announce that the SFO had concluded that it was not able to enter a regularised arrangement whereby it would provide the Defendant with intelligence and updates about ongoing cases in return for the Defendant's own *"information"* (a hollow response given the substantial information which the Defendant continued to receive from the SFO throughout this period). Instead, Mr Cherrington emphasised that the SFO *"would gratefully appreciate any information you are able to provide"*, explaining that the SFO would classify it as *"Intelligence Only"*, meaning the Defendant's identity as a covert source would never be at risk. The Defendant responded the following day, disingenuously claiming that his request for information had not related to specific cases and that he understood that the *"SFO were governed by strict rules"*. He further offered to provide information which he had *"with no conditions attached"* and invited the SFO to arrange a meeting at which the documents in the Defendant's possession could be handed over. In the circumstances, it is inferred that either:

(i)   The Defendant did indeed proceed to disclose the material which he had in his possession that was relevant to the SFO's ongoing investigations (including ENRC Confidential and Privileged Information in respect of the Claimant); or

(ii)   More probably given the true nature of the Defendant's existing relationship with the organisation, the Defendant had already disclosed the said material to the SFO as part of their mutually beneficial exchange of information and Mr Cherrington's very belated *"reply"* of 10

11

January 2018, more than 6 months after the meeting in question, constituted a retrospective attempt to place the SFO's receipt of documents and information from the Defendant on a superficially legitimate footing.

(j)     On 19 April 2018, the Defendant emailed a contact at the non-governmental organisation Global Witness, Daniel Balint-Kurti, and informed him about his *"inside source at the SFO"* who he stated was *"briefing me off-the-record about their investigation"* into the Claimant.  The Defendant noted that he was *"happy to share all information"* with Mr Balint-Kurti in this regard *"as usual"*.

*The information which the Defendant acquired about the SFO's Investigation into the Claimant*

23.     The Defendant exploited these covert relationships with senior SFO sources in order to acquire highly sensitive and confidential information about the Claimant's interactions with the SFO, including a rolling insight into *inter alia* the status and progress of the SFO's investigation and its ongoing communications with the Claimant and its officers in respect of the same.  By way of example only, the confidential information which it is known that the Defendant unlawfully elicited from SFO officials included that contained or alluded to within the following communications:

(a)     On 14 March 2013, the Defendant emailed Christopher Thompson, a journalist at the *Financial Times*, about a strictly confidential letter which he believed had been written by *"a very senior official"* within the SFO to the Claimant's Chief Executive on 28 or 29 January 2013 and which stated that the SFO intended to launch a formal investigation into the Claimant.  The Defendant noted he had obtained this information from *"a reliable source who saw the letter but could not make a copy."* The origin of this information can only have been an internal SFO source.

(b)     On the morning of 25 April 2013, the Defendant emailed a contact at Global Witness to give him advance notice of the fact that the SFO would be "*releasing a statement today that they are launching an official criminal investigation into ENRC!!"*  The fact of the SFO's Investigation was not made public until after 1pm that day.  It is again inferred that the Defendant's prior knowledge of this information (which was hugely sensitive, not least as it would have an obvious impact on the Claimant's share price) could only have come from an internal SFO source.

(c)     On 1 July 2013, the Defendant emailed Mr Simpson "*a new report on ENRC, Trio and SFO*".  This report contained confidential information about the Claimant and its owners, and their interactions with the ongoing SFO Investigation, much of which the Defendant could only have obtained from a source within the SFO, including:

(i)      Details of sources and witnesses relied on by the SFO for its Investigation;

(ii)     An analysis of *"the Trio and their assets"*.

(d)     On 21 February 2017, the Defendant emailed Mr van Niekerk and attached a report which the Defendant noted contained *"new information on the SFO investigation"*.  In the report itself, the Defendant announced that *"I have a new source inside the SFO who briefs me on existing SFO investigations. Last week he told me that the investigation into ENRC is now "their main priority" and "the next big case".*  The Defendant again went on to relay highly sensitive information about what he had been informed was the current focus of the SFO's Investigation, the identity of cooperating of third-party witnesses, the SFO's assessment of the strength of the evidence, and the Investigation's expected future course.

(e)     On 17 March 2017, the Defendant further updated Mr van Niekerk about the status of the SFO Investigation into the Claimant, reporting that his *"insider source"* had confirmed that the Investigation was *"definitely ongoing"* and *"being taken very seriously."*

(f)     On 20 April 2017, the Defendant emailed Mr van Niekerk to inform him *inter alia* that the SFO had been told that they would be able to use *"the secret Decherts documents which were given to the SFO by ENRC's former lawyers."* The same email also identified the names of individuals associated with the Claimant who were said to be attracting particular focus from the SFO and noted that *"there is more to come"*.

(g)     On 13 June 2017, the Defendant emailed Mr van Niekerk and gave an account of his 8 June 2017 meeting with Mr Cherrington and the two other senior SFO officials.  Again boasting that the primary purpose of the meeting had been to establish the terms of reference for his future relationship with the SFO, the Defendant emphasised to Mr van Niekerk that *"there will be future opportunities for a briefing"* (*i.e.* as to the status of the SFO's investigations) as a result. The Defendant proceeded to disclose the inside information which he had improperly received from the said officials about the direction and focus of the SFO's Investigation into the Claimant, including the SFO's internal assessment of the evidential merits of different parts of the case and its understanding of how any proposed penalty could be enforced against the Claimant.

(h)     On 12 September 2017, the Defendant emailed Marcus Leroux, a journalist at *The Times* who was covering the SFO's Investigation into the Claimant.  The Defendant promised Mr Leroux that he should have *"the inside track on recent developments"* in the SFO's Investigation into the Claimant, including *"who the SFO have been interviewing very recently and the details of those questions"*.

(i)     On 14 September 2017, the Defendant emailed Pierre Gastineau, the Editor-in-Chief of the private intelligence trade website, *Intelligence Online*, with a proposed draft article in which he again revealed confidential details about the SFO's Investigation, including the identity of the individuals who had recently been interviewed and the nature of the questioning which they faced.

(j)     The following day on 15 September 2017, an article was published in the *Evening Standard* under the Defendant's own by-line about the SFO investigation into the Claimant.  That article reported the private fact that Mr Mashkevich had been one of the individuals who had been questioned by the SFO.

(k)     On 20 September 2017, the Defendant exchanged emails with Marc Champion, a reporter for *Bloomberg* about an article which the latter was proposing to write on Mr Mashkevich. In the course of offering to sell Mr Champion a selection of confidential documents and information relating to the Claimant for £1,200, he also promised to disclose details of the SFO Investigation *"and how it implicates AM* [*i.e.* Mr Mashkevich] (again intelligence which it is inferred could only have been provided by an SFO source). On the same day, the Defendant contacted the Guardian journalist, Rob Evans, to inform him that he had just spoken to his SFO source, who had revealed that two new Kazakh witnesses who had agreed to testify for the purpose of the SFO Investigation into the Claimant (the identities of which the Defendant disclosed to Mr Evans).

(l)     On 23 October 2017, the Defendant again emailed Mr Champion, disclosing further highly sensitive information about the dates on which Mr Mashkevich had been interviewed by the SFO, the focus of the questioning which he faced, and the identity of his lawyers.

(m) On 27 November 2017 the Defendant emailed an investigative journalist, Christian Eriksson, in order to relay confidential information which he had received from his SFO source relating to the principal targets and current focus of the SFO's Investigation into the Claimant. The Defendant sent a further email to the same journalist on 29 November 2017, noting that he would be speaking to his SFO contact that Friday, 1 December 2017 (it is inferred in connection with the SFO Investigation into the Claimant which was clearly of interest to the journalist).

## D. THE CONFIDENTIAL NATURE OF THE INFORMATION OBTAINED BY THE DEFENDANT AND HIS AWARENESS OF THE SAME

24. Notwithstanding the constraints referred to at Paragraph **10 PoC** above, it is evident that a very substantial proportion of the information and material obtained by the Defendant as described in Paragraphs **11-23 PoC** above would have contained confidential and, in some instances, legally privileged information belonging to the Claimant and/or relating to its affairs and those of its subsidiaries and affiliates within the ENRC Group, which the Claimant was under a duty to protect (**"ENRC Confidential and Privileged Information"**). Further, the Defendant (or a reasonable person in his position) must have known the same and appreciated that he was under an equitable duty to maintain the confidence in that information and not to misuse it.

25. In support of its case that the ENRC Confidential and Privileged Information had the necessary quality of confidence and was imparted in circumstances which imposed an equitable duty of confidence on the Defendant, the Claimant will rely on the following facts and matters:

(a) By virtue of the sources from which it was acquired, the ENRC Dataset (and the information and documents which were obtained from it) would necessarily have been comprised of information contained in data and documents of an inherently confidential nature, including:

(i) Internal emails and communications between officers, employees and agents of the Claimant;

(ii) Personal emails of the Claimant's employees and officers;

(iii) External emails and communications between officers, employees and agents of the Claimant and third-parties, including the Claimant's business associates (such as its suppliers, customers, contractors, prospective and actual business partners), banks and professional advisors (including its lawyers, accountants, auditors);

(iv) Electronic documents in various formats (such as word processing files, .PDF documents, spreadsheets, presentations, images, *etc*), concerning sensitive commercial, financial and management data about the business affairs and transactions of the Claimant and its subsidiaries. By way of example only, these documents would likely have included:

- Financial statements, records and agreements;
- Business analysis and strategy reports;
- Internal memos;
- Internal audits;
- Due diligence and compliance reports;
- Documents generated in respect of existing and prospective transactions, purchases and sales;

- Minutes and records of board meetings and communications;
- Communications with relevant regulators;
- Documents generated in the course of ongoing or anticipated legal proceedings and/or containing legal advice received by the Claimant from its legal advisors, including in respect of internal and external investigations into its affairs.

(b)  The data which constituted the ENRC Dataset was stored securely on the Claimant's premises and IT systems and could not lawfully be accessed, except by persons authorised by the Claimant. Even amongst ENRC Group employees and officers, such persons were only able to access a subset of the material comprised in the ENRC Dataset, relevant to their respective roles - for instance, their own corporate email accounts, their computers' local hard disks, and portions of certain shared drives.

(c)  Mr Trevelyan's retention and continued use of the ENRC Dataset after his mandated work was completed was manifestly improper and unauthorised, a fact which would have been obvious to any reasonable person. The Defendant therefore knew that the vast majority of the documents and information which he received from Mr Trevelyan had been obtained unlawfully, including in breach of the terms of Mr Trevelyan's engagements with the Claimant. On at least one occasion (see Paragraph **3(b) Annex B.1**), the Defendant expressly referred to the problems which might arise as a result of the *"provenance"* of such material.

(d)  The overwhelming majority of the documents and information which the Defendant is known to have acquired, including from the ENRC Dataset, were not publicly available (a reality which is apparent from the lengths which the Defendant was prepared to go in order to acquire access to them as described above).

(e)  It is evident that much of the information which the Defendant acquired about the Claimant was of an intrinsically confidential nature.  For instance, information about the Claimant's internal business and communications, including details of private communications between members of its Board, its officers and employees; its interactions with its professional advisors; and the nature and course of internal and external investigations and reports which it had commissioned into aspects of its operations and business practices, constituted sensitive information which the Claimant could reasonably expect to be kept confidential by those privy to it and not to be divulged or disclosed to third parties.

(f)  Similarly, information about the Claimant which the SFO acquired and analysed during the course of its investigation into the company, and details of communications and interactions between the Claimant and the SFO in that context, constituted information which the SFO was not lawfully entitled to disclose to third parties, a reality which the Defendant would also have understood and appreciated.

(g)  The reports which had been prepared by the Claimant's legal advisors, including several which constituted part of the 2011 Leaked Documents were manifestly confidential and privileged when they were created and, as the Defendant would immediately have noticed, were marked as such. Two of those reports remain privileged today.

(h)  A central rationale of the Defendant's respective intermediary businesses lay in his willingness and ability to secure access to information which would otherwise be unavailable to his clients through

legitimate investigations and public domain searches. On numerous occasions (set out further in Section E below and the Annexes to these Particulars of Claim), the Defendant sought to encourage interest from clients and prospective clients by expressly referring or otherwise alluding to the sensitive and/or confidential nature of documents to which he had access or could obtain (presumably because he recognised that such information was what those clients were hoping to acquire).

(i)     The confidential nature of the information, and the fact that it was unavailable through other channels, is further evidenced by its substantial monetary value to the Defendant and its commercial value to its ultimate recipients who were willing to pay for its acquisition (including those evidenced in Annexes **A-C**).

(j)     Further, given the nature and subject matter of many of the documents and information which the Defendant obtained and disclosed (including documents which related to legal proceedings involving the Claimant or which concerned legal advice which it had received), it is reasonably inferred that a substantial proportion of the said documents included information belonging to the Claimant which was subject to legal professional privilege (thereby attracting obligations of confidentiality of the highest order and the strictest protections against unauthorised use).

(k)     The Defendant took measures to ensure that his acquisition and use of information and documents about the Claimant, including that obtained from Mr Trevelyan, remained covert.  Such measures would have been wholly unnecessary if he had not appreciated the sensitive, confidential and unlawful status of the information in question. Again by way of example:

(i)     The Defendant dealt with Mr Trevelyan personally, rather than through his company, Cyntel, and its other employees;

(ii)    The Defendant and Mr Trevelyan generally avoided communicating by means (including email) which would create a permanent record of their interactions.  Where written communications did take place, they tended to refer to ongoing projects in opaque or general terms;

(iii)   Mr Trevelyan set up 'anonymised' webmail accounts for the purpose of communicating with the Defendant about their projects, separate from the email addresses that he used for his ordinary personal and business dealings.   These included earthakitts@gmail.com and bennevis10@googlemail.com;

(iv)    Agreements which the Defendant entered into with clients and other intermediaries to exchange information and documents were frequently stipulated to be *"covert"*, *"off-the-record"* or *"secret"*;

(v)     The Defendant used pseudonyms to refer to Mr Trevelyan (including *"our friend"*, *"Magic"* and *"Genius"*), particularly when discussing obtaining documents via him from the ENRC Dataset;

(vi)    Documents which Mr Trevelyan provided to the Defendant were normally printed out, or copied onto a hard disk, USB Flash drive or other electronic storage medium and handed over in person, rather than transferred electronically, to lessen the risk of them being traced;

(vii)   On occasions, the Defendant expressly warned his contacts and clients to be careful about how they deployed the information which he was providing because of what he described various as its *"highly sensitive"* or *"hot"* nature or because they were *"valuable"*.

(l)     The Defendant also took particular care to avoid disclosing information to his SFO sources in a manner which would identify them, relying almost exclusively on physical meetings to hand over documents and keeping email communications with those officials to a minimum. For instance:

(i)     When the Defendant sought to pass a copy of a SAR filed on behalf of the Claimant with the Serious and Organised Crime Agency ("SOCA") to one of his SFO sources (a former senior officer, Tony Farries), he warned Mr Yearsley on 17 January 2012 that he should *"not distribute this document to anyone except to your ex-SFO mate Tony and actually I would prefer to show it to him rather than send by e-mail but we can discuss. This is a valuable doc and so we need to keep it tight. However, I am happy to meet Tony and review it and talk about the SFO generally. Please arrange a meeting for when it suits both of you."*

(ii)    Information which internal SFO sources disclosed to the Defendant were made on a strictly non-attributable basis, a fact which the Defendant emphasised to his clients and contacts on numerous occasions, including in an email to the *Guardian* journalist, Simon Goodley, on 21 February 2017 in which the Defendant referred to having *"been developing a new source at the SFO who is a senior investigator on their big cases and talks to me off-the-record."*

(m)    The Defendant was equally well aware that the information he received from his SFO sources was highly sensitive and that, in passing it to him, the SFO officers were acting in flagrant breach of their public duties. For instance:

(i)     In an email of 14 March 2013 to Christopher Thompson, a *Financial Times* journalist to whom he was leaking confidential information about the status of the SFO's Investigation into the Claimant, the Defendant emphasised that *"nobody else has my news story on the SFO investigation"* and referred to a strictly confidential letter which he believed had been written by *"a very senior official"* within the SFO to the Claimant's Chief Executive, noting that *"this comes from a reliable source who saw the letter but could not make a copy".*

(ii)    In a similar vein, the Defendant explained to another journalist with whom he was collaborating, Christian Eriksson, on 17 May 2017 that: *"I will not know about docs until I meet my source. It has been hard enough to get an SFO insider to talk off-the-record and so to get documents about a current investigation is very ambitious but not impossible."*

(iii)   In a number of emails which he sent to his contacts on 13 June 2017, the Defendant characterised a meeting which he had recently had with *"two officials from the Intelligence Unit of the UK Serious Fraud Office and its Head of Disclosure"* as *"strictly off-the-record"*, acknowledging the acute sensitivity of his contact with officials who *"act as recipients of intelligence which are given on a confidential basis to the case team."*

## E. BREACH OF CONFIDENCE / MISUSE OF CONFIDENTIAL INFORMATION

26.    In the circumstances, the Defendant was and remains under a duty of confidence towards the Claimant in respect of the ENRC Confidential and Privileged Information, and each part thereof, and was not entitled to receive, access or otherwise use or disclose the same.

27.    In breach of the said obligations of confidence, the Defendant misused ENRC Confidential and Privileged Information by:

(a)   Obtaining and/or facilitating the acquisition and disclosure of ENRC Confidential and Privileged Information without the Claimant's authorisation and despite knowing that the Claimant reasonably expected such material to be confidential (as set out in Paragraphs **24-25 PoC** above).

(b)   Using the ENRC Confidential and Privileged Information to inform his own investigations and to identify and explore new professional opportunities and to solicit further work and clients (as to which see  the various approaches and "*proposals*" which the Defendant made to potential clients in Annexes **A-C** having collated potentially relevant documents and information).

(c)   Further using ENRC Confidential and Privileged Information by disclosing it to various associates, clients, prospective clients and other third parties, including in order to obtain personal and/or financial gain for himself and/or those third parties and/or to cause substantial damage to the Claimant and its ultimate owners.

28.   In this regard, as is evident in the specific examples given in Annexes **A-D** to these Particulars of Claim, the Defendant's provision of documents and information (including ENRC Confidential and Privileged Information) to third parties generally followed the following pattern:

(a)   Either: (i) the third party would approach the Defendant, in light of his reputation as an 'intermediary' who traded in confidential information, to enquire whether the Defendant was able to obtain documents or information relating to a particular issue concerning the Claimant and/or its ultimate owners; or (ii) the Defendant, in light of their past dealings, would unilaterally approach the third party, indicate that he was in possession of new documents or information relating to the Claimant and enquire whether contact or their client had an interest in acquiring them or it.

(b)   In almost all cases, the approach by the Defendant or third party was initiated by an email or telephone call.  On occasions, these initial communications were followed by a meeting at which the Defendant and representatives of the third party would discuss the third party's requirements and/or the material the Defendant was offering for sale.

(c)   A budget for a commissioned 'project' would usually be agreed between the Defendant and the third party in advance, the extent of which would depend *inter alia* on the sensitivity of the confidential and secret information being disclosed and its perceived value to the third party, but which could involve payments totalling many thousands of pounds.

(d)   In the case of requests or offers concerning documents or information relating to the Claimant, the Defendant would (in addition to consulting the documents and information which he had already acquired in the course of previous projects for other clients) also typically approach:

(i)   Mr Trevelyan in order to ask him to search the ENRC Dataset for specific matters, using keywords or other search parameters proposed by the third party or else otherwise formulated by the Defendant himself;

(ii)   Other intermediaries, including the individuals referred to at Paragraph **21 PoC** above.

(e)   The Defendant would usually then copy the documents which he had received or acquired and: (i) contact the third party to arrange a further meeting to hand over the material in question; and/or (ii) use the information contained within these documents to prepare a written report or memorandum (often with an invitation to provide the underlying documents if requested).

(f)     The Defendant typically issued an invoice to the third party a few days later. Where applicable, the Defendant would transfer a proportion of that payment to Mr Trevelyan and/or Mr Yearsley where they acted as the source of the information or documents or were otherwise collaborating on the relevant project.

29.     Again, the Claimant is unable fully to particularise the precise nature and scope of the ENRC Confidential and Privileged Information which the Defendant acquired from his sources or the manner and extent to which he further disclosed or has otherwise misused the same, pending disclosure in this action.  However, it is apparent that in addition to the disclosures already set out above, the Claimant has further disclosed ENRC Confidential and Privileged Information to at least the following third parties (and, on many occasions, those recipients' clients, prospective clients and/or contacts) and, in so doing, has thereby breached further obligations of confidence which he owed to the Claimant and misused its confidential information:

(a)     **First Quantum Minerals Limited**, the parent company of an Anglo-Canadian mining and metals group (FQM, as defined in Paragraph **8(b)(i)** PoC, above).  In 2011 an affiliate of FQM brought legal proceedings against four British Virgin Islands ("**BVI**") companies (the "**Highwinds Group**") in which the Claimant had recently acquired an interest through the purchase of a stake in the Highwinds Group's parent company, Camrose Resources Limited ("**Camrose**").  At the time of that acquisition, the Highwinds Group was the owner of mining rights in the Democratic Republic of the Congo ("**DRC**"), including the Kolwezi Tailings Project which had previously been controlled by FQM but which the Government of the DRC had revoked for alleged unreasonable behaviour on FQM's part.  FQM contended that the Government of the DRC had unlawfully expropriated those interests, before re-selling them to the party from whom the Claimant acquired its interest.

(i)     As further set out in Annex **A.1**, following the announcement of those legal proceedings in September 2010, the Defendant began regularly to communicate with Mr Yearsley and Mr Trevelyan with a view to identifying *"hit lists"* of information, which they knew was or suspected might be contained within the ENRC Dataset and which they considered FQM might be able to deploy to further its interests in connection with the dispute. By February 2011, the Defendant and Mr Yearsley had identified more than 8,000 such documents (including private emails; internal policy and strategy documents; loan documents; contracts; communications with the Claimant's banks and financial advisors; and various legal instruments relating to the affairs of the Claimant and its ultimate owners).

(ii)    The Defendant and Mr Yearsley initially intended directly to approach Clive Newall, FQM's President.  By February 2011, they had succeeded in making contact with FQM's General Counsel, Christopher Lemon, and on 22 February 2011, a meeting was held between Mr Yearsley and Mr Lemon at FQM's offices in London.  The purpose of that meeting was to show Mr Lemon a selection of sample copy documents from the ENRC Dataset and to discuss a commercial arrangement for the provision of further ENRC Confidential and Privileged Information to FQM.

(b)     **Nardello & Co. LLP ("Nardello"),** a UK-based private intelligence firm who were acting on behalf of FQM in relation to the dispute described in Paragraph **29(a)** PoC, above, in 2011.

(i)     As further set out in Annex **A.1**, following their meeting with Mr Lemon on 22 February 2011, the Defendant and Mr Yearsley were invited to meet two senior representatives of Nardello, Michael Walsh and Sophie Lamont, the following day at Nardello's Harley Street offices and

again provided a selection of sample copy dociuments.  It is inferred that this meeting was arranged by Mr Lemon in order to avoid FQM being placed in a position where it took direct possession of documents and information relating to the Claimant which all those involved understood were likely to be confidential, privileged and unlawfully obtained.

(ii)  In light of these meetings, the Defendant directed Mr Trevelyan to undertake further searches within the ENRC Dataset with a view to extracting documents that he believed, based on his briefings with Mr Lemon and Nardello, FQM would be able to use against the Claimant, its ultimate owners and other related parties, to further FQM's interests in connection with the aforementioned dispute.    Mr Trevelyan subsequently provided the Defendant and/or Mr Yearsley with a memory stick containing a substantial quantity of extracted information, the contents of which it is inferred they disclosed to FQM and/or Nardello.

(iii)  It is further inferred that elements of the unlawfully acquired information were then also deployed by **Peter Lyburn**, a UK-based political and public relations campaign consultant, who ran a covert media and political lobbying campaign on behalf of FQM which sought to damage the Claimant and undermine its position in settlement negotiations with FQM.  In particular, it is inferred that Mr Lyburn deployed selective and misleading aspects of the ENRC Confidential and Privileged Information to which he had access in order to lobby Members of Parliament in Westminster to advocate against the Claimant's acquisitions in the DRC, including in the context of:

- A letter which was written to Mr Alderman on or around 8 April 2011 (and which was almost immediately leaked to a number of national newspapers), calling on the SFO to open a formal investigation into the Claimant;
- Statements which were made by Members of Parliament in Parliament in February, May, July and December 2011, which sought to draw attention to the FQM Dispute and called on the Government to take action against the Claimant.

(iv)  In all cases the objective of FQM and their agents was to cause damage to and exert illegitimate collateral pressure on the Claimant, its ultimate owners or other related parties (including through use of hostile publicity and political pressure, causing corresponding damage to the Claimant's share price) to induce them to compromise FQM's claims on far better terms than FQM otherwise had any legal right to anticipate.

(v)  Against the backdrop of this sustained campaign, the Claimant ultimately agreed to pay US$1.25b to FQM to settle the said claim in late 2011.

(c)  **FG Hemisphere Associates LLC**, a controversial special purpose vehicle (or 'vulture fund') set up by New York-based investment management firm, FG Capital Management Limited (collectively, **"FG Hemisphere"**), to acquire distressed sovereign debt in the developing world at discounted rates with a view to then enforcing the full value of that debt against state or governmental organisations. Having paid around $3m to acquire the rights to various debts in the DRC, FG Hemisphere commenced legal proceedings in various jurisdictions worldwide, including Jersey, with a view to enforcing the full value of that debt (exceeding $100m) against the DRC Government and the assets of a state-owned mining firm.

(i)   As set out in Annex **A.2**, FG Hemisphere then instigated a covert PR and lobbying operation against the DRC Government, as well as foreign companies such as the Claimant which had acquired interests in the country.  Mr Lyburn, who at this stage was a consultant with CT Group, a corporate strategy and political communications firm, and Mr Yearsley were among the individuals which FG Hemisphere employed in this regard.

(ii)  On 20 April 2012, the Defendant met with Mr Lyburn to discuss confidential information and documents which the Defendant held or could obtain (including from the ENRC Dataset) about relevant issues in the DRC and the Claimant and which might assist Mr Lyburn and FG Hemisphere.

(iii) Following this meeting, the pair agreed to liaise covertly with one another and Mr Yearsley. In this context, the Defendant and Mr Yearsley disclosed a very substantial quantity of ENRC Confidential and Privileged Information to FG Hemisphere and Mr Lyburn for further use in their covert PR and lobbying campaigns.

(iv) In addition, in May 2012, the Defendant and Mr Yearsley also arranged for Mr Lyburn to meet with Mr Farries (it is inferred with a view to allow him and FG Hemisphere to leak selected and misleading parts of the ENRC Confidential and Privileged Information which he had obtained to the SFO and thereby further prolong the latter's investigation into the Claimant).

(d)   **Penumbra Partners ("Penumbra")**, which, until it ceased trading in 2014, was another UK-based private intelligence, firm.  Since 2014, Penumbra's former directors, Charles Webb and Elliot Hall, together with Peter Walker, have continued to offer private intelligence services through their new venture, Hanuman Partners Limited.

(i)   On 21 June 2011, the Defendant and Mr Yearsley met with Mr Webb of Penumbra to *"discuss the magician"* (one of the pseudonyms used by the Defendant and Mr Yearsley to refer to Mr Trevelyan) and, it is inferred, to inquire about whether Penumbra would be interested in particular documents or information relating to the Claimant, which it was intended that Mr Trevelyan would then extract from the ENRC Dataset.

(ii)  As set out in Annex **B.1**, from at least this date onwards, the Defendant (along with Mr Yearsley) maintained a close professional relationship with Mr Webb and a number of individuals at Penumbra, in the course of which they again regularly sold substantial quantities of ENRC Confidential and Privileged Information to Penumbra for use by its clients. That information included:

- *"ENRC shareholder documents"*, which it is inferred Mr Webb asked the Defendant to obtain from Mr Trevelyan at the 21 June 2011 meeting and which were subsequently extracted from the ENRC Dataset in advance of follow-up meetings with Mr Webb on 28 and 29 June 2011, along with what the Defendant referred to in an email to Mr Yearsley of 24 June 2011 as *"other material for us* [the Defendant and Mr Yearsley] *to play with."*
- Further ENRC Confidential and Privileged Information which the Defendant and Mr Yearsley instructed Mr Trevelyan to extract from the *"staggering"* *"ENRC File"* in July and August 2011, in response to search terms which Mr Webb had agreed to provide. In addition to further documents about the Claimant's shareholders, this

information also included documents relating to the transaction by which the Claimant had acquired certain mining rights in the DRC (including, in particular, the contract by which the Claimant had acquired its interest in Camrose).

- The *"historical and contemporary inside track"* on the confidential circumstances in which a Belgium investigation into the Claimant's ultimate owners had been discontinued by the Belgian authorities, as well as information about the affairs and assets of the Claimant's ultimate owners and, in particular, Mr Mashkevich. That information was disclosed following requests made by Penumbra in August and October 2011, a project which the Defendant emphasised that he and Mr Yearsley could expect to *"clean up"* on in light of the extent of ENRC Confidential and Privileged Information to which they had access. In both instances, it is inferred that at least one of Penumbra's ultimate clients was the **Financial Services Authority** (the **"FSA"**, as it then was).

(e)     **G3 Good Governance Group Limited** (commonly known as **"G3"**), a London-based private intelligence firm, with whom the Defendant held a longstanding business relationship and of which Mr Yearsley was a former employee. As further described in Annex **B.2**, the Defendant sold ENRC Confidential and Privileged to representatives of G3, including Charlie Bain and Gunther von Billerbeck in at least August 2011 and the first half of 2013.

(f)     **Mr Kazhelgeldin**, with whom the Defendant regularly shared confidential information about the Claimant in the circumstances described at Paragraph **21(b) PoC** above. As further set out in Annex **C.1**, it is inferred that the Defendant disclosed ENRC Confidential and Privileged Information to Mr Kazhegeldin on a number of occasions, including:

(i)     *"Documents and files"* which the Defendant had instructed Mr Trevelyan to obtain in October 2010 (including, it is inferred, from the ENRC Dataset) about the affairs of the Claimant's ultimate owners. An email from the Defendant to Mr Kazhelgeldin of 26 April 2011 indicates that Mr Kazhelgeldin was actively looking for other third parties who might also have had an interest in these documents and who might be willing to pay the Defendant to receive the same.

(ii)    Highly sensitive information which the Defendant had obtained about the SFO's Investigation of the Claimant in the context of the relationship set out at Paragraphs **22-23 PoC** above (including apparently investigation documents which the SFO had prepared) and which, it is inferred, he passed to Mr Kazhelgeldin in the course of at least May 2012 and July 2013.

(g)     **Mr Simpson**, with whom the Defendant regularly shared confidential information about the Claimant in the circumstances described at Paragraph **21(c) PoC** above.

(i)     Following a number of meetings, emails and calls with Mr Simpson between 21 and 24 July 2011, the Defendant sent an email to Mr Simpson on 28 July 2011 with *"a detailed summary"* of the documents which were available on *"the disc"* that the Defendant and Mr Simpson had discussed in London the previous week (and which the Defendant had previously described as constituting a *"vast archive of docs"* relating to the Claimant). A list of 100 items or topics pertaining to the Claimant and its affairs were set out. That list contained or referred to a large quantity of plainly confidential and privileged information and documents belonging to the Claimant (which it is inferred had been obtained from the ENRC Dataset), including:

- A *"memo detailing assets of ENRC shareholders"* (*i.e.* the Claimant's ultimate owners);
- Letters, emails and communications between current and past employees and members of the Claimant's board;
- Details of the Claimant's bank accounts;
- Loan documents, contracts and communications with the Claimant's banks and financial advisors';
- Internal *"policy"* and *"strategy"* documents;
- Copies of various legal instruments relating to the affairs of the Claimant and its ultimate owners, including powers of attorney and security letters;
- Due diligence reports.

(ii)   As further set out in Annex **C.2**, from at least the date of this email (which the Defendant subsequently reworked into a *"proposal on ENRC"* in an email of 23 August 2011 which was to be sent to a *"prospective client"* of Mr Simpson), the Defendant disclosed large quantities of ENRC Confidential and Privileged Information to Mr Simpson and his clients on a significant number of occasions, including:

- An *"ENRC shopping list"* (*i.e.* an itemised list of ENRC Confidential and Privileged Information which he was willing to sell to Mr Simpson's client) which the Defendant emailed Mr Simpson on 4 October 2011, including documents which were derived from the ENRC Dataset and the 2011 Leaked Documents). In the same email, the Defendant also confirmed that he had *"a complete inside track, including current developments on the board and lots of other juicy material."*
- Documents concerning the Claimant's Chief-Executive, Felix Vulis, which the Defendant informed Mr Simpson in an email of 19 January 2012 that *"our mutual friend Magic"* [*i.e.* Mr Trevelyan] had managed to obtain (it is inferred from the ENRC Dataset and/or from his access to the Claimant's IT systems) and *"which detail his finances and payments he has received from ENRC, his CV and also a copy of his service agreement and employment contract."*
- A July 2012 report that Dechert had submitted to the SFO about the Internal Review, which the Defendant referred to as having been *"leaked"* and *"not in the public domain."*

(h)   **Mr van Niekerk**. As set out in Annex **C.3**, over an extended period from at least 2012 onwards, the Defendant and Mr van Niekerk acted in conjunction with one another in order to obtain and disclose to third parties a substantial volume of documents and information about the Claimant and its ultimate owners (including ENRC Confidential and Privileged Information) at the behest of Mr van Niekerk's clients.

(i)   Regulatory bodies and law enforcement agencies, including in particular:

(i)   **The FSA** (as to which Paragraph **29(d)(ii) PoC** above is repeated);

(ii)   **The SFO** (as to which Paragraphs **22-23 PoC** above are repeated).

(j)    **Journalists and media organisations,** which have published articles containing highly confidential and sensitive information which could only have come from a senior source within the SFO and in respect of which it is inferred that the Defendant acted as a conduit:

   (i)    An article which was published by Bloomberg on 9 September 2016 in which it was reported that an officer of one of the Claimant's divisions had been interviewed by the SFO;

   (ii)   An article headlined *"SFO probes Israeli Billionaire, Ex-ENRC Directors over Congo"* which was published by Bloomberg on 5 December 2016, which referred to a highly confidential letter of request from the SFO to the authorities in the DRC;

   (iii)  An article headlined *"SFO is stepping up its Kazakh miner probe"*, which the Defendant himself authored in the *Evening Standard* on 15 September 2017 and in which he leaked confidential details about the SFO investigation into the Claimant, including the fact that Mr Mashkevich was one of the individuals who had been questioned; and

   (iv)   An article headlined *"ENRC sues UK Fraud Cops as corruption charges loom"* which was again published by Bloomberg on 26 March 2019 and which referred to details of the timing of a charging decision by the SFO and details of the SFO's case theory.

**E.  LOSS AND DAMAGE**

30.    By reason of the matters aforesaid, the Claimant has suffered very substantial loss and damage. The Claimant is unable fully to particularise the nature of the same, pending disclosure and information about the actual nature and extent of the Defendant's misuse of the ENRC Confidential and Privileged Information.

31.    Without prejudice to this, however, the damage and loss sustained by the Claimant will include:

(a)    The costs incurred by the Claimant in investigating the extent, nature and source(s) of the Defendant's breaches of confidence and in attempting to limit the risks and potential liabilities arising as a consequence.  Those costs include:

   (i)    Fees which the Claimant has been forced to incur in instructing its professional and legal advisors to oversee and advise on that investigation;

   (ii)   Lost management time which the Defendant's conduct has caused to the Claimant's business, as a result of its management and employees being forced to engage with and respond to issues arising from that investigation.

(b)    Costs of a similar type and nature which have been incurred by the Claimant in dealing with regulatory bodies, business partners, employees, agents, advisors and third-parties in respect of ENRC Confidential and Privileged Information which has been obtained and/or disclosed by the Defendant.

(c)    The costs and losses occasioned by and associated with dealing with the significant falls in the Claimant's share price that were caused by the Defendant's disclosure of ENRC Confidential and Privileged Information into the public domain (including as to the fact and nature of the SFO's scrutiny and subsequent formal investigation into the Claimant and related parties) and which subsequently

led to the Claimant's delisting from the Main Market of the London Stock Exchange in November 2013;

(d)     The costs and losses occasioned to the Claimant as a result of adverse legal settlements and outcomes which the Claimant was forced to contemplate and agree as a consequence of the Defendant's practice of leaking of ENRC Confidential and Privileged Information to its opponents and/or their agents (see, *e.g.* Paragraph **19 Annex A.1**).

32.    The Claimant is entitled to and claims an inquiry into damage and the payment of equitable compensation in respect of such loss and damage. Alternatively, and at the Claimant's sole discretion, the Claimant claims an account of the profits made by the Defendant and an account of such profits.

33.    Further, and unless restrained by this Court, there is a real prospect that the Defendant will continue to misuse ENRC Confidential and Privileged Information, including by continuing to disclose it to third parties for commercial and/or professional gain.

**AND THE CLAIMANT CLAIMS:**

(1) A declaration that the Defendant misused the Claimant's confidential information;

(2) Damages or equitable compensation for misuse of the Claimant's confidential information (alternatively, at the Claimant's option, an account of profits accruing to the Defendant as a result of that misuse);

(3) An injunction to restrain the Defendant, whether acting directly or indirectly, or by his servants, agents or otherwise howsoever, from communicating or disclosing to any third party, copying, or in any way using the ENRC Confidential and Privileged Information or the documents and data which contain that information;

(4) Delivery up by the Defendant confirmed by a statement of truth of all documents and data (whether in hard copy or electronic form) in his possession containing ENRC Confidential and Privileged Information;

(5) The provision of a list, verified by a Statement of Truth, detailing the documents which the Defendant has, or have has, in his possession or control containing ENRC Confidential and Privileged Information;

(6) Orders for:

(a)    Confirmation, verified by a Statement of Truth, that the Defendant has:

(i)     Ceased using the ENRC Confidential and Privileged Information for any purpose;

(ii)    Deleted any and all the ENRC Confidential and Privileged Information which cannot be subject to the order for delivery up in (4) above.

(b)    Information in the form of a witness statement from the Defendant verified by a Statement of Truth:

(i)     Identifying each and every instance of ENRC Confidential and Privileged Information which he has, or has had, in his possession and control;

(ii)    Setting out the precise time, nature and format in which each and every aspect of the ENRC Confidential and Privileged Information came into his possession; the person(s) who disclosed the same to him (including the identity of the Defendant's sources at the SFO); and the extent to which he remains able to access or otherwise use the relevant instance of ENRC Confidential and Privileged Information;

(iii)    Identifying any agent, employee or servant who accessed or otherwise used the ENRC Confidential and Privileged Information and setting out the time and nature of that access; the parts of the ENRC Confidential and Privileged Information which that person(s) accessed; and the objectives and use to which the same person(s) put the ENRC Confidential and Privileged Information;

(iv)    Identifying each and every third party to whom the Defendant disclosed the ENRC Confidential and Privileged Information, or any part thereof; the time, nature and extent of any such disclosure; and the objectives and use to which such third party put the ENRC Confidential and Privileged Information;

(v)    Setting out the steps taken by the Defendant to preserve the security of the parts of the ENRC Confidential and Privileged Information which have been in his possession and control;

(vi)    Specifying any monetary sums or equivalent rewards which they either paid to acquire the ENRC Confidential and Privileged Information (or any part thereof) and/or which he was paid by others to obtain, use or disclose the same.

(c)   Disclosure and the provision of copies, to the Claimant, of all documents in the Defendant's possession or control, including email and other forms of electronic communication (and including emails sent to or from webmail accounts which he operates or to which he has access), relating to all and any instances where the Defendant or others disclosed ENRC Confidential and Privileged Information to third parties, or where the Defendant permitted such third parties to access ENRC Confidential and Privileged Information.

(7) Such further or other relief or orders as are just in the circumstances.


DAVID GLEN

21 October 2019

**STATEMENT OF TRUTH**

The Claimant believes that the facts stated in these Particulars of Claim are true.

I am duly authorised by the Claimant to sign this Statement.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Felix Vulis

Director, for and on behalf of Eurasian National Resources Corporation Limited

Address for delivery of documents:

Fried, Frank, Harris, Shriver & Jacobson (London) LLP

41 Lothbury

London

EC2R 7HF

UNITED KINGDOM

Attn: Justin Michaelson

Ref: JBM/DKS/5314-1

ANNEX A.1

DISCLOSURES TO FIRST QUANTUM MINERALS LIMITED AND NARDELLO & CO. LLP

1.     As set out below, during 2011, the Defendant, acting together with Mr Yearsley, disclosed ENRC
       Confidential and Privileged Information which he had acquired from Mr Trevelyan, amongst other sources,
       to representatives of: (i) First Quantum Minerals Limited, an Anglo-Canadian mining and metals group
       (**"FQM"**); and (ii) Nardello & Co. LLP, a private intelligence firm that had been engaged by FQM at or around
       that time (**"Nardello"**).

**(i) The dispute between FQM and the Claimant**

2.     In or around mid-2010, a legal dispute arose between FQM and its affiliated companies, on the one part,
       and the Claimant and its related companies, on the other, relating to the circumstances in which certain of
       the Claimant's related companies had acquired interests in a group of four British Virgin Islands (**"BVI"**)
       companies (the **"Highwinds Group"**) through the purchase of a stake in the Highwinds Group's parent
       company, Camrose Resources Limited (**"Camrose"**). At the time of the acquisition, the Highwinds Group
       was the owner of mining rights in the Democratic Republic of the Congo (**"DRC"**), including the Kolwezi
       Tailings Project which had previously been controlled by FQM but which the Government of the DRC had
       revoked for alleged unreasonable behaviour on FQM's part.  FQM contended that the Government of the
       DRC had unlawfully expropriated those interests, before re-selling them to entities associated with the
       Israeli businessman, Dan Gertler, from whom the Claimant's related companies had subsequently acquired
       their interests.

3.     Between September and October 2010, a series of legal actions (collectively the **"FQM Dispute"**) were
       commenced by FQM and its affiliates and were then publicly announced:

       (a)     On or around 15 September 2010, FQM issued a press release titled "*First Quantum Minerals
               Commences Legal Proceedings Against ENRC Subsidiaries*" reporting that FQM had filed claims in
               the High Court of the BVI against the Highwinds Group.

       (b)     On or around 1 October 2010, FQM issued a further press release titled "*First Quantum Minerals
               Launches International Arbitration in Washington Relating to Frontier and Comisa*," which described
               claims made by FQM and its affiliates against the DRC under the arbitration rules of the International
               Centre for the Settlement of Investment Disputes (ICSID).

       (c)     The same press release also referred to an ICC arbitration which FQM had issued against (amongst
               others) the state mining company of the DRC.

**(ii) The Defendant's scheme to sell ENRC Confidential and Privileged Information to FQM**

4.     In the knowledge that there was confidential, highly sensitive and privileged information contained within
       the ENRC Dataset which, in the wrong hands, might be used to damage or otherwise exert pressure on the
       Claimant or its related parties (including its owners), the Defendant deliberately took steps to try to contact
       representatives of FQM, specifically for the purpose of selling such information—which he had obtained or
       intended to obtain from Mr Trevelyan—to FQM or its associates.  Such information comprised or included
       ENRC Confidential and Privileged Information.  In this regard:

(a)     Beginning in or around October 2010, the Defendant began regularly to communicate with Mr Yearsley and Mr Trevelyan with a view to identifying 'hit lists' of information, which they knew was, or suspected might be, contained within the ENRC Dataset, to sell to FQM.

(b)     Once agreed, the hit lists which the Defendant and Mr Yearsley compiled were passed to Mr Trevelyan, who searched for and extracted potentially responsive documents and data.   The Defendant specifically instructed Mr Trevelyan to adopt a generous or inclusive approach to this task and to print-out or extract any documents which might relate to the broad ambit of the requested searches.

(c)     Once identified by Mr Trevelyan, the responsive material was collated by the Defendant into itemised lists and he acquired sample sets of what he considered to be particularly noteworthy documents, with a view to demonstrating the types and categories of information which were available to FQM.

5.     The extracted information concerned a wide variety of matters relating to the affairs of the Claimant, its owners and other related parties. By February 2011, the Defendant and Mr Yearsley claimed to have identified a non-comprehensive list of more than 8,000 documents in the ENRC Dataset which they considered would be of interest to FQM, including emails and documents belonging to or concerning Paul Walters, the Claimant's company secretary, and *"the PA to the CEO"*. The Defendant and Mr Yearsley also identified around 100 topics to which those documents related. The majority did not pertain directly (or at all) to the FQM Dispute, and it is inferred that the Defendant and Mr Yearsley intended that they might be used by FQM as part of a collateral offensive against the Claimant, its owners and other related parties, with a view to gaining additional leverage in any negotiations relating to settlement of the FQM Dispute. By way of illustration only, the topics that the Defendant and Mr Yearsley identified included:

(a)     A *"memo detailing assets of ENRC shareholders"* (*i.e.* the Claimant's ultimate owners);

(b)     Letters, emails and communications between current and past employees and members of the Claimant's board;

(c)     Details of the Claimant's bank accounts;

(d)     Loan documents, contracts and communications with the Claimant's banks and financial advisors;

(e)     Details of projects undertaken in respect of the Claimant's business under various codenames;

(f)     Internal *"policy"*, *"briefing"* and *"strategy"* documents;

(g)     Copies of various legal instruments relating to the affairs of the Claimant and its ultimate owners, including powers of attorney and security letters; and

(h)     Due diligence reports.

6.     The Defendant and Mr Yearsley consulted a long-term associate of Mr Yearsley, Ian Atkins, in order to facilitate their approach to FQM and originally intended directly to contact Clive Newall, FQM's President (whom the Defendant habitually referred to as *"the main man in Sussex" or "the Horsham man"* when discussing this project with Mr Yearsley).

7.      By February 2011, the Defendant and Mr Yearsley had succeeded in making contact with FQM's General Counsel, Christopher Lemon.

**(iii) Disclosures in February and March 2011**

8.      On 22 February 2011, a meeting was arranged between Mr Yearsley and Mr Lemon at FQM's offices in London. The Defendant met with Mr Yearsley immediately beforehand to brief him and provide him with sample documents to show to Mr Lemon.  The purpose of the meeting with Mr Lemon was to allow the Defendant and Mr Yearsley to:

   (a)     Disclose details of the ENRC Confidential and Privileged Information which was in their possession or to which they had access (including by the disclosure of sample documents); and

   (b)     Discuss commercial arrangements by which further such information could be obtained and disclosed to FQM.

9.      A further meeting was arranged for 3pm the next day (23 February 2011) between the Defendant and Mr Yearsley, on the one part, and representatives of Nardello (who by that stage were acting on behalf of FQM in connection with the FQM Dispute) on the other.  That meeting took place at Nardello's Harley Street offices and, it is inferred, was arranged by Mr Lemon in order to avoid FQM being placed in a position where it took direct possession of documents and information relating to the Claimant which those present understood to be confidential, privileged and highly likely to have been unlawfully obtained.

10.     The said meeting was attended by Michael Walsh, the Managing Director of Nardello's Multi-Jurisdictional Investigations Group and Sophie Lamont, a director of Nardello at the relevant time.  Once again, the Defendant and/or Mr Yearsley took sample documents with them to the meeting, for the purpose of demonstrating to the Nardello representatives the type and quality of the ENRC Confidential and Privileged Information available to them.

11.     Following this meeting, during late-February and early-March 2011, the Defendant directed Mr Trevelyan to undertake further searches within the ENRC Dataset with a view to identifying documents that he believed, based on his briefings with Mr Lemon and representatives of Nardello, FQM would be able to use against the Claimant, its owners and other related parties, to further FQM's interests in connection with the FQM Dispute.

12.     In this regard:

   (a)     The Defendant and Mr Trevelyan met on 7 and 9 March 2011 and it is inferred that such further searches were one of the matters they discussed; and

   (b)     Further meetings were then arranged between the Defendant and Mr Trevelyan on 16, 18 and 28 March 2011 which, as recorded by entries the Defendant made in his diary on those dates, were concerned specifically with their mutual project relating to FQM.

   (c)     In the course of these meetings or subsequently, Mr Trevelyan provided the Defendant and/or Mr Yearsley with a memory stick containing the extracted documents and information.

13.   During the same period (*i.e.* late-February and early-March 2011) the Defendant regularly updated Mr Walsh and Ms Lamont regarding Mr Trevelyan's progress.

14.   In light of the above, it is inferred that:

(a)   The Defendant and Mr Yearsley, whether by themselves or through the auspices of Mr Atkins, succeeded in contacting Mr Newall and/or Mr Lemon and provided them with a summary of information relating to the Claimant and its owners, including ENRC Confidential and Privileged Information, to which they had access.

(b)   ENRC Confidential and Privileged Information was disclosed to FQM and Nardello at the meetings on 22 and 23 February 2011 (including in the form of a selection of sample documents extracted from the ENRC Dataset) with a view to encouraging FQM and Nardello to enter into a commercial relationship with the Defendant and Mr Yearsley.

(c)   It was agreed between those in attendance at these meetings that Nardello and FQM would be interested in obtaining further information relating to the Claimant, its owners or other related parties from the ENRC Dataset.   Accordingly, at the instigation of the Defendant and Mr Yearsley, Mr Trevelyan subsequently interrogated the ENRC Dataset on a number of further occasions.

(d)   A large quantity of data and documents containing ENRC Confidential and Privileged Information were extracted from the ENRC Dataset by Mr Trevelyan as a consequence and were acquired by the Defendant and Mr Yearsley;

(e)   The Defendant and Mr Yearsley subsequently disclosed ENRC Confidential and Privileged Information to Nardello and FQM, by providing them with printed copies of the aforementioned documents, memory stick(s) containing electronic copies of the same, information derived therefrom, or otherwise.

(f)   As foreseen by the Defendant, the said ENRC Confidential and Privileged Information was subsequently used by FQM for the purposes of causing damage to and exerting collateral pressure on the Claimant, its owners or other related parties, with a view to inducing them to bring about a settlement of the FQM Dispute.

(g)   Further, and notwithstanding that insofar as it related to the transactions and matters forming the subject of the FQM Dispute, the ENRC Confidential and Privileged Information could not have contained any evidence of illegality or other impropriety on the part of the Claimant or any of its related parties (because there was none), FQM further used such information for the purpose of:

(i)   Informing its conduct of the extant legal proceedings against the Claimant's related parties in respect of the FQM Dispute; and

(ii)   Through misrepresenting the content of such information and/or the underlying circumstances, advancing a covert public relations and lobbying campaign against the Claimant (as further described in Paragraph **19 Annex A.1**, below).

(h)   In all cases, FQM's ultimate goal was to exert pressure on the Claimant, its owners and other related parties to reach a legal settlement in respect of the FQM Dispute in circumstances where otherwise

the Claimant would have been unwilling to settle, or on terms that were more advantageous for FQM than it would otherwise have been able to obtain.

**(iv) Disclosures in October 2011**

15.   Further ENRC Confidential and Privileged Information was obtained by the Defendant and Mr Yearsley later in 2011, including:

   (a)   The 2011 Leaked Documents, originating from Mr Gerrard of Dechert (see Paragraph **17 PoC** onwards);

   (b)   Documents and information relating to the Claimant's shareholders and the acquisition by the Claimant's related companies of an interest in Camrose, which the Defendant had sought to acquire at the request of Penumbra in or around July and August 2011 (see Paragraphs **2-4 Annex B.1**);

   (c)   Other information and documents derived from the ENRC Dataset or information concerning the Claimant's Internal Review (and subsequently its engagement with the SFO), which the Defendant had acquired from Mr Trevelyan.

16.   In or around October and November 2011, the Defendant and Mr Yearsley made efforts to disclose this ENRC Confidential and Privileged Information to Nardello for the same or similar purposes as described above. In support of its case in this regard, the Claimant will rely on the following further matters:

   (a)   On 19 September 2011, FQM issued a press statement regarding developments in the BVI proceedings against the Highwinds Group, noting that the BVI Commercial Court had rejected an application by the Claimant's subsidiaries summarily to dismiss the said claim.   This press release was forwarded by Mr Yearsley to the Defendant who described it as *"good news"* for them both and suggested that if he and Mr Yearsley provided Nardello with the further documents and information relating to the Claimant that they were by then in a position to disclose, this might be result in Nardello being re-engaged by FQM.   The Defendant referred in particular to the prospect of disclosing *"the Camrose docs"* referred to in Paragraph **15(b) Annex A.1**, above, to Nardello.

   (b)   Mr Yearsley agreed with the Defendant's proposed plan and also recommended that they approach *"the legal team [i.e. the law firm being used by FQM in respect of the FQM Dispute] or at least find out who FQM are using"*.

   (c)   On 5 October 2011, the Defendant met with Mr Yearsley to discuss their plan to approach Nardello again and to brief him regarding next steps.

   (d)   The Defendant and Mr Yearsley then met with Mr Walsh and Ms Lamont at around 10am on 27 October 2011 at Nardello's offices.   Once again, the Defendant took with him further documents (including, it is inferred given his remark to Mr Yearsley on 19 September 2011), at least some of the so-called Camrose documents).

17.   In light of the above, it is inferred that:

(a)   During the aforementioned meeting on 27 October 2011, the Defendant disclosed further documents, containing or comprising ENRC Confidential and Privileged Information to the Nardello representatives, Mr Walsh and Ms Lamont.

(b)   Following that meeting, the Defendant disclosed further ENRC Confidential and Privileged Information to Nardello and/or to FQM or its other agents on other occasions.

(c)   As the Defendant and Mr Yearsley had intended, Nardello further disclosed or otherwise used the ENRC Confidential Information that they received from the Defendant and Mr Yearsley during the 27 October 2011 meeting (and/or subsequently), including by disclosing the same to FQM, Peter Lyburn (as to whom see further Paragraph **19 Annex A.1** onwards, below) and/or others;

18.   In this regard, the Claimant relies on:

(i)   The prior conduct of the Defendant and Mr Yearsley in going to significant lengths actively to market ENRC Confidential and Privileged Information for sale to FQM and its agents, over a significant period of time;

(ii)   The Defendant's and Mr Yearsley's ongoing access to information from the ENRC Dataset via Mr Trevelyan;

(iii)   The recent publication of the 9 August 2011 *Times* article, which would have resulted in FQM and its agents having a renewed interest in acquiring information that might be deployed against the Claimant in this context (including by providing such information to the SFO, in a selective and/or misleading fashion, and thereby unjustifiably encouraging the SFO's engagement with the Claimant as a device to exert pressure on the Claimant, its owners and other related parties to settle the FQM Dispute).

(iv)   The ongoing public and government-relations campaign which FQM was continuing to pursue against the Claimant at this time, as described below.

**(v) Disclosures to Peter Lyburn**

19.   Peter Lyburn is a political and public relations campaign consultant and the founder and a director of Stonehaven Campaigns Ltd, a strategic communications consultancy.  During the periods which are most relevant to this claim, he was a senior consultant at two corporate and political communications consultancies: Maitland, one of Europe's leading PR and GR agencies; and, subsequently, CT Group, the corporate strategy and political communications firm founded by Sir Lynton Crosby and Mark Textor.

20.   Between at least 2010 to 2013, Mr Lyburn was engaged to assist in managing a covert public relations and political lobbying campaign on behalf of FQM with the specific remit of advancing FQM's interests in relation to the FQM Dispute.  The ultimate goal of this campaign was to exert pressure on the Claimant, its owners and other related parties to reach a legal settlement in respect of the FQM Dispute that was favourable to FQM.

21.   As the Defendant must have known and foreseen, the ENRC Confidential and Privileged Information which he obtained and disclosed to Nardello and FQM was used and further disclosed as part of this campaign. In particular, it is to be inferred that the said ENRC Confidential and Privileged Information (or a significant part of it) was passed by FQM to Mr Lyburn in the course of 2011 and 2012 and that he subsequently disclosed the same to at least the following recipients:

(a)   Journalists with whom Mr Lyburn was in contact with a view to placing hostile articles about the Claimant and its position in respect of the FQM Dispute.

(b)   Members of Parliament, whom Mr Lyburn lobbied in the hope that they would publicly criticise the Claimant and/or the circumstances in which the Claimant had acquired interests in DRC mining concessions which were previously under FQM ownership and/or to lobby the SFO, including by way of:

   (i)   A seminar called "*The Challenges of Investing in Africa with First Quantum Minerals*", which Mr Lyburn helped to arrange and which was held at the House of Commons in February 2011;

   (ii)   A letter (almost immediately leaked to a number of national UK newspapers) which a Member of Parliament wrote shortly before 8 April 2011 to Richard Alderman, the then Director of the SFO, calling on Mr Alderman to open an investigation into the Claimant;

   (iii)   Statements which were made in Parliament in February, May, July and December 2011, which sought to draw attention to the FQM Dispute and called on the Government to take action against the Claimant;

   (iv)   Evidence which was submitted on behalf of FQM to the International Development Select Committee of the House of Commons in May 2011, which again referred in detail to the Claimant's role in the FQM Dispute.

**(vi) The FQM Settlement**

22.   Against the backdrop of this sustained campaign, the Claimant ultimately agreed to pay US$1.25b to FQM to settle the FQM Dispute in late 2011.

ANNEX A.2

DISCLOSURES TO FG HEMISPHERE

1.  FG Hemisphere Associates LLC is a controversial special purpose vehicle (or 'vulture fund') set up by New York-based investment management firm, FG Capital Management Limited (collectively, **"FG Hemisphere"**), to acquire distressed sovereign debt in the developing world at discounted rates with a view to then enforcing the full value of that debt against state or governmental organisations.

2.  In or around 2003, the International Chamber of Commerce made two very substantial arbitral awards, totalling some $100m, in favour of a then-Yugoslavian energy company, Energoinvest DD. FG Hemisphere subsequently paid around $3m to acquire the rights to those awards and argued that it was entitled to enforce those awards (the **"Gecamines debt"**) against the DRC and the assets of a state-owned DRC mining firm, Gecamines. To that end, it commenced legal proceedings against both the DRC and Gecamines in various jurisdictions worldwide, including Jersey.

3.  At or around the same time, FG Hemisphere commenced a covert PR and lobbying operation against the DRC Government. FG Hemisphere did so in the expectation that the threat of continued international pressure and adverse publicity of this nature would eventually compel the DRC Government to reach an out-of-court settlement with FG Hemisphere and to satisfy the Gecamines debt on favourable terms to FG Hemisphere. The measures initiated by FG Hemisphere in this regard included:

    (a)  Providing assistance and advice to the political opposition in the DRC;

    (b)  Providing information and briefings to journalists and campaigning NGOs (notably Global Witness) on the basis that they would in turn respond in ways which benefited FG Hemisphere's interests in the DRC;

    (c)  Disclosing intelligence and strategy reports to assist FQM in its ongoing litigation against the Claimant relating to assets located in the DRC (*i.e.* the FQM Dispute);

    (d)  Hiring a lobbyist in Washington DC, Chris Cooper, to work secretly with political opponents of the DRC government in an attempt to initiate a US Senate investigation into events in the country;

    (e)  From around 2012 onwards, employing Mr Lyburn in his then-role as a consultant with CT Group to manage a covert London-based campaign.

4.  A fundamental aspect of FG Hemisphere's strategy was an attempt publicly to impugn the circumstances in which DRC state assets had been sold to Mr Gertler and then to foreign companies. The Claimant was among the foreign companies with interests in the DRC which FG Hemisphere targeted in this regard, including its purchase of a stake in the Highwinds Group. As a consequence, the Claimant (and particularly the latter transaction) became a target of FG Hemisphere's PR and lobbying campaign. Thus, while the Claimant does not itself have any association with the government of the DRC, it effectively became 'collateral damage' in FG Hemisphere's offensive.

5.  In particular, in the specific context of the UK, Mr Lyburn's campaign aimed to prolong the SFO's existing intervention in the Internal Review and/or manufacture a pretext for the SFO to expand the scope of that

intervention and/or open a formal investigation into the Claimant and its role in the Highwinds Group transaction. To that end, Mr Lyburn misused selective and misleading parts of ENRC Confidential and Privileged Information which it is inferred that he acquired from FQM and/or Nardello in an attempt to:

(a)     Encourage media reporting on that transaction;

(b)     Lobby Westminster MPs to advocate against the Claimant's acquisitions in the DRC;

(c)     Procure ex-SFO employees, who Mr Lyburn met with, to use their contacts to encourage the SFO to open a formal investigation into the Claimant.

6.     In this context, the Defendant and Mr Lyburn met on 20 April 2012, it is inferred to discuss (among other things) information and documents (including ENRC Confidential and Privileged Information) which the Defendant held or could obtain about relevant issues in the DRC and which might assist Mr Lyburn and FG Hemisphere. Following this meeting, the Defendant and Mr Lyburn agreed to liaise on a covert basis with one another. In addition, the Defendant encouraged Mr Lyburn to liaise personally with Mr Yearsley who, by this stage, was also employed directly by FG Hemisphere to assist with their covert lobbying strategy.

7.     In accordance with this agreed enterprise, the Defendant and Mr Yearsley subsequently disclosed a very substantial quantity of ENRC Confidential and Privileged Information to FG Hemisphere and Mr Lyburn for further use in their covert PR and lobbying campaigns. Pending the provision of disclosure and information in this action, the best particulars that the Claimant is currently able to give in this regard is as follows:

(a)     Immediately after his meeting with Mr Lyburn on 20 April 2012, the Defendant asked Mr Lyburn to introduce him to (i) Mr Cooper, the lobbyist running FG Hemisphere's Washington-based lobbying operation; and (ii) Professor Willy Vangu, a DRC opposition politician who was visiting London at the time to meet MPs and to ask the UK to withhold £790m in state aid which had previously been committed to the DRC. Given the circumstances in which these introductions were made, it is inferred that the said meetings were arranged by the Defendant and Mr Lyburn for the purpose, amongst others, of allowing the Defendant:

    (i)     To brief Mr Cooper and Professor Vangu about his knowledge of the Claimant's affairs (including ENRC Confidential and Privileged Information);

    (ii)     To market himself to both individuals as a source of confidential information about the Claimant and its interests in the DRC which could then be used and disclosed in the context of their respective political campaigns.

(b)     In addition, at or around this time, the Defendant and/or Mr Yearsley disclosed a very substantial quantity of documents (including it is inferred ENRC Confidential and Privileged Information which they had previously acquired from the ENRC Dataset) directly or indirectly to Amy Brown, a senior executive and General Counsel of FG Hemisphere, and/or to Mr Lyburn. In either case, it is reasonably inferred that such ENRC Confidential and Privileged Information was subsequently shared between FG Hemisphere and Mr Lyburn. In support of this inference, the Claimant will rely on an email exchange between the Defendant and Mr van Niekerk on 24 and 25 April 2012, in which the Defendant referred to having spoken to Ms Brown. When asked by Mr van Niekerk as to whether Ms Brown would be interested in receiving documents which the Defendant had previously provided

to Mr van Niekerk from the ENRC Dataset (in context, a reference to at least the ENRC Confidential and Privileged Information set out in Paragraphs **2-3 Annex C.3**), the Defendant confirmed that Ms Brown *"already has the material from Magic [i.e.* Mr Trevelyan] *which is now in circulation"*.

(c)   In around May 2012, Mr Yearsley (it is inferred acting with the Defendant's knowledge and as part of their joint plan) gave Mr Lyburn copies of at least two documents or reports comprising or containing ENRC Confidential and Privileged Information, including a copy of a filing which had been submitted by Herbert Smith in its capacity as the Claimant's legal advisors to the UK Serious Organised Crime Agency (**"SOCA"**) on or around 12 August 2010 (the **"Herbert Smith SAR"**).

(d)   Shortly afterwards, Mr Lyburn contacted Anthony Farries, a former SFO officer who had maintained close links to employees in the organisation and who was a longstanding acquaintance and source of both the Defendant and Mr Yearsley.  Mr Lyburn asked Mr Farries for his support in lobbying the SFO to open an investigation into the Claimant.  To that end, he disclosed to Mr Farries copies of the two documents which he had received from Mr Yearsley.  In the circumstances, it is reasonably to be inferred that (i) the Defendant and Mr Yearsley had arranged for Mr Lyburn to meet with Mr Farries; (ii) that they did so in the expectation that Mr Farries would ensure that the said documents (and/or the ENRC Confidential and Privileged Information which they contained) would be passed to the SFO itself; and (iii) Mr Lyburn (and/or Mr Yearsley or the Defendant), acting on FG Hemisphere's instructions and/or with a view to furthering FG Hemisphere's interests, provided further ENRC Confidential and Privileged Information to Mr Farries on other occasions for the purpose of enabling him to disclose it to the SFO and thereby creating a pretext for an investigation of the Claimant.

(e)   As the Defendant knew (and subsequently informed other private intelligence contacts), in or around June 2012, FG Hemisphere and Mr Lyburn authored a letter to the Claimant's shareholders calling for an investigation into transactions in which the Claimant had acquired interests in projects in the DRC from Mr Gertler.  That letter, which was ultimately sent on 12 June 2012 in the name of the NGO, Global Witness, was based on selective and misleadingly deployed extracts of ENRC Confidential and Privileged Information about the Claimant and its affairs which had been disclosed to FG Hemisphere and/or Mr Lyburn by the Defendant (or by the Defendant acting together with Mr Yearsley) in the course of the relationship detailed above. Notwithstanding the involvement of Global Witness (which was orchestrated by FG Hemisphere and Mr Lyburn by, it is inferred, exploiting Mr Yearsley's connections as a former, longstanding Global Witness employee), in reality the letter's genesis was concerned solely with furthering FG Hemisphere's commercial interests.

ANNEX B.1

DISCLOSURES TO PENUMBRA

1.       Between at least 2010 and 2015, the Defendant (along with Mr Yearsley) maintained a close professional
         relationship with a number of individuals at the private intelligence firm, Penumbra Partners (**"Penumbra"**)
         in the course of which he regularly sold substantial quantities of ENRC Confidential and Privileged
         Information to Penumbra for use by its clients. Penumbra ceased trading in or around 2014 and it was
         dissolved in January 2016, but its former directors, Charles Webb and Elliot Hall, together with Peter Walker,
         continued to offer private intelligence services through their new venture, Hanuman Partners Limited.

**(i) June 2011: the ENRC shareholder documents**

2.       On 21 June 2011, the Defendant and Mr Yearsley met with Mr Webb of Penumbra. According to an email
         which Mr Yearsley sent the Defendant on 15 June 2011, the main purpose of that meeting was to *"discuss
         the magician"* (one of the pseudonyms used by the Defendant and Mr Yearsley to refer to Mr Trevelyan)
         and, it is inferred, to inquire about whether Penumbra would be interested in particular documents or
         information relating to the Claimant, which it was intended that Mr Trevelyan would then extract from the
         ENRC Dataset.

3.       One class of documents which Mr Webb requested in response related to confidential information about
         the Claimant's shareholders.  In this regard:

         (a)     A further meeting was arranged between the Defendant, Mr Yearsley and Mr Webb on 28 June
                 2011.

         (b)     Prior to this meeting, the Defendant arranged to meet with Mr Trevelyan.  According to an email
                 which the Defendant sent to Mr Yearsley on 24 June 2011, the purpose of that meeting was to allow
                 *"Magic"* (*i.e.* Mr Trevelyan) to provide the *"ENRC shareholder documents"*, along with *"other material
                 for us to play with"* (it is inferred consisting of other documents containing ENRC Confidential and
                 Privileged Information, which Mr Trevelyan had identified within the ENRC Dataset and which were
                 likely to be professionally valuable to the Defendant and Mr Yearsley).  In the same email, the
                 Defendant confirmed his meeting with Mr Webb at 2.30pm on 28 June 2011 and suggested that
                 Mr Yearsley may also want to set up a meeting with representatives of Global Witness to show them
                 the documents as well, albeit that *"they may be boring and ask about provenance"* (a clear allusion
                 to the Defendant's and Mr Yearsley's understanding that the material had been unlawfully acquired).

         (c)     According to entries in the Defendant's diary:

                 (i)     The Defendant met Mr Trevelyan as planned at 10.30am on 28 June 2011 and, it is inferred,
                         received copies of the documents which Mr Trevelyan had extracted from the ENRC Dataset
                         (including documents about the Claimant's shareholders, as well as other ENRC Confidential
                         and Privileged Information and information of potential value to the Defendant and
                         Mr Yearsley).

                 (ii)    The Defendant and Mr Yearsley subsequently met with Mr Webb at 2.30pm the same
                         afternoon and, it is inferred, disclosed at least the previously requested ENRC shareholder

documents to Penumbra, as well as discussing other documents and information (Including ENRC Confidential and Privileged Information) which could be provided to Penumbra and its client(s) from the same source.

(d)     In addition, entries in the Defendant's diary also show that further meetings were arranged between the same parties for the following day (29 June 2011) with the Defendant meeting Mr Trevelyan at 10.30am, in advance of a meeting with Mr Webb at 12.15pm.  In the circumstances, it is inferred that:

(i)     At the meeting on 28 June 2011, Mr Webb had expressed interest in acquiring additional documents containing ENRC Confidential and Privileged Information from the ENRC Dataset;

(ii)    The Defendant met with Mr Trevelyan at 10.30am on 29 June 2011 in order to obtain copies of those documents and then disclosed those documents to Mr Webb at 12.15pm the same day.

**(ii) July - August 2011: the Camrose documents and contract**

4.      The Defendant and Mr Yearsley disclosed further ENRC Confidential and Privileged Information to Mr Webb in July and August 2011:

(a)     Further to their meetings on 28 and 29 June 2011, Mr Webb agreed to send the Defendant and Mr Yearsley a list of search terms for the purpose of their identifying and extracting other documents and information from the ENRC Dataset which were of interest to Penumbra and its clients.

(b)     On 14 July 2011, the Defendant emailed Mr Yearsley to inform him that *"Magic* [Mr Trevelyan] *will have other material for Charles* [Webb] *and others by the end of next week."*  He further remarked that the *"ENRC file is staggering and so let's meet next week on how to exploit."*  It is to be inferred that the Defendant's reference to the *"ENRC file"* was to the ENRC Dataset or a subset of material that Mr Trevelyan had extracted from it and given to the Defendant.

(c)     On 22 July 2011, the Defendant met with Mr Trevelyan and discussed various documents which he was seeking to obtain from the ENRC Dataset on behalf of his and Mr Yearsley's clients. Immediately afterwards, he emailed Mr Yearsley noting *inter alia* that:

(i)     Mr Trevelyan had extracted *"all the documents on the ENRC shareholders and details and the breakdown that you asked for - as of 2008".*

(ii)    Mr Trevelyan also had a copy of *"70 per cent of the Camrose contract that Colonel W is so keen on."*  *"Colonel W"* was a pseudonym used by the Defendant and Mr Yearsley to refer to Mr Webb.

(iii)   Mr Trevelyan was *"confident of obtaining the full version"* of the latter contract and that Mr Webb could be briefed that it was *"looking good… although we will not obtain the document until late next week."*

(iv)   In light of the above, the Defendant suggested that it would make sense for the Defendant and Mr Yearsley to meet the following Thursday or Friday because by that stage Mr Trevelyan would have been able to obtain the relevant material and the Defendant would have *"some juicy material"* on the aforementioned matters.

(d)   As envisaged in the above email, the Defendant then met with Mr Trevelyan on 28 July 2011 (*i.e.* "*late next week*") for the purpose, it is inferred, of discussing and/or collecting samples of the documents responsive to the search parameters that Mr Webb had previously provided to the Defendant and Mr Yearsley following their 29 June 2011 meeting.  The Defendant and Mr Yearsley then met the following day, 29 July 2011, it is inferred in order to discuss the aforementioned "*juicy material*", which he had by then collected from, alternatively been shown or had described to him by, Mr Trevelyan.

(e)   The Defendant arranged to meet Mr Trevelyan again on 3 August 2011, before which he met again with Mr Webb so that the latter could brief the Defendant on the specific documents that he and Penumbra were most interested in.

(f)   The following day, on 4 August 2011, the Defendant sent an email titled "*ENRC proposal*" to Mr Webb:

(i)   That email was sent to a webmail account operated by Mr Webb (charlesgwebb@gmail.com), rather than his official Penumbra email address (presumably because all parties understood the highly sensitive nature of the documents to which it referred and the unlawful circumstances in which such ENRC Confidential and Privileged Information had been, and was being, acquired).

(ii)   The Defendant attached a "*detailed memo about ENRC as we discussed*", which described a substantial quantity of ENRC Confidential and Privileged Information which the Defendant had in his possession, or to which he had access, on a number of issues, and which, it is to be inferred, he was offering for sale to Penumbra and its client.

(g)   On 4 and 5 August 2011, the Defendant's diary contained multiple reminders to email an invoice to Mr Webb (it is inferred in respect of the documents and information which he had acquired for Penumbra from the ENRC Dataset thus far).  It also recorded a call between the Defendant and Mr Webb at 4pm on 5 August 2011.

(h)   Subsequently, on 9 August 2011:

(i)   The Defendant sent the emails regarding that morning's article in *The Times*, to a number of his private intelligence and 'intermediary' contacts, including to Mr Webb, whom he asked to call him as soon as he had *"some news"*.  In this regard, it is inferred that the Defendant was waiting to hear from Mr Webb in relation to the "*proposal*" which he had sent to Mr Webb on 4 August 2011.

(ii)   The Defendant subsequently emailed Mr Yearsley to inform him that he had just seen Mr Trevelyan, who had given him "*an amazing file on the C company*".  He further emphasised that "*we have the priority document but I need to check with you that it is the*

*correct agreement before we get too excited."* In the circumstances, it is inferred that the reference to the *"C company"* was to Camrose and that the *"priority document"* was the full version of the contract which Mr Webb was seeking on behalf of his client (as described in the Defendant's email to Mr Yearsley on 22 July 2011) and which presumably constituted the contract by which the Claimant's purchase of its interest in Camrose from Mr Gertler was effected - see Paragraph **4(c)(ii) Annex B.1,** above.

(iii)   The Defendant further informed Mr Yearsley that there were *"lots of other juicy docs"* relating to the latter transaction which Mr Trevelyan had acquired.

(i)   The Defendant and Mr Yearsley then arranged to meet Mr Webb at his office at lunchtime the following day (10 August 2011), prior to which he and Mr Yearsley met at the Sir Thomas Cubitt public house to discuss the new documents (including the Camrose contract). It is accordingly inferred that the Camrose contract and the other ENRC Confidential and Privileged Information was disclosed to Mr Webb during the course of that meeting on 10 August 2011 or subsequently.

**(iii) August – October 2011: the Belgium settlement and Mashkevich projects**

5.   Between at least August and October 2011, the Defendant and Mr Yearsley also disclosed further ENRC Confidential and Privileged Information to representatives of Penumbra, including Mr Webb and Peter Walker, in the context of at least two further projects which the Defendant and Mr Yearsley were undertaking at this time:

(a)   A request by Penumbra to obtain inside information about the confidential circumstances in which a Belgian investigation into the Claimant's ultimate owners had been discontinued by the Belgian authorities;

(b)   A parallel request for information about the affairs and assets of the Claimant's ultimate owners and, in particular, Mr Mashkevich.

6.   In both instances, at least one of Penumbra's ultimate clients was the Financial Services Authority (the **"FSA"**), as it was then known (as to which see further Paragraph **7(f) Annex B.1,** below).

7.   In this regard:

(a)   On 26 August 2011, Mr Yearsley received an email from Mr Walker in which the latter confirmed that he and his client wanted to understand more about the circumstances in which the Belgian investigation into the Claimant's owners had been discontinued. Mr Yearsley alerted the Defendant, who advised him that he had *"the historical and contemporary inside track"* with the consequence that he and Mr Yearsley could *"clean up"* with Penumbra on this project. It is inferred that the Defendant's reference to the *"inside track"* on these matters (and his confidence generally) arose from his knowledge that he had in his possession, or could access, relevant contemporary and historical information pertaining from to that investigation (including ENRC Confidential and Privileged Information) from, amongst other sources, intermediaries such as Mr Simpson and Mr Kazhegeldin.

(b)   In a further email exchange on 30 August 2011, the Defendant and Mr Yearsley discussed how much they could charge Penumbra for this project, with the Defendant suggesting £2,500 while

noting that Penumbra were *"usually quite generous"*.  The Defendant further warned, however, that while he was sure he could provide information relating to the nature and historical progress of the Belgian investigation, he was not sure that he would be able to discover why it had been dropped or provide details of the settlement because the latter *"was so recent"*.  However, the Defendant advised that Mr Simpson would know *"a lot"* on this issue and that he was also *"meeting a source tomorrow who may help"* (the latter ostensibly a reference to Mr Kazhegeldin who the Defendant's diary records that he met on 31 August 2011).

(c)     The Defendant met with Mr Yearsley and Mr Walker on 2 September 2011.  That morning, he sent an email to Mr Walker in order to check that Penumbra was aware that he was also working alongside Mr Yearsley on *"the ENRC and Mashkevich projects"*, in addition to other projects which would be discussed that morning.

(d)     Following the said meeting with Mr Yearsley and Mr Walker, the Defendant asked an associate, Tom Mills, to *"research an updated and expanded report"* on Mr Mashkevich, with a focus on sections dealing with *"Criminal Investigations"*, *"Wealth"* and *"Base, Movement and Properties"*.  To this end, he informed Mr Mills that he had *"a file of unpublished reports, memos and documents on the Belgium case and other Mashkevich issues which needs to be inserted"* and asked Mr Mills to meet him the following Monday so that he could collect the documents.  It is again inferred in the circumstances that the said *"file of unpublished reports, memos and documents"* contained ENRC Confidential and Privileged Information, including, it is inferred, information previously extracted from the ENRC Dataset.

(e)     On 5 September 2011, the Defendant asked Mr Yearsley to *"chase Glenn [Simpson] regarding the settlement document - or even just some new detail about the settlement"*, noting that *"is where we are weak"* in light of a looming 9 September 2011 deadline which Mr Walker had apparently imposed for the work.

(f)     On 8 September 2011, Mr Yearsley informed the Defendant that he had just spoken with Mr Simpson, who hoped to be able to get the requested information on the confidential Belgian settlement by the end of the day.  In a follow-up email, Mr Yearsley noted that Mr Simpson was also expecting to get further information from his source next week *"so hopefully Penumbra get a phase two from FSA"* (the latter constituting an apparently express reference to Penumbra's ultimate client).

(g)     On 9 September 2011, the Defendant emailed Mr Walker an edited version of the report into Mr Mashkevich which Mr Mills had helped him assemble. He also updated Mr Walker that he was *"still waiting for the new intelligence to come in on the settlement of the Belgian investigation"* and that he expected to send *"the main report"* later that day, apparently due to issues with the time difference between the UK and the location of one of his sources (presumably Mr Simpson).

(h)     On 12 September 2011, the Defendant sent Mr Walker an email titled *"Report on Belgian and Swiss Investigations"*, containing a report regarding investigations and legal proceedings pertaining to the Claimant and/or its owners in Belgium, Jersey, and Switzerland.  He further updated Mr Walker that he was *"still waiting for some crucial new intel on the Belgian settlement"* and that *"a contact was obtaining it as a favour"* (again, it is inferred, a reference to Mr Simpson's efforts to acquire confidential information about the settlement agreement).  Further updates were provided by the Defendant in emails to Mr Walker on 14, 15 and 16 September 2011, in which he:

(i)    Advised Mr Walker that he was due to meet his "*source on the Belgian settlement and the Kazakh Trio*" for lunch the following day and that he hoped to obtain "*the inside track on the settlement during that meeting*" or shortly thereafter.  It is inferred that this is a reference to a planned meeting with Mr Simpson, whom the Defendant's diary records he was due to meet at 12.30pm on 15 September 2011;

(ii)    Referred to Mr Webb having phoned him about "*the other Mashkevich case*" (again an ostensible reference to the parallel project which the Defendant was undertaking for Penumbra into one of the Claimant's owners);

(iii)    Indicated that in fact he would not be able to obtain the requested "*new intell on the Belgian settleement* [sic] *on Trio*" until the following Monday.

(i)    On 19 September 2011, the Defendant emailed Mr Walker further information in light of a series of additional questions which Mr Walker had raised about information which had been disclosed in the previously submitted reports into "*Mashkevich, the Belgian investigations and the Kazakhs etc*".  The Defendant also informed Mr Walker that he had met "*a brand new source on Mashkevich*" that morning who had shown a series of confidential documents to him (including material which was likely to have been subject to legal professional privilege) and which included:

(i)    An affidavit which a lawyer for Mr Mashkevich had sworn in respect of a private hearing of a Jersey court in May 2006, which was said *inter alia* to provide "*a rare inside account of the Belgian investigation*";

(ii)    A "*thick file of other Trio documents*", which included an affidavit which Mr Mashkevich himself had sworn in London legal proceedings.

The Defendant noted that his source wanted £1,000 for these documents, although he might be able to negotiate him down to £750.

(j)    On 21 September 2011, the Defendant emailed Mr Walker and explained that he had managed to obtain a copy of his source's file for £500 (which he described as "*a bargain*").  He commented that he could "*bring over the file and also the other new Mashkevich and ENRC documents which we have already discussed any time*" the following morning.  In a subsequent email the Defendant said he would "*bring the suitcase of docs*".  The Defendant alerted Mr Walker to the fact that he was intending to invoice Penumbra "*£2500 for the first case (Belgian investigation) and £2000 for the new Mashkevich documents*".  As planned, a meeting took place between the Defendant and Mr Walker the following day, at which, it is inferred, the various documents relating to the Claimant and Mr Mashkevich were handed over.

(k)    In an email sent in the early evening of 26 September 2011, Mr Walker requested an update on the status of the information on the "*Belgium settlement*" in light of a forthcoming meeting with his client (*i.e.* the FSA).  On 15 October 2011, the Defendant emailed Mr Walker that he had "*some new intel on the settlement of the Belgian investigation into the Kazakh Trio. This comes from an ENRC legal insider who was privy to the negotiations.*"  The email set out that information, notwithstanding its confidential and privileged nature.

(l)   The Defendant subsequently provided further information to Mr Walker regarding the Belgian settlement during a further meeting on 21 October 2011.

(m)   In an email sent on 27 October 2011, Mr Walker confirmed that he had received the Defendant's invoice and, on 31 October 2011, the Defendant confirmed that he had received payment from Penumbra.  It is to be inferred that this payment related to the Defendant's work in procuring the ENRC Confidential and Privileged Information that he had provided to Penumbra, in the circumstances described above.

**ANNEX B.2**

**DISCLOSURES TO GOOD GOVERNANCE GROUP**

1.  The Defendant held a longstanding business relationship with the private intelligence firm, G3 Good Governance Group Limited (commonly known as G3). In addition, his close associate, Mr Yearsley was previously an employee of G3.

2.  As set out below, it is to be inferred that during at least the latter part of 2011 and during 2013, the Defendant disclosed ENRC Confidential and Privileged Information which he had acquired from, amongst other sources, Mr Trevelyan, to representatives of G3.

**(i) Disclosures in 2011**

3.  On 9 August 2011, Mr Robertson's article about the Claimant was published in *The Times*, based on the 2011 Leaked Documents which had been given to him by the Defendant (having originally been deliberately leaked for these purposes by Mr Gerrard of Dechert)—see Paragraphs **17-18 PoC**.

4.  Shortly afterwards, in late August and September 2011 the Defendant met and communicated frequently with representatives of G3 regarding the Claimant and its affairs.

    (a)  On or around 19 August 2011, the Defendant had a telephone call with Charlie Bain, a senior employee of G3, on the subject of the Claimant and Mr Gertler.

    (b)  In quick succession, the Defendant then arranged meetings with Mr Bain and his colleague, Gunther von Billerbeck, on 23 August 2011 and a further meeting with Mr Bain on 31 August 2011.

    (c)  Following these meetings, the Defendant's diary evidences that he sent Mr Bain an email on or around 2 September 2011 which, it is inferred, concerned issues which G3 representatives and the Defendant had discussed during the 19 August 2011 telephone call and 23 and 31 August 2011 meetings.

    (d)  On 16 September 2011 the Defendant met with Mr Bain again to discuss the topic of *"ENRC investors"*.

5.  It is inferred from:

    (a)  The subject matter of these interactions;

    (b)  Their timing, following shortly after: (i) the publication of Mr Robertson's article, which made reference to the Claimant's acquisition of mining interests in the DRC (from entities connected with Mr Gertler); (ii) the Defendant's approaches to several of his private intelligence and 'intermediary' contacts (which, it is inferred, included G3) in the wake of publication of that article in order to market the fact that he had further information for sale relating to the Claimant; and

    (c)  The nature of G3's business as a private intelligence firm, which is paid to acquire information on behalf of its clients,

that at or around this time (August 2011) G3 had a client (the identity of whom is currently unknown to the Claimant) who had an interest in obtaining confidential information about the Claimant, including information about dealings between the Claimant and Mr Gertler.

6.  Further, it is inferred that the Defendant provided such information, including ENRC Confidential and Privileged Information, which he had acquired from (amongst other sources) Mr Trevelyan, to representatives of G3.  In particular, in the circumstances and having regard to the Defendant's working methods in respect of projects concerning the Claimant at this time as set out at Paragraph **28 PoC**, it is inferred that:

(a)   The initial communications between the Defendant and G3 in late-August 2011 were for the purpose of discussing a project between the Defendant and G3, pursuant to which the Defendant would supply G3 with information and documents relating to the Claimant and its affairs.

(b)   In the course of subsequent meetings and communications, the Defendant: (i) described ENRC Confidential and Privileged Information which he had in his possession or to which he had access concerning the Claimant (including its dealings with Mr Gertler and information about its investors); and (ii) provided such ENRC Confidential and Privileged Information, in the form of copies of documents or information contained within the ENRC Dataset, the 2011 Leaked Documents, or otherwise, to G3 representatives, including Mr Bain.

**(ii) Disclosures in 2013**

7.  It is further inferred that further information and documents relating to the Claimant and/or its dealings with Mr Gertler (including ENRC Confidential and Privileged Information) were obtained by the Defendant in or around February or March 2013 and sold to G3 at around that time or shortly afterwards. In support of this inference, the Claimant will rely on the following matters:

(a)   In or around January 2013, the Defendant was contacted by Mr von Billerbeck about information which he held on the relationship between Mr Gertler and the Swiss-headquartered mining and commodities company, Glencore, which, like the Claimant, had also acquired certain assets in the DRC from Mr Gertler.

(b)   In response, on 16 January 2013, the Defendant emailed Mr von Billerbeck *"a summary of new documents"* compiled by Global Witness on the relationship between Glencore and Mr Gertler in the DRC.  The Defendant provided documents responsive to G3's enquiry relating to Glencore in or around 23 January 2013 and issued his invoice to G3 for this work and was paid a few days later.

(c)   On 20 and 21 February 2013, ostensibly as part of the same course of communications, the Defendant spoke with Mr Bain about the Claimant. Subsequent entries in the Defendant's diary indicate that among numerous other meetings and telephone and email interactions with Mr Bain and other G3 representatives during the period March to July 2013, the Defendant communicated with Mr Bain and Mr von Billerbeck, regarding the Claimant (including its dealings with Mr Gertler), on at least: 11 and 13 March 2013.

(d)   During the same period the Defendant also issued a number of invoices to G3, a number of which, it is to be inferred, concerned information that he had provided to G3 about the Claimant.  For

instance, on 29 July 2013, the Defendant made notes in his diary to email Mr Bain regarding "*Invoice → ENRC*" (and regarding "*Timur/ENRC*").

8.    Again, it is inferred that in the course of these interactions, the Defendant provided further ENRC Confidential and Privileged Information, which he had acquired from (amongst other sources) Mr Trevelyan, to representatives of G3.  In particular, it is inferred that:

(a)    The said calls on 20 and 21 February 2013 were to discuss a project between the Defendant and G3 pursuant to which G3 would receive confidential information and documents from the Defendant about the Claimant and its relationship with Mr Gertler.

(b)    In the course of subsequent meetings and communications, the Defendant: (i) described ENRC Confidential and Privileged Information which he had in his possession or to which he had access concerning the Claimant and its dealings with Mr Gertler; and (ii) provided such ENRC Confidential and Privileged Information, in the form of copies of documents or information contained within the ENRC Dataset, or otherwise, to G3 representatives, including Mr von Billerbeck and Mr Bain.

(c)    The said ENRC Confidential and Privileged Information was considered by G3 to be sufficiently valuable to its client that they were prepared to pay the Defendant to obtain access to the same.

ANNEX C.1

DISCLOSURES TO AKEZHAN KAZHEGELDIN

1.  Ake-Jean Qajygeldin, f.k.a. Akezhan Kazhegeldin (**"Mr Kazhegeldin"**) is a former Prime Minister of Kazakhstan. Since losing power in October 1997, Mr Kazhegeldin has remained politically active and formed the Republican People's Party of Kazakhstan in opposition to the regime of the then President Nazarbayev. To this end, through his political and business connections in Kazakhstan, Mr Kazhegeldin has worked on behalf of various individuals – including politicians, influential businesspeople and Kazakh government agencies – who share a political and/or commercial interest in damaging his opponents, including the Claimant or its ultimate owners, Messrs Mashkevich, Chodiev and Ibragimov.

2.  In these circumstances, Mr Kazhegeldin has become the focal point for the exchange in England, the US and Kazakhstan of unlawfully obtained, confidential and, in some instances, legally privileged information belonging to the Claimant and/or concerning its affairs. In so doing, Mr Kazhegeldin acted with the objective, directly or through intermediaries, of disseminating such information to political or business adversaries of the Claimant, and/or to the authorities in UK (such as the SFO), Kazakhstan, or elsewhere with the goal of damaging and destabilising the Claimant.

3.  Amongst the ENRC Confidential and Privileged Information which Mr Kazhegeldin is known to have acquired and subsequently misused is that which was contained in an external 2.5" USB hard disk drive (the **"AK Disk"**) that contained documents and information which Mr Trevelyan extracted from the ENRC Dataset on his behalf in response to search terms which Mr Kazhegeldin provided to him. In or around 2012, the AK Disk was disclosed by Mr Kazhegeldin to an unknown client who paid US$50,000 to Mr Kazhegeldin and Mr Trevelyan for the ENRC Confidential and Privileged Information which it contained.

4.  It is further evident that Mr Kazhegeldin and the Defendant exchanged documents and information about the Claimant (including ENRC Confidential and Privileged Information) on a number of occasions during at least 2010, 2011, 2012 and 2013. For instance:

    (a)  On 14 October 2010, the Defendant sent an email to Mr Kazhegeldin attaching various press releases which had recently been issued by FQM. He then sent a further email to Mr Kazhegeldin on 27 October 2010 informing him: *"my contact is compiling more documents on the three entities that you are interested in – The Trio, Mr M and Mr K. I will collect them by the end of this week"* and requesting a meeting the following day. It is inferred that:

        (i)  The Defendant's *"contact"* in respect of this project was Mr Trevelyan;

        (ii)  The documents which Mr Trevelyan was compiling on behalf of the Defendant (including in respect of the Claimant's ultimate owners) were derived, in whole or in part, from ENRC Confidential and Privileged Information contained within the ENRC Dataset, as it stood at that time;

        (iii)  The Defendant subsequently disclosed those documents to Mr Kazhegeldin, as promised.

    (b)  The Defendant and Mr Kazhegeldin met again on 19 and 20 April 2011. Shortly, afterwards, on 22 April 2011, the Defendant emailed Mr Kazhegeldin promising (apparently in response to a request

raised by Mr Kazhegeldin at their earlier meeting) to "*talk to my contact about the material on Alexander M and Trio and… and ensure that the documents and files are still available for you*". Again, it is inferred that the Defendant's "*contact*" was Mr Trevelyan and that the "*documents and files*" to which reference was made consisted of material (including ENRC Confidential and Privileged Information) which the Defendant had identified and intended to acquire from the ENRC Dataset and/or by way of Mr Trevelyan's ongoing access to the Claimant's IT systems as part of his mandated work (as to which Paragraph **12(d)** PoC is repeated).

(c)     On 26 April 2011, the Defendant sent another email to Mr Kazhegeldin asking him to keep him informed about "*any interest in the material on Trio and Alexander M*" (a remark which, it is inferred, indicates that Mr Kazhegeldin was now actively looking for third parties, who might also have an interest in obtaining the said ENRC Confidential and Privileged Information about the Claimant's ultimate owners).

(d)     On 28 July 2011 the Defendant sent an email to Mr Kazhegeldin attaching his "*proposal on the Trio.*" The attached document identified six separate topics relating to ENRC and its owners on which the Defendant claimed to have "*masses of detail*" and which, it is inferred, he was offering for sale to Mr Kazhegeldin.  In particular, the Defendant stated that:

(i)     He had "*direct access*" to copies of reports containing ENRC Confidential and Privileged Information;

(ii)    "*Enemies of the Trio*" were planning to send this information to the Financial Services Authority and SFO;

(iii)   He was aware of, and by implication had access to, "*a disc containing details of* [the Claimant's] *operations and assets between 2004 and 2008*" (ostensibly a reference to the PA Data and/or the IT Employee Data which Mr Trevelyan had obtained in the circumstances further set out in Paragraphs **12(b)-(c)** PoC).

(e)     In addition, from at least 2012 onwards and in the circumstances further set out in Paragraph **22 PoC** onwards and **Annex D**, the Defendant obtained information regarding the SFO's engagement with the Claimant and its subsequent investigation, including (i) details of confidential communications between the SFO and the Claimant and its representatives; and (ii) the steps being taken by the Claimant internally in response to the SFO's intervention, including communications with its legal and professional advisors in respect of the same.  In this regard:

(i)     Following a further meeting between Mr Kazhegeldin and the Defendant on 20 May 2012, the Defendant met Mr Trevelyan on both the following day and on 23 May 2012 to discuss the SFO's engagement with the Claimant's Internal Review. In the circumstances, it is inferred that Mr Kazhegeldin requested that the Defendant seek to obtain information and/or documents regarding or relating to the SFO's confidential interactions with the Claimant; the Defendant sought and obtained that information and/or documents from Mr Trevelyan; and that the said information and/or documents were then disclosed to Mr Kazhegeldin at a follow-up meeting which he and the Defendant arranged three days later on 26 May 2012.

(ii)  On 16 July 2013, the Defendant contacted Mr Kazhegeldin regarding an "*SFO chart on Trio [i.e. the Claimant's ultimate owners] property*". It is to be inferred that Defendant was seeking to disclose to Mr Kazhegeldin a confidential chart which had been compiled by the SFO on the basis of information which the SFO had gathered about property belonging to the Claimant's ultimate owners during the course of its Investigation into the Claimant (alternatively, a chart which had been prepared by the Defendant using ENRC Confidential and Privileged Information on the instructions of Mr Kazhegeldin on the basis that the latter would then disclose it to the SFO).   In either case, it is reasonably inferred that other documents and information concerning the Claimant or its owners would likewise have been passed amongst Mr Hollingsworth, the Defendant and the SFO.

ANNEX C.2

DISCLOSURES TO GLENN SIMPSON

1.     Glenn Simpson is a former journalist who subsequently became a partner at SNS Global LLC (a US-based private investigation firm).  In or around 2010 or 2011, Mr Simpson co-founded his own private intelligence company, Fusion GPS, and since then has acted as both chief executive and a partner of that firm.

2.     Over a period at least between 2011 and 2013, the Defendant and Mr Yearsley acted in conjunction with one another to disclose a substantial volume of documents and information about the Claimant and its owners (including ENRC Confidential and Privileged Information) to Mr Simpson.  Those disclosures took place in the context of a longstanding and mutually beneficial business relationship in which Mr Simpson on one hand and the Defendant and Mr Yearsley on the other collaborated and shared confidential information in respect of projects which they were undertaking for or on behalf of their respective clients and prospective clients.

3.     The best particulars that the Claimant is currently able to give about these disclosures is set out below.

**(i) The July 2011 ENRC documents**

4.     In July 2011, the Defendant met and communicated with Mr Simpson on numerous occasions for the purpose of disclosing documents and information about the Claimant (including ENRC Confidential and Privileged Information) to Mr Simpson:

   (a)    The Defendant met with Mr Simpson in London on 21 July 2011.  On the following day (22 July 2011), the Defendant called Mr Simpson, following which he had further meetings with Mr Simpson at around 2pm and 7pm. Between these meetings, the Defendant's diary records that he also met with Mr Kazhegeldin and Mr Trevelyan (at around 3pm and 5.30pm respectively).

   (b)    On 24 July 2011, the Defendant sent an email to Mr Simpson informing him that he would *"compile a summary of the vast archive of docs and e-mail it you"*.

   (c)    On 28 July 2011, the Defendant emailed Mr Simpson about *"two other mega Kazakh cases"* that the Defendant wished to discuss with Mr Simpson *"in person"*. Later the same afternoon, he also sent Mr Simpson an email attaching a Word file bearing the file name *"ENRC.doc"*.  The Defendant explained that the latter document contained *"a detailed summary"* of the documents which were available on *"the disc"* which the Defendant and Mr Simpson had discussed in London the previous week. The Defendant characterised the documents as being *"pretty devastating"* (in context a reference to the likely consequences for the Claimant if they were to be obtained by client(s) of Mr Simpson).  The list of 100 items or topics set out in the attached Word file referred to a large quantity of plainly confidential and privileged information and documents, including:

      (i)     A *"memo detailing assets of ENRC shareholders"* (i.e. the Claimant's ultimate owners);

      (ii)    Letters, emails and communications between current and past employees and members of the Claimant's board;

      (iii)   Details of the Claimant's bank accounts;

51

     (iv)    Loan documents, contracts and communications with the Claimant's banks and financial advisors';

     (v)    Details of projects undertaken by the Claimant in respect of its business under various codenames;

     (vi)    Internal *"policy"* and *"strategy"* documents;

     (vii)    Copies of various legal instruments relating to the affairs of the Claimant and its ultimate owners, including powers of attorney and security letters;

     (viii)    Due diligence reports.

5.    It is accordingly to be inferred that:

     (a)    The *"disc"* and *"vast archive"* which the Defendant informed Mr Simpson he had obtained were either references to the ENRC Dataset itself (to which the Defendant had access via Mr Trevelyan) or to a composite set of documents and data which had been extracted and assembled from the ENRC Dataset

     (b)    In either event, the said *"disc"* and *"archive"* would have contained a large quantity of ENRC Confidential and Privileged Information.

     (c)    The said documents and the ENRC Confidential and Privileged Information which they contained (as outlined in the Defendant's *"detailed summary"*) were of interest to Mr Simpson's existing and prospective clients, not least because of their foreseen capacity to inflict *"devastating"* damage on the Claimant if used or disclosed.

**(ii) The October – December 2011 project**

6.    On 9 August 2011 an article headlined *"Copper giant calls in outsider to examine corruption claims"* was published in *The Times* under the by-line of Mr Robertson. That article had been written by Mr Robertson on the basis of the 2011 Leaked Documents, which had been provided to him by the Defendant, in the circumstances set out in further detail in Paragraph **18 PoC**. As set out therein, the 2011 Leaked Documents contained or comprised ENRC Confidential and Privileged Information.

7.    On the same day, 9 August 2011, the Defendant sent emails to a number of individuals to bring the said *Times* article to their attention and with a view to marketing to them further ENRC Confidential and Privileged Information to which he had access. Mr Simpson was amongst the individuals contacted by the Defendant. In particular, the Defendant referred to the Article and wrote *"it's a shame that we missed out, but there is a lot of material that was not published in the story"* and advised Mr Simpson to call him to discuss *"because there is lots of other Kazakh business to be done, if you are interested."*

8.    It is to be inferred that, over the course of the following 3 months, Mr Simpson obtained authorisation from his client to proceed with the proposed project relating to the Claimant and, further, that the Defendant and Mr Yearsley accordingly sought to acquire and subsequently liaised with Mr Simpson in order to sell a substantial quantity of documents and information (including ENRC Confidential and Privileged Information) to Mr Simpson's client. In this regard:

(a)   On 23 August 2011, the Defendant sent an email to Mr Simpson titled *"Proposal on ENRC"*.  This *"proposal"* contained a detailed list of information relating to the Claimant which, further to his email of 9 August 2011, the Defendant was offering to sell to Mr Simpson and an unnamed *"prospective client"*. The email again outlined a large quantity of information and documents (albeit described as *"just a taster"*) which the Defendant either had in his possession or which he could obtain.  In the circumstances, it is inferred that the sources from which the said documents and information were derived included both the ENRC Dataset and the 2011 Leaked Documents and that they therefore included a substantial quantity of ENRC Confidential and Privileged Information.  In this regard, the Claimant will rely further on the Defendant's own description of the documents which he was offering to Mr Simpson, which included:

(i)   Information on the assets, tax and financial affairs of Mr Mashkevich, in respect of which the Defendant again attached a document with the filename *"ENRC.doc"*.  The latter was described as *"a list of internal ENRC documents which gives you an insight into the quality of the material at our disposal"* and repeated the list previously provided to Mr Simpson in the Defendant's email of 28 July 2011. The Defendant additionally referred in this context to information from *"due diligence and asset-tracing investigations"* which he had undertaken *"over the years"* into the Claimant and its owners.

(ii)   An internal ENRC email which Sir Paul Judge, a director of the Claimant, had sent to the Claimant's other directors and company officers in May 2011 about Mr Mashkevich and his prospective role as a future chairman of the Claimant.

(iii)   The 2011 Leaked Documents, which originated from Mr Gerrard (see Paragraph **18 PoC**).

(iv)   Information about the circumstances of the Claimant's acquisition of the Kolwezi Tailings Project from Mr Gertler, as well as a *"95-page contract between Gertler's company, Camrose Resources, and ENRC which has never been published."*

(v)   A confidential report which had been submitted to SOCA on the Claimant's behalf by its lawyers.

(b)   The Defendant sent a further email to Mr Simpson on 16 September 2011, in which he referred to a meeting that was due to take place between Mr Simpson's client *"on ENRC"* and in advance of which the Defendant sought to arrange a meeting or call with Mr Simpson on the footing that there had been *"some positive developments that make a three month deal"* with that client *"much more attainable."*  On the same day, the Defendant asked Mr Mills to research *"American investors in ENRC plc that own more than 1% of the shares… especially… any institutional investors or hedge funds"* (on the basis, it is to be inferred, that he knew or suspected Mr Simpson's client to have been an investor or hedge fund with an interest in the Claimant).

(c)   On 4 October 2011, the Defendant emailed Mr Simpson to inform him that he would send him *"the ENRC shopping list"* (*i.e.* an itemised list of ENRC Confidential and Privileged Information which he was willing to sell to Mr Simpson's client). The Defendant confirmed that he had *"a complete inside track, including current developments on the board and lots of other juicy material"*. He also asked Mr Simpson to *"check if the money has arrived"* (presumably in anticipation that a deal would now be agreed with his client). The Defendant sent the said *"shopping list"* to Mr Simpson that afternoon.

It contained a list of 10 items, including the following documents which again constituted or contained ENRC Confidential and Privileged Information:

(i)   A detailed report on the Claimant's internal investigation into events at SSGPO since 2007;

(ii)   Copies of the reports by "*three major UK law firms*"—*i.e.* a subset of the 2011 Leaked Documents which the Defendant had acquired in or around July 2011, the same having originally been leaked by Mr Gerrard of Dechert (see Paragraph **18 PoC**);

(iii)   Details of "*thousands of other internal ENRC documents - 2004 - 2008*";

(iv)   A copy of the 2010 Whistle-Blowing Email (another element of the 2011 Leaked Documents);

(v)   A copy of the internal email sent by Sir Paul Judge to the Claimant's board on or around May 2011, as referred to at Paragraph **8(a)(iii) Annex C.2**, above.

(d)   On 12 October 2011, the Defendant emailed Mr Yearsley (who by this stage, if not from the outset, was also working alongside the Defendant on the said project with Mr Simpson) and informed him that Mr Simpson was "*close to signing a deal on ENRC*".

(e)   In an email of 20 October 2011, the Defendant expressed his disappointment that the deal had not yet been formally agreed, emphasising to Mr Simpson that he had "*an inside track with documents*" and believed that they "*could clean up*".

(f)   By no later than 25 October 2011, however, an agreement to proceed had been reached, pursuant to which the Defendant and Mr Yearsley disclosed a very substantial volume of ENRC Confidential and Privileged Information to Mr Simpson (including, it is to be inferred, that previously outlined in the Defendant's "*proposal*" and "*shopping list*" described above) for use by the latter's client.   In this regard:

(i)   On 26 October 2011, the Defendant called Mr Simpson about the project and the pair subsequently met on 16 November 2011 at the Mayfair Hotel.

(ii)   The Defendant's diary for 28 November 2011 contained a note to email "*Glenn – bank*" (it is inferred a reference to arrangements relating to a payment which the Defendant was expecting to receive, or had already received, from Mr Simpson).   The following day on 29 November 2011, the Defendant's diary further refers to the Defendant having scanned a document for Mr Simpson.

(iii)   On 30 November 2011, Mr Simpson emailed Mr. Hollingsworth stating, "*I have to brief client orally on Monday morning in DC.   Need a current roundup, including especially whatever we have on Felix.*" (ostensibly a reference to Felix Vulis, the Claimant's former Chief Executive).

(iv)   On 2 December 2011, the Defendant emailed Mr Simpson to let him know that he would email a "*round-up*" on the project, "*plus the Felix material*".   A few days later, on 9 December 2011, Mr. Hollingsworth emailed Mr Simpson information about "*a Suspicious Transaction Report*" that "*ENRC's solicitors*" had filed with SOCA.

(v)    On 10 December 2011, the Defendant emailed Mr Simpson, stating that he hoped Mr Simpson was "*satisfied with all my material and the documents and we have now satisfied the mandate.*" He asked Mr Simpson to let him know "*if there is anything else you need for this project*" and suggested that they "*talk on the phone on Monday or Tuesday*" (12 or 13 December 2011).

(vi)    Accordingly, it is inferred that by the time of this email on 10 December 2011, the Defendant had disclosed to Mr Simpson information and copies of the documents comprising or containing ENRC Confidential and Privileged Information, including some or all of the materials described in his 23 August 2011 "*proposal*" and/or  4 October 2011 "*shopping list*" (see Paragraphs **8(a) and (c) Annex C.2**, above ), as requested by Mr Simpson's client.

**(iii) The January and February 2012 projects**

9.    Further ENRC Confidential and Privileged Information was obtained from the ENRC Dataset and disclosed by the Defendant to Mr Simpson and his client in January and February 2012.  In this regard:

(a)    On 8 January 2012, Mr Simpson emailed the Defendant to inform him that he was "*discussing next steps*" with his client but that "*the priority remains felix*" (again ostensibly a reference to a requirement to obtain confidential information about Mr Vulis).

(b)    The Defendant replied to this email on 9 January 2012, stating that he had "*some interesting new material on this case but very little - if at all - relates to Felix*" and that "*a lot depends on your client's priorities and focus*". Subsequently, on 19 January 2012, however, the Defendant emailed again to inform Mr Simpson that "*our mutual friend Magic*" (a reference to Mr Trevelyan) had managed to obtain "*new documents on Felix Vulis which detail his finances and payments he has received from ENRC, his CV and also a copy of his service agreement and employment contract, although it is not signed*" (documents which, it is inferred, Mr Trevelyan had obtained from the ENRC Dataset in response to the Defendant's requests).

(c)    In an email sent to Mr Simpson on 16 February 2012, the Defendant stated that "*there are still rumblings at ENRC if you are interested*". Mr Simpson responded later the same day, noting that he would be in London that weekend.

(d)    The Defendant and Mr Simpson subsequently met in London at 4.30pm on 19 February 2012.

10.    It is to be inferred that in the course of these interactions (or related interactions around the same time) the Defendant disclosed further ENRC Confidential and Privileged Information to Mr Simpson, including documents which he had obtained from the ENRC Dataset via Mr Trevelyan (and including documents and information relating to Mr Vulis), whether by handing over copies to Mr Simpson in person, during their meeting, by transmitting them electronically via secure means (e.g. an anonymous, high-security webmail service such as Hushmail), or otherwise.

**(iv) 2013 SFO Investigation disclosures**

11.    The Defendant obtained and disclosed further ENRC Confidential and Privileged Information to Mr Simpson during 2013.  A main focus of these disclosures concerned inside information about the status and progress of the SFO's investigation into the Claimant and its owners.

(a) On 14 and 15 March 2013, the Defendant emailed Mr Simpson, ostensibly in connection with an article regarding the Claimant which the Defendant was seeking to have published in the *Financial Times* on behalf of Mr Simpson and his client. The Defendant asked Mr Simpson whether he would be able to obtain a letter that he believed the SFO had written to the Claimant. Separately, the Defendant also informed Mr Simpson that he had obtained a July 2012 report which Dechert had submitted to the SFO about the Claimant's Internal Review process (a manifestly confidential document which the Defendant said had been *"leaked"* and which *"was not in the public domain"*).

(b) On 18 March 2013, Mr Simpson replied to the Defendant's emails, asking if he could send a copy of the Dechert report. The Defendant's diary for 19 March 2013 contained a note to call Mr Simpson and to *"Scan + Email Report to Alex and Glenn"* (a clear reference to his intention to send the Dechert report to both Mr Yearsley and Mr Simpson), with a similar entry the next day, 20 March 2011.

(c) On 20 March 2013, the Defendant emailed Mr Simpson attaching the requested *"report"*, which comprised a draft 27-page deck of slides titled *"ENRC: Presentation to the SFO"*, along with Dechert branding and copyright notices.   This confidential document was materially different from the document that Dechert had previously presented to the SFO on 20 July 2012 and, to the best of its knowledge, is not a document which the Claimant has in its possession (thereby indicating that it must have been leaked by Dechert itself).   The Defendant signed off this email by inviting Mr Simpson to *"talk soon about the other document you sent me and SFO."*

(d) The entry in the Defendant's diary for 22 March 2013 contained notes to email Mr Simpson about the SFO and also to compile a *"budget"* for a project which he was undertaking in respect of the Claimant's owners.

(e) Subsequently, on 1 July 2013, the Defendant emailed Mr Simpson *"a new report on ENRC, Trio and SFO"*. This report contained confidential information about the Claimant and its owners, and their interactions with the ongoing SFO Investigation into their affairs, much of which the Defendant could only have obtained from a source within the SFO and including:

  (i) Details of sources and witnesses relied on by the SFO for its Investigation;

  (ii) An analysis of *"the Trio and their assets"*.

**(v) Shaft Sinkers disclosures**

12. Separately, between April and June 2013, the Defendant disclosed further documents and information (including ENRC Confidential and Privileged Information and/or documents which had been obtained from the ENRC Dataset) to Mr Simpson and his clients.  One such project concerned the provision of confidential documents relating to a legal dispute which had arisen over a drilling contract relating to a potash mining project in Russia between EuroChem Volga-Kaliy LLC (**"Eurochem"**) and the Claimant's related companies IMR and Shaft Sinkers (Pty) Limited (**"Shaft Sinkers"**). The Defendant's disclosures in this regard were made despite the fact that legal proceedings were on foot and that at least some of the internal information which the Defendant clearly acquired and disclosed was therefore liable to be protected by legal professional privilege.  In this regard:

(a) On 29 April 2013, the Defendant sent an email to Mr Simpson in which he offered to provide Mr Simpson with information in connection with the legal proceedings launched by EuroChem.

(b) Entries in the Defendant's diary for 31 May 2013 and 13, 14 and 17 June 2013 included notes about reports which the Defendant was preparing for Mr Simpson in respect of at least two ongoing projects relating to the Claimant and its affairs.

(c) On 27 June 2013, the Defendant's diary contains a reminder to call Mr Simpson about *"docs"* which the Defendant was seeking either to acquire or disclose.

(d) An entry in the Defendant's diary for 8 July 2013 included a note to email Mr Simpson about *"IMR assets"* (it is inferred a reference to confidential information which the Defendant had obtained about assets held by IMR, including it is inferred information contained in ENRC Confidential and Privileged Information which he had obtained from the ENRC Dataset).

ANNEX C.3

DISCLOSURES TO PHILLIP VAN NIEKERK

1.      Phillip van Niekerk is a former journalist who, since January 2011, has been the Managing Partner of
         Calabar Consulting, a private intelligence firm with a particular focus on African affairs.

**(i) January 2012: The Gertler project**

2.      On 14 December 2011, the Defendant emailed Mr van Niekerk to acknowledge receipt of a payment which
         had been transferred to his bank account.  He then set out *"a list of new documents"* which he had *"access
         to which have not been published"* and which he was *"fairly sure that not even First Quantum possesses"*.

3.      The following day he emailed Mr van Niekerk to confirm that he was happy to work on an exclusive basis
         in respect of a new project for Mr van Niekerk, the focus of which was Mr Gertler.  In the course of this
         project, the Defendant relied on and disclosed a very substantial quantity of ENRC Confidential and
         Privileged Information, including documents and information which he obtained from Mr Trevelyan and the
         ENRC Dataset:

         (a)     On 9 January 2012, the Defendant emailed Mr van Niekerk and set out further details of what he
                 described as the *"Dan Gertler documents"*.  These documents included the following ENRC
                 Confidential and Privileged Information:

                 (i)     A *"secret report to the Serious Organised Crime Agency"* that was *"marked 'Restricted'"* and
                         shareholder agreements *"between the intermediary offshore companies that facilitated the
                         sale of the DRC mining asset"*, as well as other two other documents that related to the
                         *"corporate entities that facilitated the sale of the DRC mining asset"*;

                 (ii)    An agreement relating to *"Gertler's corporate vehicle and the offshore companies that bought
                         the mining asset in the DRC in 2010"* (it is inferred a reference to the Camrose contract).

         (b)     The Defendant and Mr van Niekerk arranged to meet on 16 January 2012 to discuss both the Gertler
                 project and what the Defendant referred to as *"lots of activity on ENRC."*  Shortly before they were
                 due to meet, the Defendant sent Mr van Niekerk a summary of the documents which the Defendant
                 intended to give to Mr van Niekerk the following day (17 January 2012).  Again those documents
                 contained ENRC Confidential and Privileged Information and included documents which the
                 Defendant had previously obtained from Mr Trevelyan and the ENRC Dataset in the circumstances
                 described at Paragraph **4 Annex B.1**:

                 (i)     An *"execution copy"* of an *"agreement regarding the sale of SMKK shares and Camrose
                         Resources Ltd"* (dated 8 December 2009);

                 (ii)    An *"execution version"* of a *"Letter of Intent regarding the sale of shares in Camrose
                         Resources Ltd"* (dated 14 June 2010);

                 (iii)   A *"letter from Camrose Resources Ltd to Highwind Properties Ltd"* about a loan facility;

                 (iv)    The Herbert Smith SAR;

(v)     An *"agreement and contract between ENRC Congo BV (and its three related BVI companies) to acquire 50.5 per cent of the issued share capital of Camrose Resources Ltd."*

(c)     On 19 January 2012, the Defendant emailed Mr van Niekerk to update him about *"two successful meetings with two sources on Gertler"*.  In particular, the Defendant informed Mr van Niekerk that:

(i)      *"Magic"* (*i.e.* Mr Trevelyan) had informed him that there was a possibility of obtaining (it is inferred from the ENRC Dataset) *"at least two - if not three – more 'Suspicious Activity Reports'"* which had been sent to the SOCA.

(ii)     A separate source had given the Defendant *"some insights into Gertler and ENRC in* [the] *DRC"*, an issue which the Defendant implied he would address in *"a more detailed memo"* in due course.

(iii)    The Defendant also informed Mr van Niekerk that Mr Trevelyan *"would like to be paid for the documents he has already supplied"* (a reference to the documents in Paragraph 3**(b)** **Annex C.3**, above) and that *"he would also like to be paid if he delivers on the new extra SAR reports."*

(d)     On 26 January 2012, the Defendant emailed Mr van Niekerk to inform him that he had *"more meetings with Magic on Gertler and also my ENRC source"* and had the following updates:

(i)      There were two further Suspicious Activity Reports *"which are not in the public domain"* and which Mr Trevelyan could potentially obtain (again it is inferred from the ENRC Dataset); and

(ii)     That the Defendant had confirmation from his *"ENRC source"* that he has *"access to documents which will detail ENRC's business interests and assets in DRC and the role of Gertler."*

**(ii) April – May 2012: Exchange of information with FG Hemisphere**

4.      Further, in April and May 2012, the Defendant arranged for Mr van Niekerk to meet Amy Brown of FG Hemisphere, thereby enabling them to exchange confidential information about the Claimant and, it is inferred, to discuss their shared interest in further using and disseminating the ENRC Confidential and Privileged Information which the Defendant had previously disclosed to both.  In this regard:

(a)     On 24 April 2012, the Defendant emailed both Mr van Niekerk and Ms Brown to pass on their respective contact information.

(b)     On 25 April 2012, Mr van Niekerk replied to the Defendant, asking if Ms Brown had *"seen the material you got from the genius?"* (*i.e.* Mr Trevelyan). The Defendant replied that Ms Brown had already received that material which *"was now in circulation"* and that *"it will be difficult to get more documents"*.

(c)     On 4 May 2012, the Defendant emailed Mr van Niekerk informing him that Ms Brown would be in London between 23 and 29 May 2012.  He subsequently emailed Ms Brown informing her that Mr van Niekerk was *"still keen to talk"* to her and a meeting was subsequently arranged for 27 May 2012.

**(iii) Leaks of information about the SFO investigation into the Claimant**

5.     From at least 2017 onwards, the Defendant engaged in an exchange of information with Mr van Niekerk relating to developments in the SFO's Investigation of the Claimant and its related parties.  In the course of this relationship, the Defendant provided Mr van Niekerk with confidential inside information about the Claimant which the Defendant had obtained from his source(s) at the SFO.  In addition, the Defendant procured information relating to the Investigation, which had apparently been provided to Mr van Niekerk by his own SFO sources, and placed it into the public domain.  For instance:

(a)     In or around February 2017, the Defendant and Mr van Niekerk exchanged emails about a new *"Kazakh"* project which the Defendant was working on for Mr van Niekerk.

(b)     To this end, the Defendant regularly updated Mr van Niekerk about the status and progress of the ongoing SFO Investigation into the Claimant on the basis of information which he was able to obtain from a senior source within the SFO (as to which Paragraph **23 PoC** and Paragraph **3 Annex D** are repeated).

(c)     In addition, ostensibly acting on information given to him by Mr van Niekerk, the Defendant sought to place articles in the media about the SFO investigation into the Claimant, including an article under the Defendant's own by-line which was published in the *Evening Standard* on 15 September 2017 in the circumstances further set out in Paragraph **3 Annex D.**

**(iv) December 2017: further disclosure of information from the ENRC Dataset**

6.     On 21 December 2017, ostensibly in the course of the said Kazakh project, the Defendant emailed Mr van Niekerk *"eight pages of summaries and memos based on an analysis of hundreds - if not thousands - of documents leaked between 2004 and 2008"* including on the following topics:

(a)     *"ENRC"*;

(b)     IMR, which the Defendant described as *"a subsidiary of ENRC and key to the SFO investigation"*;

(c)     The *"Kazakh Trio"* (a reference to the Claimant's ultimate owners);

(d)     Victor Hanna (the Head of Africa Operations at the Claimant);

(e)     Mr Gertler;

(f)     FQM.

7.     On 22 December 2017, Mr van Niekerk emailed the Defendant to ask whether he would be able to *"obtain the underlying data"*. The Defendant subsequently responded that he *"would make a start"* and that he felt as though there was *"a reasonable chance"*.   Notwithstanding this elusive response, the said *"summaries and memos"* (or at least a significant number of them) were derived from reports which the Defendant had previously submitted to other clients about material which he had previously identified and extracted from the ENRC Dataset (amongst other sources).   It is further to be inferred that the Defendant proceeded to disclose these underlying source documents to Mr van Niekerk and that further ENRC Confidential and Privileged Information was received by Mr van Niekerk and his client from the Defendant as a consequence.

ANNEX D

DISCLOSURES RELATING TO THE SERIOUS FRAUD OFFICE INVESTIGATION

1.   As further set out in Paragraphs **22–23 PoC,** from at least 2012 onwards, the Defendant (often in conjunction with Mr Yearsley) has exploited longstanding relationships with current and former officers at the SFO in order to acquire confidential, private and sensitive information relating *inter alia* to individuals and companies of actual or prospective interest to the SFO, as well as the status and nature of ongoing and contemplated SFO investigations (including, in particular, the SFO's engagement with, and investigation into, the Claimant).

2.   In addition, over at least the same period, the Defendant has:

   (a)   Disclosed the highly confidential information which he acquired about the SFO's interactions with the Claimant to numerous clients, third-parties and the media; and

   (b)   Disclosed ENRC Confidential and Privileged Information to the SFO itself, including as part of a mutually beneficial exchange of information with serving SFO officers and including with the ambition of advancing the interests of clients who stood to gain if the SFO's engagement with the Claimant was prolonged or escalated.

**(i) Disclosures of confidential information about the SFO's investigation to third parties**

3.   The best particulars that the Claimant is presently able to give of instances where the Defendant has been able to obtain sensitive and confidential details about the nature and status of the SFO's investigation into the Claimant, in the majority of cases ostensibly from sources within the SFO, and disclose the same to third parties are as follows:

   (a)   In an email to Mr Yearsley of 3 April 2012, the Defendant referred to a need to confirm a forthcoming lunch with Mr Goodley, a journalist at *The Guardian,* at which he intended to disclose the *"inside track on the SFO and ENRC which should be of interest to him"* (ostensibly a reference to inside information which his SFO sources were then providing to him regarding the SFO's current engagement with the Claimant about the Internal Review).

   (b)   On 14 March 2013, the Defendant emailed Christopher Thompson, a journalist at the *Financial Times,* about confidential details relating to the SFO's ongoing engagement with the Claimant in connection with its Internal Review process, including in particular an account of a letter which the Defendant believed had been sent by the SFO to the Claimant's CEO on 28 or 29 January 2013 and which he said stated that the SFO intended to launch a formal investigation into the Claimant.

   (c)   During the morning of 25 April 2013, the Defendant emailed Mr Balint-Kurti of Global Witness to inform him *"I understand that the SFO are releasing a statement today that they are launching an official criminal investigation into ENRC!!"* The Defendant disclosed this highly sensitive information, notwithstanding the fact that Claimant's legal advisors had attended a meeting at the SFO's offices at 9am that day, during which they were informed that the SFO had decided to open a formal investigation but at which the SFO agreed, in view of the price-sensitivity of that information, not to make the fact of the investigation public until 1pm that day.

(d)  On 21 February 2017, the Defendant emailed Mr van Niekerk and attached a report which the Defendant noted contained *"new information on the SFO investigation"*.  In the report itself, the Defendant stated that *"I have a new source inside the SFO who briefs me on existing SFO investigations. Last week he told me that the investigation into ENRC is now 'their main priority' and 'the next big case'"*.  The Defendant went on to relay highly sensitive information about what he had been informed was the current focus of the SFO's Investigation, the identity of cooperating of third-party witnesses, the SFO's assessment of the strength of the evidence, and the Investigation's expected future course.

(e)  A similar update was provided the same day to Mr Goodley of *The Guardian*, with the Defendant commenting that he had been developing a new source at the SFO *"who is a senior investigator on their big cases and talks to me off-the-record."*

(f)  On 17 March 2017, the Defendant further updated Mr van Niekerk about the status of the SFO Investigation into the Claimant, reporting that his *"insider source"* had confirmed that the investigation was *"definitely ongoing"* and *"being taken very seriously."*

(g)  On 20 April 2017, the Defendant emailed Mr van Niekerk to inform him *inter alia* that the SFO had been told that they would be able to use *"the secret Decherts* [sic] *documents which were given to the SFO by ENRC's former lawyers"* (a reference, it is inferred, to the material which subsequently was the subject of   the 8 May 2017 judgment of Andrews J in *Eurasian Natural Resources Corporation Limited v Director of the Serious Fraud Office* [2017] EWHC 1017 (QB)). The Defendant noted that this was *"not yet official"*, a comment which indicated that this information could only have been given to him by his source inside the SFO.  The same email also identified the names of individuals associated with the Claimant who were said to be attracting particular focus from the SFO and noted that *"there is more to come"*.

(h)  On 13 June 2017, the Defendant again emailed Mr van Niekerk and gave an account of the 8 June 2017 meeting to which he had been invited by two officials from the Intelligence Unit of the SFO (Grant Cherrington and his colleague "*Vince*") and its "*Head of Disclosure*".  The Defendant again provided Mr van Niekerk with inside information which he had improperly received from the said officials about the direction and focus of the SFO's Investigation, including the SFO's assessment of the evidential merits of different parts of the case.  The Defendant also referred to *"guidance"* which he had received from the SFO officials about: the precise nature of the SFO's case against the Claimant; the identity of the individuals within the Claimant whose role made them *"primary targets"*; the extent of cooperation which they had received from the DRC Government; and the identity of some of those who had been interviewed thus far.

(i)  On 12 September 2017, the Defendant emailed Marcus Leroux, a journalist at *The Times* who was covering the SFO's Investigation into the Claimant.  The Defendant promised Mr Leroux that he would provide him with *"the inside track on recent developments"* in the SFO's Investigation into the Claimant, including *"who the SFO have been interviewing very recently and the details of those questions"*.

(j)  On 14 September 2017, the Defendant emailed Pierre Gastineau, the Editor in Chief of *Intelligence Online*, with a proposed draft article in which he again revealed confidential details about the SFO's

investigation, including the identity of the individuals who had recently been interviewed and the nature of the questioning which they faced.

(k)  The following day on 15 September 2017, an article was published in the *Evening Standard* under the Defendant's own by-line (and for which he subsequently invoiced the newspaper) about the SFO investigation into the Claimant.  That article reported the fact that Mr Mashkevich was one of the individuals who had been questioned.  On the same day, the Defendant emailed Mr van Niekerk about the article, noting that while it did not include information about the SFO interviewing Mr Gertler, it was nonetheless *"job done"* on the basis that "*I assume the Kazakh involvement is more important anyway."*

(l)  On 20 September 2017, the Defendant exchanged emails with Marc Champion, a reporter for *Bloomberg* about an article which the latter was proposing to write on Mr Mashkevich. The Defendant offered to sell Mr Champion a selection of documents and information which he had extracted from his files (including ENRC Confidential and Privileged Information) for £1,200.  He also offered to introduce Mr Champion to other sources of confidential information about the Claimant and Mr Mashkevich, including Kirill Stein and Mr Kazhegeldin and promised to disclose details of the SFO investigation "*and how it implicates AM*".

(m)  On the same day, the Defendant contacted the Guardian journalist, Rob Evans, to inform him that he had just spoken to his SFO source, who had revealed that two new Kazakh witnesses (whose identities the Defendant disclosed to Mr Evans) had agreed to testify for the purpose of the SFO investigation into the Claimant.

(n)  On 23 October 2017, the Defendant again emailed Mr Champion with further detail about the dates on which Mr Mashkevich was interviewed by the SFO, the focus of the questioning which he faced, and the identity of his lawyers.

(o)  On 27 November 2017 the Defendant emailed an investigative journalist, Christian Eriksson, in order to relay confidential information which he had received from his SFO source relating to the principal targets and current focus of the SFO's Investigation into the Claimant.  The Defendant sent a further email to the same journalist on 29 November 2017, noting that he would be speaking to his SFO contact that Friday, 1 December 2017 (it is inferred in connection with the SFO Investigation into the Claimant which was clearly of interest to the journalist).

(p)  On 19 April 2018, the Defendant emailed Mr Balint-Kurti and informed him about his *"inside source at the SFO"* who he stated was providing off-the-record briefings about the SFO Investigation into the Claimant.  The Defendant noted that he was *"happy to share all information"* with Mr Balint-Kurti in this regard *"as usual"*.

**(ii) Disclosure of ENRC Confidential and Privileged Information to the SFO**

4.  In addition, it is inferred that the Defendant has also exploited the same relationship with SFO sources in order to disclose information (including ENRC Confidential and Privileged Information) to the SFO and/or to assist his clients (or their clients) to disclose information and documents to the SFO in circumstances where such disclosures could not properly have been made and/or received by the SFO.  In support of its case in this regard, the Claimant will rely on the following matters:

(a)    The disclosures of documents to the SFO which the Defendant and Mr Yearsley effected through Mr Lyburn and Mr Farries in the circumstances set out in Paragraph **7 Annex A.2.**

(b)    The Defendant's 8 June 2017 meeting with Grant Cherrington, a senior executive at the SFO, another member of the Intelligence Unit of the SFO named *"Vince"* and the SFO's *"Head of Disclosure"*. In emails which the Defendant sent to Ms King and another contact, Richard Hynes, later the same day, he referred to the SFO Intelligence Unit as *"recipients of intelligence which are given on a confidential basis to the case team"* and that the purpose of the meeting had been *"mainly to establish the terms of reference for my relationship with the SFO."*

(c)    The subsequent email of 10 January 2018, in which Mr Cherrington belatedly thanked the Defendant for a *"report which he had provided on Cottage Consultants et al"*. In the circumstances, it is inferred that the Cottage Consultants' *"report"* also contained reference to the substantial quantity of ENRC Confidential and Privileged Information which the Defendant held about the Claimant given:

    (i)    The use of the term "et al" indicates that the information which had been disclosed to the SFO by the Defendant in this *"report"* was not confined to the Cottage Consultants investigation;

    (ii)    The high priority which it is known that the SFO attributed to the outcome of their Investigation into the Claimant at the time (as to which Paragraphs **3(d) and (f) Annex D** are repeated;

    (iii)    The SFO's willingness to countenance and encourage other improper disclosures of confidential and privileged information concerning the Claimant (including, in particular, from Mr Gerrard);

    (iv)    The fact that it is apparent that the SFO's Investigation into the Claimant was a frequent focus of the discussions and communications between the Defendant and his SFO sources.

(d)    The Defendant's response to Mr Cherrington on 11 January 2018, in which he offered to provide information about ongoing SFO investigations *"with no conditions attached"* and invited the SFO to arrange a meeting at which the documents in the Defendant's possession could be handed over. For the reasons set out in Paragraphs **22–23 PoC**, it is inferred that the Defendant disclosed ENRC Confidential and Privileged Information to the SFO, either:

    (i)    At the meeting which he purported to offer the SFO in this email;

    (ii)    Or, more likely given the existing nature of the Defendant's existing relationship with the SFO, that he had already done so on previous occasions (with Mr Cherrington's very belated "reply" of 10 January 2018, more than 6 months after the meeting to which it purported to refer, constituting a retrospective attempt to place the SFO's receipt of such information from the Defendant on a superficially legitimate footing).

Claim No. BL-2019-001955

IN THE HIGH COURT OF JUSTICE
BUSINESS & PROPERTY COURTS OF ENGLAND &
WALES
BUSINESS LIST (ChD)

B E T W E E N:


EURASIAN NATURAL RESOURCES CORPORATION
LIMITED

Claimant

- and -


MARK HOLLINGSWORTH

Defendant



PARTICULARS OF CLAIM



## FRIED FRANK

Fried, Frank, Harris, Shriver & Jacobson (London) LLP

41 Lothbury

London

EC2R 7HF

T: +44 207 972 9600



Ref: JBM/5314-1


2168788