# Exhibit 39

# *252 Bankers Trust International plc v PT Dharmala Sakti Sejahtera and counterclaim

 No Substantial Judicial Treatment

**Court**
Queen's Bench Division (Commercial Court)

**Judgment Date**
19 October 1995

**Report Citation**
[1996] C.L.C. 252

Queen's Bench Division (Commercial Court)

Mance J.

Judgment delivered 19 October 1995

*Discovery—Foreign proceedings—Order for discovery overseas—Action tried in England—Judgment reserved—Plaintiffs commenced US proceedings—Application in US court for discovery in order to obtain evidence for production in English proceedings—US orders for disclosure in relation to defendants' transactions with other clients—Whether foreign proceedings abusive and oppressive—Whether costs to be taken into account—Whether English or US court to judge whether US proceedings oppressive.*

This was an application for an order requiring the plaintiffs to apply to the US District Court to discontinue the proceedings commenced there, to set aside its ex parte orders for discovery and to restrain further proceedings.

In this action the plaintiffs, Bankers Trust International plc ('BTI') claimed that the defendant, PT Dharmala Sakti Sejahtera ('DSS') owed nearly $65m in relation to transactions in derivatives which the parties had entered into. BTI had acted through Bankers Trust Co ('BTCo'). DSS counterclaimed for rescission of the transactions, and damages for deceit and negligence. The proceedings were commenced in England. DSS made interlocutory applications, which were largely unsuccessful, for discovery in relation to BTI's transactions with other clients. The applications were based on a claim that BTCo had been fraudulent. The trial of the claim and counterclaim took place in July 1995 and judgment was reserved.

In August, DSS obtained a copy of an article published in the 'Washington Post' relating to an action in America against BTCo and BTI. DSS believed it showed that a fraudulent 'system' of conduct had been operated by BTCo in relation other clients as well as themselves. DSS also believed that there were a number of other actions which endorsed their belief. As a result DSS applied, unsuccessfully, to the trial judge for leave to amend its pleadings to include a claim of systematic fraud. DSS then applied to the US District Court for an ex parte order for disclosure directed to BTCo and its parent and associated company. The US court granted the orders. DSS hoped that as a result new and relevant information would emerge that would enable them to reapply to the trial judge for leave to amend in order to assert systematic fraud.

BTI and BTCo applied for an order that DSS apply to the US District Court to discontinue the proceedings there and for the setting aside of the US District Court's orders.

© 2019 Thomson Reuters.

*Held*, allowing the application and making the appropriate order to restrain the US proceedings:

1. Although in principle foreign proceedings could be used to gather evidence in a foreign jurisdiction for use in English proceedings, the court had jurisdiction to restrain a party to English proceedings from pursuing foreign proceedings where they were oppressive or vexatious. DSS had produced insufficient new evidence of a systematic fraud to warrant pursuing US proceedings in order to adduce fresh evidence or amend in England at a time when the English actions had already been tried.

2. It was for an English court to judge whether foreign proceedings in a US court constituted an abuse or were otherwise oppressive in the context of English proceedings. Taking into consideration all the circumstances, including the fact that costs could not be recovered in the New York court, and the speculative nature of the proposed large-scale investigation into the plaintiffs' business which, if it produced material to support the fraud *253 allegations would require the reopening of the English trial, the US proceedings were both abusive and oppressive and ought to be restrained. ( *South Carolina Insurance Co v Assurantie Maatschappij 'de Zeven Provicien' NV [1987] AC 24 distinguished* )

**The following cases were referred to in the judgment:**

*Euromepa SA v R Esmerian Inc 51 F 3d 1095* (2nd Cir 1995).
*Ketteman v Hansel Properties Ltd [1987] AC 189* .
*Societe Nationale Industrielle Aerospatiale v Lee Kui Jak [1987] AC 871* .
*South Carolina Insurance Co v Assurantie Maatschappij 'de Zeven Provicien' NV [1987] AC 24* .

**Representation**

Ian Milligan QC and David Owen (instructed by Linklaters & Paines ) for the plaintiffs.
Stuart Isaacs QC (instructed by Ince & Co ) for the defendant DSS.

**JUDGMENT**

Mance J:

These actions relate to transactions in derivatives-entered into by PT Darmala Sakti Sejahtera ('DSS') with Bankers Trust International plc ('BTI') acting through Bankers Trust Company ('BTCo'). BTI claims that DSS owes it nearly $65m. DSS counterclaims for rescission of the transactions and/or for damages for deceit and/ or. negligence and/or negligent misstatement. An expedited: trial was ordered by Waller J on 5 May 1995. Applications by DSS for discovery were determined by Longmore J on 9 June 1995 and by myself on 4 July 1995. The trial took place between 10-and 28 July 1995 when I reserved judgment. Judgment has not yet been given.

On 14 September 1995 DSS applied ex parte to the US District Court, Southern District of New York for, and on 20 September 1995 they were granted orders for the taking of depositions and production of documents directed to (a) BTCo and (b) BTCo's ultimate parent company, Bankers Trust New York Corp ('BTNYC') and another subsidiary of BTNYC, BT Securities Corp ('BTSC'). On 21 September 1995 they served three subpoenas addressed to each of these Bankers Trust companies. The subpoenas identify as persons sought to be deposed seven named witnesses, from the chairman and president down, together with a custodian of records in relation to, the documentary requests and:

> 'a witness designated pursuant to Fed.R.Civ.P 30(b)(6) with knowledge of: (a) policies and practices of Bankers Trust in 1994 with respect to marketing and selling derivatives; (b) complaints and/or claims asserted by Bankers Trust customers arising out of or relating to the marketing and sale of derivatives; and (c) investigations by regulatory authorities relating to the marketing and sale of derivatives by Bankers Trust.'

BTI and BTCo now apply by summons dated 27 September 1995 for an order requiring DSS to apply to the US District Court to discontinue the proceedings and to set aside its orders dated 20 September 1995 arid restraining DSS from seeking to enforce the orders or to commence or continue any further like application. The summons also seeks declarations that any application by DSS for leave to re-amend its pleadings in the present actions to allege facts founded on evidence obtained in the New York proceedings would be refused and that the evidence to which the New York orders and subpoenas relate would not be admitted. I do not consider that this court can make any such prospective declarations in respect of applications for leave to re-amend not yet formulated or made and evidence not yet identified. I say no more therefore about the claim to these declarations. It was and is the claims requiring withdrawal of the US proceedings and restraining further such proceedings which are central to this application.

That there is jurisdiction to restrain a party to English proceedings from pursuing foreign proceedings in certain circumstances is beyond question. The nature of the *\*254* jurisdiction and of the circumstances in which it may be exercised was considered in the House of Lords and Privy Council in *South Carolina Insurance Co v Assurantie Maatschappij 'de Zeven Provincien' NF [1987] AC 24* and *Societe Nationale Industrielle Aerospatiale v Lee Kui Jak [1987] AC 871*. The present is not a case where BTI or BTCo can or do suggest that DSS by its proceedings in New York has invaded or is invading any legal or equitable right of any Bankers Trust company. These two cases show that, at least generally speaking, the only other circumstances in which an English court will restrain a party from pursuing foreign proceedings are when to do so would be 'unconscionable', a term which 'includes, at any rate, conduct which is oppressive or vexatious or which interferes with the due process of the court' (see per Lord Brandon in the *South Carolina* case at pp. 40F and 41D and per Lord Goff in the *Aerospatiale* case at p. 896F–G). In judging whether this is the case, the court must take into account not only the potential injustice to the one party if the other is allowed to pursue the foreign proceedings, but also the potential injustice to the latter if he is not so allowed ( *Aerospatiale* at p. 896G).

The most common situation in which these principles come before the court for consideration is when there are two competing sets of proceedings, in both of which one or other party claims determination of the substantive dispute. An example occurred in the present case when BTI and BTCo applied unsuccessfully to Waller J in May 1995 for an injunction restraining the pursuit by DSS of concurrent Indonesian proceedings against them. The present situation is different in that the avowed aim of the New York proceedings is to complement and provide material 'for use in' the present English proceedings. This was also the situation in the *South Carolina* case. The House of Lords decision there shows that there is nothing axiomatically unacceptable about the use of s. 1782 to gather evidence in the US for use in English proceedings, although the means by which such evidence is gathered would not be available under English law and might involve the taking of depositions from and pre-trial discovery against third parties who were not parties to the English proceedings. To use s. 1782 was not to interfere with the English court's control of its own process: see per Lord Brandon at p. 41G. The defendants who were making use of s. 1782 were simply trying to obtain in a foreign country, by means there lawful, evidence which they believed that they needed for their case. Whether they applied to this court under RSC, O. 39, r. 2 for letters rogatory or to an American court under s. 1782 was also a matter for them. The rule precluding the obtaining of pre-trial discovery against third parties under English law is for the protection of third parties, not of either of the parties to English litigation: see per Lord Brandon at p. 42E–G. In so far as the plaintiffs in the *South Carolina* case had incurred extra costs in resisting the orders sought under s. 1782, that was their choice. The third parties were willing to supply the material sought: see pp. 42H-43C. In so far as the steps taken under s. 1782 caused inconvenience in terms of delay, part of such delay arose from the plaintiffs' attempt to injunct

the defendants from pursuing their s. 1782 applications and any further delay in trial of the English proceedings was the price of justice being fully done in such proceedings and could also be controlled by the court fixing a date: see p. 43F and 43H.8

Distinctions exist however between the circumstances in the present case and the *South Carolina* case. There the defendants were retrocessionaires and their application under s. 1782 was against the agents who had accepted and the adjusters who had investigated claims on the original insurance business written on behalf of the original insurers. The agents and adjusters were not agents of the plaintiffs who were the reinsurers. A request to the agents for voluntary disclosure had been refused, after being referred to the original insurers as well as the plaintiffs who were their reinsurers. However, neither the agents nor the adjusters resisted disclosure when sought under s. 1782. Later, despite an English injunction obtained in the meanwhile to restrain pursuit of the s. 1782 application, certain *255 disclosure by the agents and adjusters was permitted by the plaintiffs. But it was in issue whether this was full or adequate. The present case differs in that the relief sought under s. 1782 is directed to the other party to the English action (BTCo) as well as its parent (BTNYC) and an associated company (BTSC). Mr Isaacs QC for DSS pointed out that the latter two companies are as third parties in a parallel position to that of the agents and adjusters against whom s. 1782 relief was sought in the *South Carolina* case. That is so in form. In substance, however, the corporate connection between the three Bankers Trust companies may put a different complexion on the matter. Precisely the same relief is sought against all three Bankers Trust companies under s. 1782. The evidence filed by DSS to obtain s. 1782 relief in New York consists of affidavits of Mr Sesser, a partner in their New York attorneys, and an accompanying declaration by Mr Thillagaratnam, a partner in their Singapore lawyers, which do not differentiate between the three companies or explain why all three were sued. On the contrary Mr Thillagaratnam's declaration asserts that the information in the *Washington Post* article, which is relied on as providing the basis of the s. 1782 application:

> 'is limited to an allegation that BTI and [BTCo] would not allow a customer to get out of a swap with losses less than the bank's reckoning'.

This suggests that the article is viewed as demonstrating systematic fraud on the part of the two Bankers Trust companies which are parties to the English proceedings, and does not explain why the other companies have been involved, save perhaps out of major caution.

A second important distinction lies in the different stages at which the applications were made. In *South Carolina* the application was at an early stage, with a view to providing evidence at trial, which would not have been delayed much, if at all, had it not been for the plaintiffs' unjustified attempts to stop the s. 1782 proceedings. In the present case, the trial is over, and judgment is awaited. I should however add that DSS do not seek to suggest that the date when I give judgment should be in any way delayed or affected by the existence of the s. 1782 proceedings. Mr Isaacs simply submits that DSS should be allowed to carry on with their pursuit of further evidence in the hope that it will produce further material justifying an application before judgment, or, if not, after judgment.

A third distinction is that many of the precise categories of documents now sought to be obtained under s. 1782 have in the course of the present actions been the subject of applications for discovery, in which DSS were largely unsuccessful before Longmore J and myself. To the extent that discovery was ordered, no complaint has been made in the present actions that it was not properly given. I was given a schedule of the suggested overlap between the documents identified in the New York subpoenas and the previous applications to this court in the present proceedings. Having examined the material to which this schedule refers, I say no more than that the overlap, even though not quite as complete as the schedule might superficially suggest, is very considerable, as for example in the areas of procedures and standards in the conduct of derivatives business, problems with customers and regulatory authorities experienced in that regard, any changes resulting from such problems, the 'orderly withdrawal in the first quarter of 1994 from substantial market positions in [BTNYC's] trading and positioning function' referred to in an annual report and the fees, profits and any other benefits received by Bankers Trust companies and Mr Hyun from such business. The documents now sought also include documents in specific areas (such as the termination of

© 2019 Thomson Reuters.

Mr Hyun's employment) where there was cross-examination at trial, but no request for discovery was pursued. It is also to be noted that the blanket request now made for discovery of 'all documents relating to Indonesian companies to whom Bankers Trust sold derivative products from January 1993 to the present' is made in circumstances where (a) the fact that BTCo did derivatives *256 business in Indonesia was well known (it is indeed one of DSS's pleaded allegations that Mr Nurjadin represented to DSS that none of BTCo's customers in Indonesia had ever lost money on BTCo's products) and (b) Mr Hyun was asked questions in cross-examination about problems with one such customer, PT Adimitra Rayapratamo ('Adimitra') without any specific request for discovery of documents in relation to Adimitra being pursued. I shall return to Adimitra later.

The plaintiffs suggest further distinctions. In the *South Carolina* case, there was no suggestion that the material sought under s. 1782 would be irrelevant or incapable of use in the English proceedings. In the present case, the plaintiffs submit, the material sought will not be admissible and will not enable any application to amend. Moreover, if the s. 1782 subpoenas are allowed to be enforced, they threaten to involve very wide oral depositions as well as very onerous discovery, which will involve large costs and take up much time, in relation to an action in which the plaintiffs were entitled to assume that the next step was a judgment, followed by a possible appeal by one side or the other. For these and other reasons to which I will come, the plaintiffs submit that the *South Carolina* case can and should be distinguished and that DSS's present attempt to reopen evidential matters should be restrained as abusive and/or oppressive.

DSS's justification of the proceedings under s. 1782 is set out in the declaration of Mr Thillagaratnam. That declaration, inter alia, recounts as background DSS's case in the English proceedings, and both the course of certain Indonesian proceedings begun by DSS against BTI and BTCo and of the present English proceedings. It ascribes the application under s. 1782 to the obtaining by Mr Thillagaratnam on 2 August 1995 of a faxed copy of an article published in the *Washington Post* on 11 June 1995. To avoid a possible adjournment of their present applications, the plaintiffs agreed not to pursue any suggestion that DSS could or should have obtained notice of the *Washington Post* article prior to 2 August 1995 or have taken earlier steps thereafter to invoke s. 1782, if it was appropriate for them to invoke it at all. Mr Thillagaratnam says in para. 18ff:

> '(18) ... If the material in this article had been made available earlier to DSS, it would have been able to plead the existence of a "system" of conduct operated by Bankers Trust in relation to other clients and DSS. The information in the *Washington Post* is limited to an allegation that BTI and Bankers Trust [defined elsewhere in the declaration as a reference to BTCo] would not allow a customer to get out of a swap with losses less than the bank's reckoning. At the bottom of p. 7 of the article, it says:
>
>> "At the same time, the bank did not want a customer to pull out of a derivative based on a quoted value that was higher than the true value ... So, salespeople would attempt to convince a customer to hang on."
>
> This is precisely what Bankers Trust did immediately after the US Federal Reserve Board raised Federal Fund Rates on February 4,1994.
> (19) There may well be other examples of systematic conduct that may be discovered when enquiries are made in the USA, but the material in the *Washington Post* article is the starting point. DSS clearly did not have the benefit of the material stated in the *Washington Post* article at the time when the discovery applications were heard in the English proceedings.
> (20) The allegation would have greatly strengthened the case on the relevance of the matters on which DSS sought discovery in the English proceedings, which discovery was refused ...'

Mr Thillagaratnam then summarised Longmore J's ruling on 9 June 1995 ordering that discovery need not be given in respect of issues raised by para. 35(iv) of DSS's points of defence and counterclaim in the present proceedings. Paragraph 35 pleads that BTCo *257 as agent for BTI made the alleged representations- deceitfully or recklessly. Sub-paragraph (iv) refers in support to para. 35–40 of an affidavit of Mr Thio sworn 22 April 1995. Mr Thio there refers to suits brought by a number of American companies, including Gibson Greetings Inc and the Proctor & Gamble Co ('P & G'), against BTCo and other associated companies alleging misconduct in respect of derivatives transactions and leading in the case of Gibson Greetings, to a finding by the Securities and Exchange Commission ('SEC') of fraud by BTSC and to disciplinary action and a fine of $ 10m in respect of such misconduct. Longmore J held that it was impossible to go into a whole series of different transactions in New York on the basis of similar fact evidence in a trial fixed for 10 July 1995 and estimated to last eight days, that if discovery was given it would inevitably result in a mini-trial in England of all that went on in New York, undermining both the eight day estimate and Waller J's order for expedition and, further, that it was not necessary for there to be such discovery and that, since DSS had not thought it necessary to make any similar allegation in the Indonesian proceedings, it was in that light also not necessary for the just disposal of the English proceedings to order the discovery sought. I would add that Longmore J also pointed out, firstly, that what DSS were seeking to do was to infer from allegedly fraudulent conduct in America that there were similar frauds in relation to the conversations which took place with DSS involving Mr Hyun and Mr Nurjadin in the Far East, and, secondly, that he was not deciding that DSS could not at trial cross-examine and argue and make submissions about what happened in New York if they felt that assisted their case, subject always to any ruling by the trial judge. In the event, after a brief allusion in opening, the allegations in para. 35(iv) of the pleading and para. 35–40 of Mr Thio's affidavit really played no part in the trial. Mr Williams, a Bankers Trust economist, was asked whether his reports had also played a part in relation to any of the American deals which became the subject of litigation, to which he answered, not to his knowledge; otherwise there were only a few tangential references to the American problems in evidence and submissions. It was not suggested to Mr Hyun or Mr Nurjadin that their conduct was in any way connected with or part of any policy or practice evidenced by the American problems experienced by any Bankers Trust company.

Mr Thillagaratnam also mentioned the discovery application which I decided on 4 July 1995, saying that, on the issue whether DSS was entitled to discovery of New York documents as to whether BTCo used DSS's transactions to. hedge other unprofitable commitments, I considered that:

> 'documents in this area are unlikely to carry matters very far therefore, although some further documentation may be able to be provided. It is clear on the evidence and because of the complexity of the Bankers Trust Group internationally that any detailed investigation of profitability or of hedging ...: is unlikely to be either simple or, in the context of the issues in this action, justified.'

In fact this does not appear to be a wholly accurate summary of the relevant part of my judgment, where 'the area' referred to in the first sentence was the possible self-interest of the plaintiffs or their salesman in the form of profits and/or remuneration to be earned. The reference to hedging in the second sentence was (as the passage omitted from the quotation shows) to hedging of the DSS transactions conducted after they were effected. I had in the previous paragraph accepted the plaintiffs' evidence that there was no question of the DSS transactions being entered into to hedge previous unprofitable transactions. My judgment also dealt with a large number of other aspects of discovery not summarised by Mr Thillagaratnam. In particular, in relation to an application for discovery relating to the agreements made with the Federal Reserve Bank, I applied what had been said by Longmore J and added this, at p. 32: *258

> 'It is impossible to dive sensibly into one aspect — the culmination — of problems involving other clients without a full investigation of the position vis-a-vis the other clients and it would, it seems to me, be intolerable to overload this action with discovery going to the plaintiffs' relationship with other clients. Assuming, as Longmore J did, that this could be admissible, it still seems to me unlikely to be particularly helpful to investigate or consider, in relation to this action, what were no doubt substantial relationships, which have evidently given rise to substantial problems in the US between different arms of the plaintiffs and different clients. That seems to me to apply both in relation to the issue whether there was negligence in this case and also in relation to the issue whether there was fraud. As to fraud there is no suggestion of any overlap between the relevant personnel dealing with those different clients and dealing with DSS. The matters the subject of the agreement with the Federal Reserve Bank appear to have occurred in a different part of the world. Once again it seems to me that this request suffers from being far too diffusely spread.'

I then went on to make a qualification in relation to any specific video tape or document describing the particular type of derivative contracts represented by either of the swap transactions the subject of this action, which I held should be disclosed, especially if it reached Mr Hyun or Mr Nurjadin, but also even if it did not.

Mr Thillagaratnam's declaration next said that he has been advised by Mr Isaacs QC that, if the evidence of the material in the *Washington Post* article was now to be obtained, DSS would have quite a strong case for applying to me, as the trial judge, before any judgment for leave to amend its pleadings to assert systematic fraud. He then referred to RSC, O.20, r. 5 and said that he has been advised that it permits amendment of pleadings even after the trial or even after judgment or on appeal. He referred to O. 59, r. 10 . He also made reference to the *South Carolina* case.

The hearing took place before me on 2 and 3 October 1995. Mr Isaacs did not then support Mr Thillagaratnam's suggestion that, had the material in the article been available, DSS 'would have been able to plead the existence of a "system" of conduct operated by [BTCo] in relation to other customers and DSS'. He also accepted that the passage quoted by Mr Thillagaratnam from the article related to the particular facts of the Gibson Greetings case, but he said that DSS's contention was that this was only one of the plaintiffs' practices and that the article indicated that there were others, though DSS was not in a position to identify them. DSS simply 'do not know what further evidence of a fraudulent system may be thrown up by material discovered in New York' and the article was 'just the starting point'. In my judgment this is all extremely speculative.

Subsequently, on 9 October 1995 DSS's solicitors, Ince & Co, indicated a wish to rely on certain newspaper articles in the Wall Street Journal of 3–4 October, the Independent and Financial Times of 5 October and Business Week for 16 [sic] October 1995. I required the matter to be restored for further submissions and on 10 October 1995 DSS applied without objection to introduce an affidavit of Mr S P Knight of Ince & Co, exhibiting their letter dated 9 October with accompanying articles, together with a letter from Mr Sesser of DSS's New York attorneys dated 9 October 1995 attaching pp. 1–47 of an unsealed second amended complaint by P & G against BTCo and BTSC. Mr Sesser asserts in his letter that:

> 'it is now known that at least ten Bankers Trust customers, including Proctor & Gamble and DSS, may have suffered from serious misconduct of Bankers Trust in connection with its sale of derivatives in the 1993–94 time frame, resulting in losses of many millions of dollars to each of those customers. Moreover, the misconduct *259 in each case reflects a pattern of activity fully consistent with the allegations of DSS.'

© 2019 Thomson Reuters.

He then summarises P & G's second amended complaint and goes on:

> 'We believe that this new information amply supports DSS's position that the harm it suffered at the hands of Bankers Trust was not conduct to be judged in isolation, but rather was part of a pattern of systematic conduct tolerated and perhaps even encouraged at the highest levels of management. The Business Week article makes it clear that Proctor & Gamble's amended complaint is not based upon unsubstantiated allegations, but rather is based upon "a mountain of evidence" — including 6,500 tape recordings of Bankers Trust employees. These recent revelations — most of which came to light only after our application to the court in New York — clearly reinforce the justification for Judge Patterson's discovery order and our subpoenas.'

The matter was not put before me so high in Ince & Co's letter of 9 October 1995 or by Mr Isaacs in his further submissions on 10 October 1995. The letter says this:

> 'In essence, the particular points which DSS make on the press cuttings are;
>
> (i) [P & G] have succeeded in adding to its claim against BT the US civil racketeering charges. The P & G filing, in support of its new charges, identifies eight customers of BT other than P & G itself, of whom five (including Gibson Bros) have not previously been mentioned in any public document. The remaining seven have now been identified and they include Adimitra, which featured in evidence to the trial judge before Mr Justice Mance and on which Mr Hogi Hyun was a material witness.
> (ii) The civil racketeering charges allege a pattern of wrongdoing on the part of BT which is not confined to understatement of the value of a customer's losses. They involve the allegations summarised on p. 1 of the *Business Week* article.
> (iii) BT's description of P & G on p. 4 of the *Business Week* article as "sophisticated, experienced and knowledgeable about the use of interest-rate derivative contracts and the risks presented by those contracts" are closely mirrored in the present actions.
> (iv) The allegations, as in the present actions, concern inter alia BT's conduct in the period after 4 February 1994 US dollar interest rate rise.
> (v) BT's bid to block *Business Week* from publishing the article based on sealed documents from the P & G dispute failed.'

Mr Isaacs made it clear that there was in the material attached to Mr Knight's affidavit no basis upon which he could properly make any application either to introduce fresh evidence or to amend DSS's pleadings. DSS were, he said, simply seeking to obtain fresh evidence in New York which might enable them in the future to make such an application. He accepted also that there is, so far as presently known, nothing in the contents of the trading or training tapes to which the press articles refer, which links with Mr Hyun. He submits, however, that the 'tenor' of the material appears to undermine the plaintiffs' case in general and Mr Hyun in particular. He points out that P & G's complaint identifies a number of companies as allegedly defrauded or deceived by, and in some cases as involved in consequent litigation with, BTCo and/or BTSC. Among these is Adimitra. Mr Isaacs said that, if these transactions, with Adimitra in particular, were established as part of a pattern or system of fraud falling within the Racketeer Influenced and Corrupt Organisations Act ('RICO') as P & G assert, then DSS could hope to show (a) that Mr Hyun was aware of the fraudulent selling techniques which P & G has alleged against the

Bankers Trust group and/or (b) that Mr Hyun applied such *260 techniques or acted fraudulently in other ways vis-a-vis DSS in the course of the transactions the subject of this case.

The bulk of pp. 1–47 of P & G's complaint deals in detail with the transactions with P & G and others which appear to have little resemblance to and no connection with the present. The transactions with P & G are first set out (pp. 1–31), with references to the agreement with the Federal Reserve Bank of 4 December 1994 and the consent order made by the SEC on 22 December 1994 (pp. 31–33), with references to the problem with Gibson Greetings (pp. 33–37) and then with a summary of various, now disputatious transactions with other American companies (pp. 37–45 and 46–47). None of these involves or indicates any link with the present transactions or the persons handling them. Looking at some of the points made in Ince & Co's letter of 9 October 1995, the present case cannot be allowed to turn into a general investigation of derivatives transactions entered into, varied or terminated by Bankers Trust employees after 4 February 1994 interest rate rise. The fact that P & G may have been described by Bankers Trust as 'sophisticated, experienced and knowledgeable about the use of interest-rate derivative contracts' and that it is part of BTI's and BTCo's case in the present litigation that DSS were also 'sophisticated, experienced and knowledgeable', even if not to the same extent as P & G, does not carry DSS anywhere. The level of sophistication, experience and knowledge actually or apparently held in any case must depend on the circumstances and can only be assessed on a case by case basis. It would be quite inappropriate to attempt in the course of the present case to determine whether some unknown Bankers Trust employee may in some other case or context have misdescribed Bankers Trust's understanding of P & G's expertise, with a view to arguing that BTI or BTCo, or Mr Hyun in particular, has also misdescribed BTCo's understanding of DSS's expertise in the context of the present litigation. The attempt to block publication by Business Week, which I am told was anyway a joint attempt by Bankers Trust and P & G, is patently irrelevant.

As to Adimitra, Mr Hyun accepted in cross-examination during the trial of the present action that he had on behalf of one or other Bankers Trust company (quite probably BTCo) entered into, firstly, in October 1993 a time dependent swap and, secondly, on 1 March 1994, a LIBOR barrier swap with a potential 22.22 fold leverage factor, similar to respectively swaps 1 and 2 with DSS in this case. As summarised in P & G's complaint, Adimitra are alleging that BTCo and BTSC 'misrepresented or omitted material information in their dealings with [Adimitra] during the course of [Adimitra's] transactions in complex, leveraged derivatives'. This is not, in terms, necessarily a plea of fraud, but I will assume that fraud in an English sense is in fact alleged by Adimitra, although Mr Isaacs accepted that fraud may have a more extended meaning and usage in US law and litigation than in this country. P & G's complaint says that:

> 'Based on [Adimitra's allegations, P & G expects discovery to reveal additional fraudulent acts committed by [BTSC] and [BTCo] as part of transactions with [Adimitra].'

I accept that there are parallels between the initial and replacement swaps entered into by or through BTCo with DSS and Adimitra. The parallels extend to an allegation by Adimitra that BTCo represented that swap 2 was 'less risky' than swap 1 (said to be false because of the absence of a cap and the potential 22.22 fold leverage factor) and that converting to swap 2 would improve Adimitra's position. But such parallels prove nothing. One would expect BTCo through Mr Hyun to be marketing the same type of transactions to different customers at the same time in broadly the same terms. It might be more a matter of comment if they were not doing so.

P & G's complaint also records the inclusion in Adimitra's complaint against BTCo and BTSC of an allegation summarised as follows: *261

> 'The payment by Bankers Trust to [Adimitra] on the day that [Adimitra] unwound the swap and entered into the LIBOR barrier swap was accompanied by language suggesting that [Adimitra's] position, as a result of making the change to swap 2 was a gain of $638,000, the amount of Banker's Trust payment. In fact; at that date, [Adimitra's] position was a loss of $16m.'

This allegation focuses on the alleged difference between the amount paid over by BTCo on entry into swap 2 and the value of swap 2 as assessed internally by BTCo. Again it has a limited (although On its faceless prominent) parallel in the present action in so far as DSS have alleged that the current market values to BTI of swaps 1 and 2 were, respectively, minus $2m and minus $8m on the dates when they were entered into and that these values were not disclosed by BTCo to DSS, and have relied upon these matters in support of their allegations of fraud. The fact that there was non-disclosure of current market values in two transactions, as opposed to one, does not appear to me by itself to assist on the question whether there was fraud in either. BTI and BTCo say that it was simply not the practice to disclose such values. The further suggestion, by P & G that it expects discovery in respect of Adimitra to reveal that BTCo or BTSC 'used language suggesting that [Adimitra's] position, as a result of making the change, was a gain of $638,000', whereas in fact it was a loss of $ 16m, is largely unspecific, and does hot appear to carry the matter much, if at all, beyond an allegation that the value to BTCo or BTSC was not disclosed. Viewing the position in respect of Adimitra generally, nothing in the summary given by P & G or in any other material before this court suggests that any easy conclusions, about matters such as fraudulent, system or intention, could be drawn from a closer examination of the, Adimitra transactions or of the documentation involved in it. The Adimitra case may well raise similar issues to the present, but, if so, they would require a full trial to resolve, and, as I have said, the fact that they arise in two cases rather than one does not appear to me by itself to carry DSS anywhere.

In general terms, the exercise upon which DSS wish to embark in the light of pp. 1–47 of P &.G's complaint appears to me to be, once again, essentially speculative. The (part of) P & G's complaint now available does however highlight the ambit of the proposed exercise. I regard this too as a factor of major weight on this application. The depositions and discovery proposed in New York would extend potentially to the whole subject matter of the numerous transactions with P & G and all of the other customers identified in P & G's complaint, including Adimitra. The likelihood that any material which DSS might thereby gather would be admissible in the present proceedings, even leaving aside the fact that the trial has taken place, is also a relevant factor. Mere matters of disposition or credit are unlikely to be admissible at all. It is on the other hand common ground that evidence of similar frauds may go to prove the commission of a fraud or of a fraudulent state of mind. The material in the press articles, if correctly stated, certainly puts certain aspects of the plaintiffs' business in a bad light, and allows speculation about the 'culture' and attitude to clients and business transactions prevalent within the plaintiffs at the relevant times. It does not however contain any material which directly connects the present transactions or Mr Hyun or anyone else involved in them to any such attitudes or misconduct. Apart from Adimitra, the transactions referred to appear to be purely American, and the nature of the misconduct which is suggested in relation to them finds no exact parallel in the present proceedings. The information now available about the transactions and litigation relating to Adimitra also appears to me of no real significance for reasons already indicated.

In summary, there is nothing in my judgment in any of the material now available, which appears to lend independent, weight to a suggestion that Mr Hyun's or Mr Nurjadin's conduct towards DSS in this case was fraudulent or part of any 'system' of fraud. There is also nothing in my judgment to affect the general conclusions of both Longmore J and myself that it would not, in any event, be appropriate to burden this *262 case with a full investigation involving discovery in relation to the American problems affecting Bankers Trust companies. I do not consider that the material now available, would, if it had been available at the time of the rulings made by Longmore J and myself, would have led then to any different outcome. It can even be regarded as fortifying the conclusion that the case would become unmanageable if it was necessary to investigate with full discovery (and, as now suggested, depositions) up to seven or nine other complex relationships in order to decide the rights and wrongs of the particular relationship with DSS. Be that as it may, the present applications must anyway be

viewed in the context of litigation which has gone to trial where DSS have already had the opportunity of cross-examining witnesses (including Mr Hyun), producing documents and presenting their own case.

I would add, although it simply reinforces the conclusion to which I would anyway have come, that the existence of disputes relating to transactions with other clients of Bankers Trust companies was referred to in some detail in Mr Thio's affidavit of 22 April 1995, where he suggested specifically that the transactions with P & G, Gibson Greetings and others were:

> 'strikingly similar and raise the issue of the possible existence of instructions given by BT Co by its principals as to how derivative products are to be marketed and sold.'

Mr Thio also identified and summarised the December 1994 agreement with the Federal Reserve Bank and the consent order by the SEC (even though copies may only have been received later). DSS on the face of it had the opportunity to investigate these matters further in America. They also discovered the existence of the Adimitra litigation, and knew that it was continuing, before Mr Hyun was cross-examined — although Mr Isaacs informed me only shortly before. Mr Isaacs then asked Mr Hyun various questions about that dispute. DSS did not seek further details or an adjournment or apparently even obtain a copy of the New York complaint. It cannot in all these circumstances be said that the new material now available relates to a wholly new area which was outside DSS's knowledge at the time of trial or which they had no opportunity whatever to investigate whether by making enquiries or by seeking discovery in America prior to trial here. They did of course seek considerable discovery here with the result which I have indicated.

Mr Isaacs submitted that I should nonetheless follow the approach of the House of Lords in *South Carolina* case. DSS should be allowed the freedom to make any enquiry and take any legal action which New York or any other foreign law may permit. As regards enquiries, no-one challenges DSS's right to make any enquiries they wish of anyone. What is in issue is DSS's entitlement to continue, after the trial of the action in England but before judgment, to pursue BTCo and its associate companies for depositions and discovery in New York in the hope of and with a view to obtaining useful material to facilitate an application to adduce fresh evidence or to amend in England. Mr Isaacs submits that, if this is objectionable at all, then the right course is for the plaintiffs or their parent and associate company to raise the objection in New York. The order expressly gives them such a right in respect of discovery and there is no doubt also an inherent common law right to apply to discharge or vary such an ex parte order. This submission merits close consideration. However, the suggested course would itself mean a substantial application to the New York court, which would start with the disadvantage that it was considerably less familiar both with the English proceedings and with English procedure than is this court. The problems of conveying, even to the experienced US District Court for the Southern District of New York, the effect of what has happened to date in England, as well as, I add, the implications of English rules of court relating to the production and use of fresh evidence after trial or on appeal, are I think apparent from a reading of Mr Thillagaratnam's declaration. I understand moreover that there *263 would be no right to recover costs in New York. The *South Carolina* case is not authority that costs must always be irrelevant, although they were there, largely because they were self-inflicted or could be dealt with by the English court.

I am, further, assisted at this point by the US courts' own attitude. In *Euromepa SA v R Esmerian Inc 51 F 3d 1095* (2nd Cir 1995) the US Court of Appeals for the Second Circuit, on appeal from the District Court for the Southern District of New York, refused to limit depositions and discovery Under s. 1782 to cases where similar relief could be obtained in the relevant foreign court, preferring the issue of closely tailored discovery orders in such cases to outright refusal of relief. It acknowledged an exception to this approach in a case where there was 'authoritative proof that a foreign tribunal would reject evidence obtained with the aid of s. 1782' and cited the *South Carolina* case in a footnote as a useful example of authoritative guidance in an opposite sense from England. The court pointed out:

> 'Because the French court can always enjoin [the applicant] from pursuing discovery in a manner which violates the judicial policies of [the foreign country], or can simply refuse to consider any evidence that [it] gathers by what might be-under French procedures- an unacceptable practice, we do not think that the district court's concern for trespassing upon the prerogatives of French sovereignty should have weighed so heavily in its decision.'

It went on to say:

> 'After all, a foreign tribunal's corrective response to a well-intentioned but unwelcome grant of discovery could bar the evidence gathered in the given case, and it could also constitute the kind of authoritative declaration mentioned earlier that would provide helpful instruction to American courts in handling future cases.'

After a further reference to the *South Carolina* case, the court said:

> 'Since section 1782 contemplates international cooperation, and such cooperation presupposes an on-going dialogue between the adjudicative bodies of the world community, such a result would be far from undesirable.'

Thus, in the first passage, the US court expressly contemplates the possibility of specific intervention in the particular case. There seems to be no reason why such specific intervention should be any less welcome than the general guidance which it might afford for future cases.

I have already indicated why in my opinion the English court is better placed to assess the background, implications and propriety of the present s. 1782 proceedings than is any US court. Further, the English court will not exercise any jurisdiction to restrain foreign proceedings unless satisfied that they constitute an abuse in the context of English proceedings or are otherwise oppressive. But, whether they are so abusive or oppressive, is pre-eminently a matter for the English court to judge, and, if they are, I do not think that this court should then be hesitant about giving effect to its conclusions. If the proceedings are abusive or oppressive, then intervention by this court now will also avoid any future problem. It must be assumed, indeed Mr Isaacs positively confirmed, that DSS will comply with any English injunction so that the s. 1782 proceedings would be withdrawn. By contrast, if this court simply steps back, as Mr Isaacs invited, on the basis that the plaintiffs' first course should be to apply in New York, there is at least an increased risk of conflicting attitudes, quite possibly because of the difficulty which may exist in putting the full picture before the New York court.

In the present circumstances, I consider that the applications made under s. 1782 are, on the basis on which they are now sought to be justified, both abusive and oppressive. There must be some end to litigation. The trial in this action has taken place. Even *264 corporate litigants have a 'legitimate expectation that the trial [of the action] will determine the issues one way or the other', to quote Lord Griffiths in *Ketteman v Hansel Properties Ltd [1987] AC 189* at p. 220F. There have been extensive interlocutory rulings on the scope of discovery. I would fully acknowledge the value of properly controlled discovery both in cross-examination and as an aid to ascertaining the truth. Nonetheless, the scope of discovery, even of

© 2019 Thomson Reuters.

a purely documentary nature, is recognised as a potential problem in English proceedings. Mr Isaacs openly accepts that the material now available is but a starting point for the further investigation thereby intended. Moreover, what is proposed includes compulsory examination of large numbers of the plaintiffs and their associate companies' officers, including an unidentified deponent on practices and procedures, whom the plaintiffs are required to nominate for the purpose, in respect of a large number of other cases, which have hitherto played no significant part whatever in the trial. Volumes of documents are also sought, many of which, I should add, would seem to be capable of bearing only the most indirect relationship to any suggestion of any systematic conduct which DSS might hope to establish by anyone. The course of action now proposed in New York, purportedly in aid of the present proceedings, could itself well involve, and could certainly lead, to something more than the 'mini' trial which Longmore J feared would arise in the present action if discovery were ordered of material relating to Bankers Trust problems with clients and regulatory authorities in New York. It would represent a large scale investigation of the general conduct of the plaintiffs' derivatives business conducted on a speculative basis with a view to discovering material to enable or support allegations which, if they could properly be made at all, would doubtless be highly contentious, would require the reopening of the trial and would involve examination of other transactions entered into with other clients.

In my judgment, drawing all the matters which I have identified together, the new material constitutes a wholly inadequate foundation for the course of conduct now proposed at the present stage in these proceedings. In my judgment what is proposed in New York under s. 1782 is abusive and oppressive in the context of the present proceedings which provide its purported justification. In this connection I draw no distinction between BTCo on the one hand and BTNYC and BTSC on the other hand. No separate need for involving BTNYC and BTSC in New York has been suggested or shown. DSS themselves have drawn no distinction between the three companies in the New York proceedings, claiming the same relief in the same terms against each. To treat the three companies as one for present purposes reflects the substance of the matter. It would be unrealistic and unjust if this court were to restrain the pursuit of abusive and oppressive action against BTCo on the ground that it is the other party to the English litigation, but were at the sane time to allow duplicate proceedings addressed to BTCo's associate companies in America which would appear to produce precisely the same abusive and oppressive effect for BTCo (and for the Bankers Trust group as a whole), for those handling this litigation on BTCo's behalf and for the conduct of the trial. I shall accordingly restrain the pursuit by DSS of all three sets of s. 1782 proceedings and subpoenas.

*(Order accordingly)*  *265