# Exhibit 41

Case Nos: HC10CO3206;HC10CO3211

Neutral Citation Number: [2011] EWHC 287 (Ch)
**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice, Strand, London, WC2A 2LL

Date: 17th February 2011

### THE HON MR JUSTICE FLOYD

BETWEEN:

|  |  |
|---|---|
| **THE ROYAL BANK OF SCOTLAND PLC** | Claimant |
| **- and -** | |
| **(1) THOMAS O. HICKS** | |
| **(2) GEORGE N. GILLETT** | |
| **(3) KOP FOOTBALL (CAYMAN) LIMITED** | |
| **(4) KOP FOOTBALL (HOLDINGS) LIMITED** | |
| **(5) KOP FOOTBALL LIMITED** | Defendants |

AND BETWEEN:

|  |  |
|---|---|
| **(1) KOP FOOTBALL LIMITED** | |
| **(2) KOP FOOTBALL (HOLDINGS) LIMITED** | |
| **(3) MARTIN BROUGHTON** | Claimants |
| **-and-** | |
| **(1) KOP FOOTBALL (CAYMAN) LIMITED** | |
| **(2) THOMAS O. HICKS** | |
| **(3) GEORGE N. GILLET** | |
| **(4) UKSV HOLDINGS COMPANY LIMITED** | |
| **(5) KOP INVESTMENT LLC** | Defendants |

**Mr Paul Girolami QC** and **Ms Rebecca Stubbs** (instructed by **Peters & Peters**) for **Mr Hicks, Mr Gillett and Kop Football (Cayman) Limited**
**Mr Richard Snowden QC** and **Mr James Potts** (instructed by **Freshfields Bruckhaus Deringer LLP**) for **The Royal Bank of Scotland plc**
**Mr Philip Marshall QC, Mr Paul Harris** and **Mr Jorren Knibbe** (instructed by **Couchmans LLP**) for **Sir Martin Broughton**
**Mr David Chivers QC** and **Mr Philip Gillyon** (instructed by **Shearman & Sterling LLP**) for **UKSV Holdings Company Limited** and **N.E.S.V. 1, L.L.C.**
**Kop Football Limited, Kop Football (Holdings) Limited** and **Kop Investment LLC** were not represented

Hearing dates: 9-11 February 2011

## Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

THE HON MR JUSTICE FLOYD

Mr Justice Floyd:

1. These applications are made at a CMC which is a further stage in the litigation surrounding the sale of Liverpool Football Club by companies formerly under the control of Mr Hicks and Mr Gillett, (to whom I will now refer as "the former owners") to UKSV Holdings Company Limited ("UKSV").   UKSV is a U.K. subsidiary of N.E.S.V.1, LLC ("NESV"), a Delaware Corporation.

2. There are two actions in existence:

   i) An action by The Royal Bank of Scotland plc ("RBS") against the former owners, Kop Football (Cayman) Limited (a company still controlled by the former owners ("Cayman")), Kop Football (Holdings) Limited ("Holdings") and Kop Football Limited ("Football"). Holdings and Football no longer own LFC and are under the control of the former owners. I call this action "the RBS action"; and

   ii) An action by Holdings, Football and Sir Martin Broughton (the former Chairman of Football and Holdings) against Cayman, the former owners and Kop Investment LLC ("Investment") as well as UKSV.   As Football and Holdings are now under the control of the former owners, Sir Martin Broughton is the only remaining claimant inclined to pursue it.   I shall therefore call this action "the Broughton action".   It is now intended to make Football and Holdings defendants to the Broughton action.

3. There are six applications before me:

   i) An application by the former owners and Cayman seeking to discharge or vary an anti-suit injunction which I granted against them on 14th October 2010;

   ii) An application by the former owners and Cayman seeking to strike out or dismiss the Broughton action;

   iii) An application by RBS seeking to make amendments to the claim in the RBS action;

   iv) An application by Sir Martin Broughton seeking to make amendments to the claim in the Broughton action;

   v) An application by NESV seeking an order joining themselves as a defendant to the Broughton action;

   vi) An application by Sir Martin Broughton seeking, if necessary, permission to serve Investment out of the jurisdiction.

**Background**

4. Prior to the events which gave rise to this dispute, the former owners were the ultimate owners of the shares in The Liverpool Football Club and Athletic Grounds Limited ("LFC") which operated Liverpool Football Club.   They did so through a chain of corporate entities.   LFC was owned by Football.   Football was owned by Holdings.   Holdings was owned by Cayman.   Investment owned Cayman.   Football and Holdings are English companies.   Cayman is (unsurprisingly) a Cayman Islands

registered entity.   Investment is registered in the state of Delaware in the United States and is owned by the former owners in equal shares.

5.   The process leading to the sale of LFC arose because Football and LFC were indebted to RBS and a co-lender (Wells Fargo Bank N.A.) under a loan facility ("The Credit Agreement").   The Credit Agreement, to which Football and Holdings were parties, chose English law as the governing law and contained an exclusive jurisdiction clause, clause 28.2:

> "All parties agree that the courts of England are … to have exclusive jurisdiction to settle any dispute (including claims for set-off and counter claims) which may arise in connection with the creation, validity, effect, interpretation or performance of, or the legal relationships established by, any Finance Document or otherwise arising in connection with any Finance Document and for such purposes irrevocably submit to the jurisdiction of the English courts."

6.   A further agreement, the Security Agreement to which Football and Holdings were parties contained a similar clause. The Security Agreement charged all the Group Shares, including the shares in LFC, to RBS.

7.   Each of the former owners entered into a guarantee with RBS of the obligations of each obligor under the Senior Finance Documents. These contained exclusive jurisdiction clauses in favour of England in relation to any dispute arising out of or in connection with the guarantee. The parties further expressly agreed that "the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary".   The provisions set out in Schedule 1 of the Deed were nevertheless to be interpreted in accordance with the law of New York, without prejudice to the fact that the guarantee was governed by English law.

8.   By April 2010 RBS had made it clear that any further extensions of time would only be granted if Messrs. Hicks and Gillett relinquished control of the sale process to the board of Holdings. The former owners agreed with RBS that corporate governance structures should be put in place and built into the constitutions of Holdings and Football.   These arrangements included a Corporate Governance Side Letter ("CGSL"), the terms of which provided that:

> "(c)     You agree that: ...
>
> (iii)   there will be no Owner representatives appointed to the boards of [Holdings] and its subsidiaries other than the Owners …
>
> (d) You agree not to exercise any of your rights as direct or indirect shareholders in [Holdings] and its subsidiaries in a manner that would be contrary to the corporate governance arrangements contemplated by this letter, the RBS Side Letter…"

9.    The parties to the CGSL included the former owners and Cayman.  It was to be governed by English law, and included a *non*-exclusive submission to the jurisdiction of the English Courts.

10.    The RBS Side Letter, referred to in the CGSL, included as parties LFC, Holdings and Football.  The RBS Side Letter contained the following terms:

> "(b) with effect from 16 April 2010 responsibility for the sales process will have been transferred from the [former owners/Investment/Cayman] to the board of [Holdings]; the Chairman's role will include leading that process on behalf of [Holdings];
>
> (c) with effect from 16 April 2010 all further discussions and correspondence with interested parties ... will be conducted by or on behalf of the board of [Holdings] and all agreements relating to the process will be entered into by [Holdings].."

11.    The RBS Side Letter incorporated Clause 28 of the Credit Agreement by reference, that is to say the exclusive English jurisdiction clause.

12.    The board of Holdings was to consist of a new independent Chairman, the two executive directors of that company (namely Christian Purslow and Ian Ayre) and the former owners.

13.    As a result, Sir Martin Broughton was engaged in April 2010 as the independent Chairman of Holdings, Football and LFC in order to lead the process of selling or transferring control of LFC, to meet the indebtedness to RBS.  Sir Martin's letter of appointment as Chairman of these Companies required him in particular to:

> "participate, as leader of the process, in facilitating an exit event or value realisation event for the current owners in respect of the Club (an "*Exit Event*") which Exit Event may, without limitation, be achieved by way of the direct or indirect sale of the Club and the re-payment in full of the Club's senior debt facilities ..."

14.    The letter of appointment, which was signed by at least Mr Gillett on behalf of Holdings, Football and LFC, contained an English law and exclusive jurisdiction clause providing that:

> "any dispute or claim arising out of or in connection with it shall be governed by and construed in accordance with the law of England and Wales. Each party agrees to submit to the exclusive jurisdiction of the courts of England and Wales in respect of any claim or matter arising under or in connection with this letter of appointment."

15.    The sale process was conducted between April and October 2010.  As the repayment date under the Credit Agreement approached, there were only a limited number of offers on the table.  On 3rd October 2010 Sir Martin Broughton gave notice of Board

meetings of Football and Holdings to be held on 5th October 2010 in order to consider two offers, which were expressed to expire on that day.

16.     The former owners were opposed to acceptance of either offer and, on 4th October 2010, purported to remove by resolution some of the directors of Holdings and Football and replace them with appointees of their own.  This was, on the face of it, a clear breach of the CGSL.  These steps were notified to Sir Martin Broughton on 5th October shortly before the Board meetings. Sir Martin Broughton, after having taken advice, considered that the steps taken by the former owners were ineffective to alter the constitution of the Boards of Holdings and Football.   The Board meetings accordingly proceeded with the constitution of the Boards unaffected. Messrs. Hicks and Gillett refused to participate further in the Board meetings, though their representatives did remain in attendance.

17.     Accordingly on 6th October a sub-Committee of the Board decided to accept the offer made by UKSV.  Football then concluded a conditional agreement for the sale of the entire issued share capital of LFC to UKSV on that day.  The sale was at that stage conditional on obtaining a declaration of the validity of the steps taken to conclude the sale, a condition which was subsequently waived by NESV.

**The first application and the mandatory injunction**

18.     On Friday 8th October 2010, RBS successfully applied to me for an interim injunction to prevent the former owners taking further steps in breach of the corporate governance arrangements put in place in April 2010. I granted that injunction and set a return date for Tuesday 12th October 2010.  On that date  RBS sought a mandatory order to reverse the steps that had already been taken in breach of those arrangements.

19.     The claim form in the RBS action was issued on Monday 11th October 2011.  The Brief Details of Claim showed that RBS sought declarations that the removal of the directors was invalid, or, if valid, was in breach of the CGSL and the RBS Side Letter. RBS also sought an injunction restraining the former owners and Cayman from acting in breach of the CGSL and the RBS Side Letter, and a mandatory injunction reversing the changes made by the former owners.

20.     On Monday 11th October 2010 the former owners issued proceedings under CPR Part 8 against RBS, Sir Martin Broughton, Holdings, Football and the other directors (claim number HC10CO3212, now discontinued: "the former owners' action") and issued an application for an interim injunction to stop the sale of the Club to UKSV. The former owners sought declarations that the decision to enter into the sale contract with UKSV and NESV ("the SPA") was not binding on Holdings or Football, that the SPA did not bind Holdings, and injunctions to prevent the sale proceeding.

21.     On the same day, Sir Martin Broughton, Holdings and Football issued the Broughton action, seeking declarations against the former owners (and others) concerning the invalidity of the resolutions of the former owners in reconstituting the Board and the validity of the resolution to accept the offer of UKSV.

22.     The following day I heard argument on (i) RBS's application for mandatory relief and continuation of the injunction against the former owners and (ii)  the former owners' application for an injunction to restrain the sale. The former owners argued that there

was no actionable breach of the CGSL because RBS had acted in repudiatory breach of the CGSL, essentially by excluding the former owners from the sale process and refusing to consider other offers.

23.    I gave judgment in the morning of Wednesday 13th October 2010, granting the mandatory injunction in the form sought by RBS, requiring the Boards of Football and Holdings to be restored to that required under the corporate governance arrangements by 8pm BST on the same day. I held that the former owners' argument based on repudiatory breach had no realistic prospect of success. I refused the injunction sought by Messrs. Hicks and Gillett. I also refused permission to appeal, and a stay. There was no appeal against my decision. The former owners' position, now, is that they accept that they have no realistic prospect of successfully showing that RBS were in repudiatory breach of the CGSL.

24.    At approximately 5.40pm BST on 13th October the former owners complied with my order in the RBS action by reversing the purported steps that they had taken on 4th October 2010. That left, or at least should have left, Holdings free to complete the SPA with UKSV and NESV.

**The Texas Petition and the TRO**

25.    At 5.56pm BST on 13th October, the former owners caused a Petition for a Temporary Restraining Order (the "Petition" and the "TRO") to be filed with the District Court in Dallas County, Texas in the United States. The Petition was issued in the names of Investment, Cayman, Holdings and Football. The Defendants to the Petition included Sir Martin Broughton and his co-(non-owner) directors, RBS and NESV.

26.    The Petition and TRO were expressly aimed at stopping the sale, the result which the former owners had failed to achieve in their own proceedings before me in England. The Petition also went further in that it sought to prevent RBS and others from taking any action to enforce its security. The Petition is a detailed document which plainly had been in preparation for some considerable time, although no mention of it was made in the course of the hearing before me. The substantive allegations made in the Petition included the following:

    i)    As part of the Introduction, the Petition alleges as follows:

        "Plaintiffs bring the suit to save them from an epic swindle at the hands of rogue corporate directors and their co—conspirators. Broughton, Ayre and Purslow (collectively, the "Director Defendants"), have conspired with RBS, NESV, Nash and other un-named co-conspirators to devise and execute a scheme to sell the iconic Liverpool Football Club and Athletic Grounds Limited ... to NESV - the owners of the Boston Red Sox - at a price they know to be hundreds of millions of dollars below true market value. In blatant disregard of their fiduciary duties, the Director Defendants and their co-conspirators have excluded [the former owners], who are also corporate directors and who are the ultimate owners of Liverpool FC, from meetings, discussions and communication regarding the potential sale to NESV. The Director Defendants,

RBS and/or their co-conspirators have interfered with efforts by [the former owners] to obtain financing for Liverpool FC, have disregarded or downplayed offers that were actually or potentially superior to the offer made by NESV, and the Director Defendants have repeatedly violated their fiduciary duties of loyalty, care and candor by withholding material information from, and/or misrepresenting material information to, the Plaintiffs regarding negotiations to sell Liverpool FC."

ii)    The Introduction continues:

"Plaintiffs respectfully pray that this Court will hold each of the defendants collectively and individually liable for the **hundreds of millions of dollars** in actual damages that their actions are causing Plaintiffs, impose punitive damages that may exceed **$1,000,000,000** and award Plaintiffs such other and further relief to which they are justly entitled." (original emphasis)

iii)   Section C is headed "Director Defendants Hatch a Plot to Exclude and Mislead [the former owners]". The Director Defendants are alleged to have engaged in secret meetings with RBS to seek to undermine the efforts of the former owners to effect a sale. Having set out the duties owed by the Director Defendants to the Plaintiffs (presumably to Holdings and Football), the pleading continues at [31]:

"Rather than exercising independent, reasoned judgment and honoring their fiduciary duties, on information and belief, the Director Defendants were acting merely as pawns of RBS, wholly abdicating the fiduciary responsibilities that they owed in the sale. Rather than genuinely consider new equity investment, Defendants Broughton, Ayre, and Purslow, with the assistance of Defendant Nash (Liverpool FC's Financial Director), engaged in a press/public relations campaign to undermine the owners' efforts to substantially reduce the debt and eliminate the RBS deadline."

iv)    At [34] one finds this:

"Moreover, the Director Defendants undertook these actions while at the same time enriching themselves at the club's expense. During the very same meeting at which Ayre, Purslow, and Nash received confidential information that later found its way to the media, those three defendants sought approval of the full year-end bonuses of between £250,000 ($398,000) and £300,000 ($478,000) that were approximately equal to their yearly base salaries. Thus, the Director Defendants were paid hundreds of thousands of pounds each while they were breaching their fiduciary duties and actively undermining the current ownership of the club."

v)  At [39] the Director Defendants, RBS, and Nash are said to have unlawfully withheld material information from the former owners relating to negotiations with NESV and another potential purchaser in late September and early October 2010.

vi)  At [47]:

"RBS has been complicit in this scheme with the Director Defendants. For example, in letters from RBS to potential investors obtained just within the past few days, RBS has informed investors that it will approve of a deal only if there is "no economic return to equity" for [the former owners]. In furtherance of this grand conspiracy, on information and belief, RBS has improperly used its influence as the club's creditor and as a worldwide banking leader to prevent any transaction which would permit [the former owners] to recover any of their initial investment in the club, much less share in the substantial appreciation in value of Liverpool FC that their investments have created."

vii)  Section D is headed "Defendants Conspire to Sell Liverpool FC to NESV at Below-Market Price". This section gives an account of the events of October 5th and 6th 2010.

viii)  At [53] the Petition describes some at least of the events in this court on 8th and 12-13th October:

"On October 8, 2010, RBS sued [former owners, Cayman, Holdings and Football] in a British court tacitly recognising that actions of the rogue board could not have been effective, RBS sought, among other things, a mandatory injunction that would require [those parties] to place Messrs Ayre and Purslow back on the Board. On October 13, 2010, the British court entered an order requiring Messrs Ayre and Purslow and Broughton to be restored to the Boards of [Football and Holdings]. Consistent with Director Defendants' prior and ongoing breaches of fiduciary duty, the Director Defendants will then, presumably, ratify the collusive and improper deal with NESV in a subsequent vote at a board meeting that is scheduled for 8:30 p.m. London time (2:30 p.m. Central time) today, despite the existence of better offers."

ix)  In order to support a declaratory judgment, the petition states at [57]:

"an actual controversy exists between the plaintiffs and defendants regarding the defendants' actions and intentions to sell Liverpool FC to NESV for a fraction of the club's fair market value."

x)  The Petition therefore sought, at [58] a declaration that Ayre and Purslow had been removed as directors of Football and Holdings on 4th October 2010 and

had no authority to bind those companies, and that all acts authorised by their votes were void, including the approval of the sale of LFC to NESV or any related party.

xi)     At [66] RBS and NESV are accused of aiding and abetting breaches of fiduciary duty by the Director Defendants.

xii)    At [69] Sir Martin Broughton is accused of *"constructive fraud"*.

xiii)   At [74] Sir Martin Broughton, RBS and NESV are accused of a civil conspiracy, because they:

> "knowingly and willingly entered into an agreement or confederation, each sharing a common unlawful purpose, or the common purpose of using unlawful means, to whit, promoting the breaches of fiduciary duty of defendants Broughton, Ayre and Purslow."

27.   The Texas court was persuaded on the basis of these allegations to grant the TRO without notice to the defendants (although it declined what was in effect an anti-anti-suit injunction). It made it clear that the order was granted solely on the basis of what was alleged in the Petition. It is clear from the account of the proceedings in England given at [53] of the Petition that the Court was not told in that document that an application to restrain the sale had been made and refused in England. It now transpires that the Judge had asked why the application made in his court was not being made in England and was told by the attorney for the claimants that it had not been possible because "the courts were closed" and that the plaintiffs "couldn't reach the court for that relief". At a subsequent hearing the plaintiffs' attorney, on being questioned by the Judge answered, no doubt on the instructions of the former owners, that "under no circumstances have we ever sought the relief that was sought before this court. It has never been sought". It is tolerably plain that he had not been told by the former owners that the application had been made and refused.

28.   Both the former owners have recently made and served undated witness statements for the purposes of the present proceedings. Neither of them has given any explanation of why the court in the United States was misled about the making and refusal of the application in England. The former owners have left it instead to their solicitor, Mr Oliver, to say on their behalf that they did not intend any disrespect to this Court by making the application in Texas on 13th October 2010. Mr Oliver says that Texas counsel was unaware of the fact of the making and refusal of the application. Whilst he accepts that both the former owners were aware that the application had been made and refused, he says that they did not appreciate the legal significance of what had happened in London. They "turned to their Texan counsel to investigate what their options might be going forward". Mr Oliver says that the former owners "can quite see how the court might have concluded, given the sequence of events and its refusal of their application for injunctive relief, how it was vexatious for them to have then started the Texan proceedings and sought the TRO as they did. It was not their intention so to act or their perception at the time that they were doing so."

29.   I find this second-hand explanation both difficult to understand and difficult to accept. The burden of Mr Oliver's evidence is that once the application in England failed, they turned to Texan counsel.  For present purposes I am inclined to start from the proposition that Texan counsel was not told that the application had been made and refused in England.  That is Mr Oliver's evidence, and the alternative is almost unthinkable.  Nevertheless, one still has to ask why the former owners did not, when they "turned to their Texan counsel", explain that they had failed in England.  That was, after all, the immediate reason why they were turning to him.  Moreover, whatever the former owners' knowledge of the law, they must have appreciated that a court might be influenced by the prior refusal of another court of the same relief.

30.   I have also received no explanation whatsoever of how the Texan court came to be given the explanation which it was given of why the application had not been made in England, namely that the courts were closed.  That suggests that Texan counsel must have asked that question himself, as one would expect, and that he was given an obviously incorrect answer, presumably by his clients.  At the moment, the case that the former owners decided to withhold information from Texan counsel and from the Texan court, and indeed fed him with incorrect information, appears to be a strong one. The former owners have had a generous period to provide a proper explanation, and they have not done so.

31.   The prior unsuccessful application in England was highly material to the application before the Texas court.

32.   At the board meetings of Holdings and Football on the evening of 13 October 2010, the Former Owners notified the Boards that they had obtained the TRO.  Having taken advice, the Board of Football resolved that the NESV SPA had become unconditional and that completion should take place on 15 October 2010.  The former owners' Texas lawyers then filed a Motion for Contempt in the Texas Proceedings.

**The second application and the anti-suit injunction**

33.   Upon learning of the TRO, RBS, Holdings, Football, Sir Martin Broughton, UKSV and NESV applied to this court on 14th October 2010 for an anti-suit injunction, having notified the former owners' lawyers of the application.   The application was made in the RBS and Broughton actions.  I granted that injunction, on the basis of what appeared to me to be the unconscionable conduct of the former owners in seeking to undermine the English proceedings. The injunction required the former owners, Cayman and Investment to apply for the discharge of the TRO and to withdraw the Texas proceedings, and prohibited further claims by them against the parties to those proceedings in relation to "the Disputes".  The "Disputes" were defined in my order as:

> "any dispute between the parties (or any of them) arising out of or in connection with (i) the management of the affairs of [Holdings and Football] or any direct or indirect subsidiary of the same (ii) the sale process in relation to [Holdings] or any direct or indirect subsidiary, or the assets of any of the same (iii) the corporate governance arrangements under letters dated 16 and 30 April 2010 from The Royal Bank of Scotland Plc to, amongst others, the Defendants; (iv) any "Finance Document"

> as defined in the Credit Agreement dated 25 January 2008 (as amended and restated) between The Royal Bank of Scotland Plc and, amongst others, the defendants."

34.   Paragraph 3 of my order provided as follows:

> "The Defendants shall not, without the prior consent of this Court, commence or pursue, or procure or assist the commencement or pursuit of, any further proceedings relating to the Disputes in any Court or Tribunal other than the High Court of England and Wales or the courts of the member states of the European Union."

35.   I also made orders adding NESV and UKSV to the former owners' action and an order adding Investment as a defendant to the Broughton action.

36.   The Texas orders were duly discharged in response to (but expressly *solely* in response to) my order. This was done "without prejudice", which I was told meant that it would not prevent a further claim being made at a later date. The contempt motion was also withdrawn, but in a way which suggested that it might be resurrected in due course. The discharge of the TRO allowed the sale to UKSV to be completed, under the authority of a properly constituted board.

37.   The former owners' action was discontinued on 15th October 2010. Sir Martin Broughton has now resigned as a director of Holdings, Football and LFC.

**Statements in the media**

38.   The complaints of the former owners concerning the sale of LFC to NESV and UKSV made within the allegation of repudiatory breach of the corporate governance arrangements and in the Texas proceedings did not come to an end with the discontinuance of the former owners' action and the withdrawal of the Texas proceedings, the TRO and the contempt proceedings.

39.   For example, in an interview with Sky News on 15th October 2010 Mr Hicks said that:

> "this was an organised conspiracy, it "went on over many months", and it consisted of the Royal Bank of Scotland, Martin Broughton who wanted to have a good PR event in his life…"

He also said that he just wanted "the truth to come out in the English courts".

40.   In a report in The Times of 16th October 2010 it was said on Mr Hicks' behalf by his US attorney that he would:

> "…pursue "every legal avenue possible", vowing to mire Liverpool in litigation for years to come. "My clients worked tirelessly to resolve these issues, but RBS would not listen to any reasonable solution and the directors acted selfishly and illegally.""

**The former owners' intentions and undertakings**

41.　　Despite these statements in the media, the former owners' current position in relation to bringing proceedings is markedly less enthusiastic.  Mr Oliver, their solicitor, says that his clients remain:

> "greatly aggrieved at the manner in which the sale of [LFC] was conducted, and the terms on which [LFC] was sold, given the alternative proposals which were on the table when the decision to pursue a sale to NESV was taken."

42.　　He says that they:

> "continue to investigate the events which have happened and to consider what courses of action are open to them to seek redress, where proceedings might and should best be brought and who the defendants to any proceedings might be".

43.　　Mr Oliver says it is "almost certain" that if any proceedings are instituted they will not "take the form of the Texas petition", not least because that suit has now been overtaken by events.  He explains that, at the date of his witness statement (27th October 2010), he had not received the documentation from the solicitors for Football and Holdings which has subsequently been delivered. It was therefore not possible to state what if any proceedings the former owners are minded to institute "for the simple reason that no decisions have been made".  Both the former owners confirm this present state of uncertainty.

44.　　In the light of this uncertainty the former owners both proffer an undertaking in their evidence to give the other parties to the proceedings seven days' notice of any intention to commence or cause the commencement of proceedings in any court (other than those of the member states of the EU).

45.　　In his witness statement, however, Mr Hicks claims that the documentation to which he has now gained access "confirms that we were deliberately excluded from that sale process of a company that we indirectly owned, and of which we were duly elected and serving directors".  These documents also indicate, he says, that "Broughton and others purposefully kept critical information, including information regarding potential offers to purchase [LFC] hidden from George Gillett and me beginning no later than August 2010".  The evidence shows that both former owners have a very clear idea of what they contend has been a serious wrong to them committed by RBS and Sir Martin Broughton.

**Mill Financial**

46.　　Mr Gillett is also indebted to Mill Financial LLC, a Virginia entity.  In January 2008 he entered into a Tri-Party Intercreditor agreement ("TPI") with RBS and Mill.  The TPI is according to its terms, governed by New York law and the parties submit to the non-exclusive jurisdiction of the New York courts.  Under the TPI, RBS was obliged to keep Mill informed of any enforcement of its rights under RBS' loan agreements, including its loan to Football. The former owners are concerned that if they are called

upon to assist Mill in any proceedings Mill may decide to bring, they may be said to be in breach of the anti-suit injunction.

47.     It is common ground that if I continue the anti-suit injunction it should be made clear that it does not extend to the giving of assistance to Mill in any proceedings Mill may choose to bring.  Such proceedings would not in any event have fallen within the definition of "Dispute" in the anti-suit injunction, as they would not be proceedings relating to a dispute between the parties to the English proceedings.

**The relief originally sought in the RBS and Broughton actions and the proposed amendments**

48.     Given that the RBS and Broughton actions were commenced at a time when the sale of LFC was in the future, it is hardly surprising that they require amendment if they are to proceed. The original proceedings were concerned with the validity of the removal of and replacement of Messrs Purslow and Ayre and the ability of the Board to enter into the conditional sale agreement.  If those steps were valid, then RBS also sought declarations that there had been breaches of the corporate governance arrangements.  By its proposed amendment RBS seeks declarations that:

   i)     RBS did not act in repudiatory breach of the terms of the CGSL and RBS Side Letter;

   ii)    RBS' conduct was not such as to deprive it of equitable relief in relation to the enforcement of those letters;

   iii)   RBS' conduct in relation to the sale process of LFC did not involve it in dishonestly assisting any breach of fiduciary duty by the English directors in relation to the sale;

   iv)    RBS' conduct in relation to the sale process of LFC did not involve an actionable conspiracy against Holdings or Football;

   v)     RBS is not prevented from enforcing its rights under the Security Agreement in respect of outstanding liabilities owed to RBS;

   vi)    RBS is not prevented from enforcing its rights under Guarantees from the former owners in respect of outstanding liabilities owed to RBS.

49.     The relief originally sought in the Broughton action is also the subject of substantial proposed amendment for the same reason.  Firstly, it is sought to make Football and Holdings defendants instead of claimants.  Secondly, Sir Martin Broughton, now the sole claimant, seeks declarations:

   i)     That he is not liable to the former owners, Holdings, Football, Cayman or Investment for breach of any duty in respect of his conduct as a director of Football, Holdings and LFC, and in particular with regard to his involvement in the sale of LFC to UKSV;

   ii)    Alternatively, a declaration or order pursuant to section 1157 of the Companies Act 2006 relieving him of any liability in respect of the same

matters, on the ground that he acted honestly and reasonably and ought fairly to be excused.

50.    The Broughton action continues to seek declarations, in slightly amended form, concerning the authority of the boards of Football and Holdings to accept the offer and conclude the sale agreement with UKSV.

**Principles applying to the grant of negative declaratory relief**

51.    It was at one time thought that there were threshold jurisdictional requirements to be crossed before the court would entertain proceedings for negative declaratory relief. However, it has now been made clear that the wide powers in the Senior Courts Act 1981 to grant declarations (whether or not any other remedy is claimed) are not subject to any special threshold requirements. The question of whether to grant a negative declaration is essentially one of the exercise of the court's discretion.

52.    Thus in *Messier-Dowty v. Sabena* [2000] 1 WLR 2040, the Court of Appeal concluded that there should be no reluctance to grant negative declaratory relief where it was useful to do so. As Lord Woolf MR (giving the judgment of the Court) explained at [36]:

> "I can see no valid reason for taking an adverse view of negative declaratory relief. That is whether it is claimed in relation to transnational disputes or domestic litigation...In appropriate cases their use can be valuable and constructive".

53.    At [41] Lord Woolf said:

> "The approach is pragmatic. It is not a matter of jurisdiction. It is a matter of discretion. The deployment of negative declarations should be scrutinised and their use rejected where it would serve no useful purpose. However, where a negative declaration would help to ensure that the aims of justice are achieved the courts should not be reluctant to grant such declarations. They can and do assist in achieving justice...
>
> So in my judgment the development of the use of declaratory relief in relation to commercial disputes should not be constrained by artificial limits wrongly related to jurisdiction. It should instead he kept within proper bounds by the exercise of the courts' discretion."

54.    Lord Woolf did however add a note of caution at [42]:

> "While negative declarations can perform a positive role, they are an unusual remedy insofar as they reverse the more usual roles of the parties. The natural defendant becomes the claimant and vice versa. This can result in procedural complications and possible injustice to an unwilling "defendant". This in itself justifies caution in extending the circumstances where negative declarations are granted, but, subject to the exercise of

> appropriate circumspection, there should be no reluctance to
> their being granted when it is useful to do so."

55.     Pumfrey LJ (as he by then had become) had to summarise these principles in *Nokia
        Corporation v Interdigital Technology Corporation* [2007] EWHC 3077 (Pat) in a
        case concerning negative declaratory relief about compliance with European mobile
        phone standards.  He put it in this masterly way:

> "It is obvious from [*Messier Dowty*] that the principal factor
> affecting the exercise of the court's discretion ... is the utility of
> the negative declaration sought. Will the declaration if granted
> be the legal equivalent of shouting in an empty room, or is
> there some point in it?"

56.     It is to be noted that, in arriving at his conclusions, Lord Woolf cited the opinion of
        the Advocate General in *Owners of cargo lately laden on board the ship Tatry v
        Owners of the ship Maciej Rataj (The Tatry)* [1999] QB 515, at 526 summarising the
        approach under the Brussels Convention:

> "23. It should also be borne in mind that the bringing of
> proceedings to obtain a negative finding, which is generally
> allowed under the various national procedural laws and is
> entirely legitimate in every respect, is an appropriate way of
> dealing with genuine needs on the part of the person who
> brings them. For example, he may have an interest, where the
> other party is temporising, in securing a prompt judicial
> determination – if doubts exist or objections are raised – of the
> rights, obligations or responsibilities deriving from a given
> contractual relationship".

57.     That passage is a recognition of the modern policy in relation to the granting of
        negative declarations.  Authorities such as *Re Clay* [1919] 1 Ch 66 now have a limited
        part to play.

58.     It follows, in my judgment, from the more flexible approach to the grant of negative
        declarations, that it will be more difficult to strike out such a claim or refuse
        permission to amend to add one.

**Principles applying to the grant of anti-suit injunctions**

59.     The English court has a power, which derives from section 37(1) of the Senior Courts
        Act 1981, to grant injunctions restraining the commencement or pursuit of
        proceedings in a foreign court.  There are two broad categories of case in which it can
        be prevailed on to do so.  The first is where there is some legal or equitable right, such
        as an exclusive jurisdiction clause, for proceedings to be brought here, and therefore
        not in the foreign court.  The second is where it would be vexatious or oppressive for
        the foreign proceedings to be commenced or pursued:  see *Turner v Grovit* [2001]
        UKHL 65; [2002] 1 WLR 107 per Lord Hobhouse at [25].

60.     Even in the first category of case the decision to grant an anti-suit injunction remains a discretionary one: see *Donohue v Armco* [2001] UKHL 64; [2002] 1 Lloyd's LR 425 at [23] to [27].  For example, as Lord Bingham said in *Donohue*:

> "The English court may well decline to grant an injunction …
> where the interests of parties other than those bound by the
> clause are involved, or where grounds of claim not covered by
> the clause are part of the relevant dispute so that there is a risk
> of parallel proceedings and inconsistent decisions".

61.     Nevertheless, a party with the benefit of an exclusive jurisdiction clause in favour of the courts of this country, has

> "a strong prima facie right not to be the subject elsewhere than
> in England of claims … falling within the scope of the clause":
> *Donohue* at [29].

62.     In the second class of case, the court intervenes not because of the existence of any enforceable right, but because the commencement or continuation of proceedings in the foreign jurisdiction would be unconscionable or vexatious and oppressive.  As Hoffmann J (as he then was) pointed out in *Barclays Bank plc v Homan and others* [1993] BCLC 680 at 686h-688c, these very general words have to be qualified by considerations of comity.  He made this point succinctly by pointing out that the right not to be sued abroad arises only if the *"English* court must intervene to prevent injustice" (his emphasis).  The foreign judge was:

> "usually the best person to decide whether in his own court he
> should accept or decline jurisdiction, stay proceedings or allow
> them to continue."

**Which application comes first?**

63.     Whilst there was no real dispute about any of the above principles, there was a significant dispute as to the approach in the present case.  Mr Girolami QC, who appeared for the former owners and Cayman, submitted that one should take the matter in two stages.  Firstly one should consider what is left in the proceedings as they were at the time of the grant of the original anti-suit injunction.  That is the background against which one should test whether the anti-suit injunction should now be discharged. It should be discharged if it is no longer necessary for the injunction to be in force to protect those original proceedings.   If the injunction should be discharged then that is the end of the matter, as there is no fresh application for a new anti-suit injunction.

64.     Mr Snowden QC for RBS, supported by Mr Marshall QC for Sir Martin Broughton submitted that this is an unduly technical approach.  If an anti-suit injunction is necessary to protect the proceedings whether as originally formulated or as amended then the injunction should not be discharged.   The continuation of the injunction should not depend on the timing of the amendments, which is, in any event, a function of the way in which events have moved on.

65.   It is true that the authorities speak of a requirement for the existence of legal proceedings in this country which need to be protected: see e.g. *Airbus Industrie v Patel* [1999] 1 AC 118 cited in *Turner v Grovit* at [27]. But that was a case where there were no proceedings contemplated in England apart from the proceedings for the injunction, and the English court was being asked to adjudicate between two foreign jurisdictions. That is not the present case. Here there are already proceedings pending, and subject to permission to amend being given, there will be proceedings in this country in relation to the amended claims. Whilst the suggestion that there are no proceedings yet in existence in relation to the amended claims is of course correct, I think that Mr Snowden and Mr Marshall are right that if they can support the continuation of the anti-suit injunction by reference to the amended pleading, then that injunction should not be discharged.

66.   Whilst this was not the order in which the applications were argued before me, I consider that it is therefore sensible first to deal with the applications to amend. The form of the proceedings, if any, which are permitted to go forward forms a critical part of the factual basis for the continuation or discharge of the anti-suit injunction.

**The amendment applications**

*The Broughton Action*

67.   Mr Girolami submitted that it would be wrong to permit amendment of the Broughton action, because it would reverse the usual role of claimant and defendant. It was, he submitted, the right of the former owners to institute proceedings when they have collected the necessary evidence and not to be bounced into bringing proceedings before they were ready to do so. This was particularly the case given the potential application of the rule in *Henderson v Henderson*: if they fail to raise some positive case in respect of the sale, any subsequent attempt to do so would be an abuse of process. He also drew attention to the breadth of the declaration sought, which relates to the whole of Sir Martin Broughton's tenure in office from April to October 2010, and which is not limited to the sale of LFC. Finally he submitted that the mere fact that, in the past, the former owners have intimated proceedings is not enough to justify declaratory relief. Their present position was that indicated in the evidence which I have set out above.

68.   I am not persuaded by any of these submissions. As to the last of these submissions, one of the areas in which it has been indicated that negative declaratory relief may be useful is where a party is "temporizing" about bringing a claim. I consider that description fits the conduct of the former owners well. It has to be remembered that the former owners were content to authorise the commencement of the Texas proceedings containing allegations of a serious kind against Sir Martin Broughton's conduct of the sale. Those allegations were verified on oath by Mr Hicks. The proceedings were only withdrawn because of my order: the allegations made in it have never been. Since then, so far as their perception is concerned, nothing has changed. Indeed, according to their evidence, their position has been confirmed by the material disclosed in England. Plainly nothing has changed to alter the grievance which they feel about the way the sale was conducted by Sir Martin. His conduct of the sale process continues to be subject to attack by the former owners in the media and in the evidence.

69.    In these circumstances it seems to me to be plain that Sir Martin Broughton has established that it would be useful for him to have the negative declaration sought. So far as the specific points made by Mr Girolami are concerned:

    i)    It is of course right to keep in mind the reversal of roles, as Lord Woolf pointed out in *Messier Dowty*. But this cannot be more than a factor. Where a party has already presented a detailed pleading to a court, its importance as a factor is very much reduced. The former owners may now be what Lord Woolf called "reluctant defendants", but it would be wrong to describe them as reluctant litigants.

    ii)    So far as the state of readiness of the former owners is concerned, this did not inhibit the rapid commencement of the Texas proceedings, or the strength of the statements made to the press. What is more they are now in possession of substantial delivery of documents at a stage in proceedings far in advance of that at which they would normally receive it. I think the time has come when they need to state their case or accept that they do not have one.

    iii)    *Henderson v Henderson* will of course, as Mr Marshall pointed out, not render abusive any claim of which the former owners are unaware: see for example *Stuart v Goldberg Linde (a firm)* [2008] EWCA Civ 2; [2008] 1 WLR 823. So whilst the former owners will be placed under an obligation to bring forward the whole of the claim which they know about, or could with reasonable diligence have discovered, the principle in *Henderson v Henderson* goes no further.

    iv)    Finally, it is arguable that the declarations sought may ultimately be held to extend too widely. But there is no doubt about where the centre ground lies, and the sale process is particularly identified within the terms of the declaration sought. I do not think I would be justified in refusing permission to amend solely on the basis of a preliminary view about the width of the declaration sought.

70.    Mr Girolami also took some points on the rules. Firstly he said that although permission to serve Investment out of the jurisdiction had been granted at the suit of Football and Holdings, it had not been sought on behalf of Sir Martin Broughton. Investment has not been served with the claim form, whether in original or in amended form. Secondly, he submitted that although the former owners and Cayman have acknowledged service, they had done so in relation to the claims as pleaded, not generally. In the light of both those submissions, it was necessary to examine the amendments to see whether permission to serve out of the jurisdiction could be granted in relation to them. There is no ground within CPR PD6B which is wide enough to cover a negative declaration of the kind now sought.

71.    Mr Marshall's answer was that, once Football and Holdings become defendants rather than claimants, then the case is one appropriate to CPR 6B 3.1 ground (3):

        "A claim is made against a person ("the defendant") on whom the claim form has been or will be served (otherwise than in reliance on this paragraph) and —

(a) there is between the claimant and the defendant a real issue which it is reasonable for the court to try; and

(b) the claimant wishes to serve a claim form on another person who is a necessary or proper party to that claim."

72.   This ground does not require proceedings to have been commenced against the defendant.   Football and Holdings are English registered companies, and it is therefore proper to say not only that the claim form will be served on them, but also that there is a real issue between the claimant and the defendant which it is reasonable for the court to try. The duties which Sir Martin Broughton owed were duties owed to Football and Holdings.   It is in relation to those duties that Sir Martin Broughton seeks declarations, and it is those duties which have been invoked by the former owners in the allegations which they have caused to be made against him in the Texas proceedings and elsewhere. The first subparagraph of the ground is therefore satisfied.

73.   It also seems to me that Cayman, Investment and both the former owners are necessary and proper parties to the amended claims. Cayman and Investment made the allegations in the Texas proceedings, as they were two of the Plaintiffs, along with Football and Holdings. The former owners are those who are complaining that they have suffered loss through the actions of Sir Martin Broughton which are complained of.

74.   It follows that I propose to allow the amendments to the Broughton action.

*The RBS action*

75.   Mr Girolami did not deal separately with the application to amend in the RBS action, recognising I think that if he failed to resist the amendments in the Broughton action then he would fail here as well.   I think that correctly reflects the position, and so I will allow the amendments in the RBS action.

**The applications to strike out or stay the Broughton action**

76.   It follows that I do not propose to strike out or stay the Broughton action, given that the amendments will be allowed.

**The application to discharge or vary the anti-suit injunction**

77.   By the application, as developed through the evidence, the former owners seek discharge of the anti-suit injunction in its entirety, or in the alternative that it should be modified so far as necessary so as (a) to permit assistance to Mill in pursuit of any action under the TPI, and (b) to permit them to make applications in the United States under the United States procedural code Title 28 section 1782.

78.   The discharge of the injunction is not sought by the former owners by reference to the circumstances that existed at the time of its grant.   It is submitted that, in the circumstances which now exist, where there are no foreign proceedings immediately in prospect, "blanket" maintenance of anti-suit relief is not justifiable. In the absence of any identifiable foreign proceedings it is not possible to identify the exceptional circumstances which would be needed to justify such relief.   Not all those who might

be parties to such proceedings are subject to exclusive jurisdiction clauses. Moreover at least two potential protagonists, Investment and NESV, have connections with the United States: Investment is a Delaware corporation with a principal place of business in Texas and NESV is incorporated in Delaware. In such circumstances the relief should be discharged and replaced with the undertaking proffered by the former owners. If notice is given pursuant to the undertaking of intended proceedings abroad, the opposite parties will be able to assess by reference to those actual proceedings whether to seek an anti-suit injunction based on actual as opposed to imagined facts.

79.   RBS resist the discharge of the injunction. They submit that they have a strong prima facie contractual right to have any dispute between the parties to the exclusive jurisdiction clauses tried here. Moreover they submit that the clauses should be, and will be liberally construed. The "non-exclusive" jurisdiction clause in the CGSL should be construed as exclusive given that it is a Finance Document and the parties cannot have intended that inconsistent jurisdiction clauses should govern the same transaction. They also rely on the Guarantees. They submit that, given the absence of any proper explanation from the former owners for their vexatious conduct to date, there is no basis for discharging the injunction even absent the contractual grounds.

80.   The position of RBS was supported by Sir Martin Broughton and NESV/UKSV.

81.   I have to confess that by the conclusion of the argument, despite the plethora of individual issues, there did not really seem to be much of substance between the positions of the parties. The injunction which I granted contains an express proviso for seeking permission from the court for any action which would otherwise be caught by the injunction. So there is no question of the injunction being a blanket prohibition on all conceivable actions, as the former owners tended to suggest. They may apply for permission, and the court would grant it if it could see that, in accordance with the principles I have discussed, the action was one which it would be wrong for the court to restrain. On the other hand if I were to discharge the injunction and accept instead the former owners' undertakings, then, unless the proposed action was one which all the opposite parties regarded as unobjectionable, there would again be a further hearing to determine whether the planned proceedings were an abuse. The difference would lie in which side had to issue an application notice.

82.   However, I am satisfied that the former owners have not shown any good reason why the injunction should be discharged. The main considerations, as it seems to me, are the following.

83.   Firstly, I think it would be unrealistic to proceed on the basis that no proceedings are currently threatened. The reality of the situation is that the former owners have already started two sets of proceedings and openly asserted their intention to start more. They will undoubtedly start more proceedings if allowed to do so. There is a real threat that those proceedings will be in the United States. The former owners would scarcely be asking for discharge of the anti-suit injunctions if they were content to bring proceedings here.

84.   Secondly, although the form of those proceedings is not yet settled, their general form is clear enough. It is a claim by Football, Holdings, Cayman and Investment that there has been an unlawful means conspiracy by RBS, Sir Martin Broughton, the

other English directors of Football and Holdings and NESV to exclude the former owners from the sale process and to sell LFC at an undervalue to NESV. In the absence of any explanation from the former owners as to the nature of the proposed proceedings, I have to work on the assumption that the burden of the proceedings will be along these lines. The objective includes the recovery of sums by way of punitive damages against RBS, NESV and Sir Martin Broughton, amongst others.

85.   Thirdly, it seems to me that the case against Sir Martin Broughton, at least so far as brought by Football and Holdings, constitutes a breach of the exclusive jurisdiction clause in his letter of appointment. That letter required him to lead the sale process and made him a director of Football and Holdings. The claim which the former owners threaten to bring against Sir Martin Broughton through their control of Football and Holdings, as outlined above, seems to me to arise out of or in connection with his letter of appointment. It is a complaint about the manner in which he led the process, and about alleged breaches of duty which arose on his appointment. Sir Martin Broughton has a legal right to have that action tried in England.

86.   Fourthly, the claim that Sir Martin Broughton acted when leading the sale process in breach of fiduciary duty to Holdings and Football would be bound to lie at the centre of any future foreign proceedings by the former owners and their companies. Given Sir Martin's right to have that claim determined in England, the foreign proceedings, even if involving other parties, would not only be extremely inconvenient but would carry with them the risk of inconsistent decisions.

87.   Fifthly, I would accept that it is less clear that any action brought against RBS would necessarily fall within any of the exclusive jurisdiction clauses. Mr Snowden stressed the clause in the Credit Agreement concerning disputes arising in connection with "the legal relationships established by, any Finance Document or otherwise arising in connection with any Finance Document". This is a wide term, and such clauses are generally themselves afforded a generous construction. He also argued that "non-exclusive" in the CGSL was a slip or error, or should be construed as meaning "exclusive" having regard to the fact that it was a Finance Document. He submitted that, given that it was unlikely that the parties would have intended to have their disputes split between different jurisdictions, it was the central documents in the transactions which should govern the place where the parties agreed to have their disputes decided. He relied on a passage from the judgment of Lord Collins of Mapesbury in *UBS AG v HSH Nordbank AG* [2009] 2 Lloyd's Rep 272, at [95]:

> "Whether a jurisdiction clause applies to a dispute is a question of construction. Where there are numerous jurisdiction agreements which may overlap, the parties must be presumed to be acting commercially, and not to intend that similar claims should be the subject of inconsistent jurisdiction clauses....Where the parties have entered into a complex transaction it is the jurisdiction clauses in the agreements which are at the commercial centre of the transaction which the parties must have intended to apply to such claims ...."

There are obvious difficulties with these arguments. Firstly, now that the sale transaction has gone through, it may be possible for a case to be formulated against

RBS which is independent of any Finance Document to such an extent that it does not arise "in connection with any such document". That may be so even allowing for any generous construction that may be afforded to the clause. Secondly, whereas Football and Holdings may have been content with exclusive jurisdiction clauses, Cayman may not. Hence the non-exclusivity of the clause in the CGSL may have been deliberate. I am also not impressed by RBS' reliance on the Guarantees. Although I have allowed them to amend to include a declaration that the Guarantees are enforceable, no claim has been brought on the Guarantees. At the moment, therefore, the Guarantees seem to me to be peripheral to the dispute. It would therefore not be right to base the continuation of the anti-suit injunction on the fact that the apprehended future claim would necessarily amount to a breach of the exclusive jurisdiction clauses in the RBS documents.

88.  Sixthly, the claim which was brought in Texas by Football and Holdings at the behest of the former owners did seek to impugn the sale process. To that extent, the dispute arose out of or in connection with the RBS Side Letter and could therefore be said to be one within the exclusive jurisdiction clause. At the moment, despite indications given by Mr Girolami, I cannot be certain that any new suit will not take a similar line. There remains a threat in my judgment that the proceedings will encompass subject matter within the exclusive jurisdiction clauses. Moreover, the intimated claim against RBS involves allegations of their complicity in breach of duty owed by Sir Martin Broughton to Football and Holdings. The prospect of the proceedings being splintered in such a way as to cause the breach of duty to be determined in England but RBS' involvement in it elsewhere is a highly unattractive one: compare the converse case in *Donohue* where all the factors pointed to the conspiracy being determined in a single composite trial in New York.

89.  Seventhly, I still find it difficult to imagine what possible real connection such a claim would have with any jurisdiction in the United States. I think it is correct, as Mr Snowden submitted, that the owners have not identified any basis for the existence of any other suitable forum for the disputes. The disputes concern an English asset (LFC), duties owed by English directors under English law to English companies, and corporate governance arrangements governed by English law.

90.  Eighthly, it is, as Mr Marshall points out, material to observe that the proceedings in Texas seek punitive and not merely compensatory damages against the defendants. In *Societe Aerospatiale v Lee Kui Jak* [1987] 1 AC 871 at 894E-G, Lord Goff recognised that a litigant's reliance on the availability of enhanced or punitive damages in a jurisdiction having no connection with a dispute may be an indicator that he is acting oppressively. Although the significance of such a factor can be reduced or eliminated by an appropriate undertaking, none was proffered here.

91.  Ninthly, it has to be recalled that the present application is one to discharge the injunction which has been granted. The former owners have not, to my mind, given a satisfactory explanation of the conduct which led to the application being made in Texas. It is true that this is only a factor, and it is certainly not the purpose of an anti-suit injunction to punish a party for past misconduct. But I do consider, nevertheless, that this past conduct is a factor which I should bear in mind at this stage in deciding whether to substitute an undertaking for the injunction.

92.   Finally, the former owners have not shown that there is any present need to discharge the injunction.  According to their evidence they have not formulated such a claim. So the anti-suit injunction is not presently restraining the commencement of any proceedings.   Given what has happened in the past, I think the court is justified in seeing what those proceedings are before releasing the injunction.

93.   I conclude, therefore, that there remains a real threat that such proceedings as may be issued by the former owners or their companies outside the jurisdiction would fall within one or other or both of the categories of case where it is proper for the English court to restrain the commencement or pursuit of proceedings.  I have carefully considered whether this is a case where I should leave it to the foreign court to decide whether to accept jurisdiction, and have concluded that it is not, having regard to the factors which I have identified above.  I therefore refuse the application to discharge the anti-suit injunction.  I should make it clear that this does not pre-judge or foreclose an application under the proviso in paragraph 3 of the injunction, made in connection with some particular proceedings which the former owners intend to commence.  The court would obviously expect in such circumstances to see evidence of specifics: parties, subject matter, causes of action and forum.

*USC section 1782*

94.   I can deal with this point quite shortly.  The section gives the US court power to grant assistance to litigants in aid of proceedings in foreign courts in appropriate cases. What is suggested by the former owners is that they should be free to make an application under this statute in the United States in aid of such proceedings as they may choose to bring in this country.

95.   Generally speaking, the English court does not exercise control over the manner in which litigants choose to obtain the evidence which they need to support their case: see the speech of Lord Brandon of Oakbrook in *South Carolina Co. v Assurantie Maatschappij "De Zeven" Provincien N.V.*[1987] 1 AC 24 at 41G-42C. It is true that on occasion the English court has said "No thank you" in advance of such proffered assistance, and granted an injunction to restrain such orders being obtained or worked through: see for example *Bankers Trust International v PT Dharmala Sakti Sejahtera* [1996] C.L.C. 252; *Omega Group Holdings Ltd v Kozeny* [2002] CLC 132.  It has done so, however, where the procedure was likely to burden English proceedings with excessive or unnecessary disclosure or pre-trial depositions.

96.   It seems to me that this is a case where the general principle should apply.  The ability to apply for disclosure under USC 1782 in aid of its proceedings in this country is a facility available to any litigant.  The proceedings in this country have not reached a stage where it can be said that an application under USC 1782 would necessarily be abusive, neither has any application for a 1782 order been formulated (on both points, contrast *Bankers Trust*).  Mr Chivers QC for NESV and UKSV emphasised the fact that it appears possible to make applications under USC 1782 *ex parte*.  That concern can be dealt with by a requirement of giving notice.  Accordingly I would make an exception to the anti-suit injunction to allow applications under USC 1782, subject only to the condition that 7 days' prior notice is given to any respondent to such an application of the intention to issue proceedings under that statute.

**Joinder of NESV**

97.     Joinder of NESV to the Broughton action was sought by NESV (UKSV already being a party).  It was resisted essentially on the grounds that if amendment was refused there would be nothing left in the Broughton action.  As amendment has been allowed, that point falls away.

**The Sixth Application**

98.     This was brought out of an abundance of caution in case it can be said that Sir Martin Broughton did not have permission to serve Investment out of the jurisdiction.  In my judgment he already does have that permission, and so the sixth application was unnecessary, and should be dismissed.

**Costs**

99.     A number of costs issues are outstanding, but were not reached on this CMC.  To avoid the costs of a further hearing, I would be content if all parties agree to deal with those issues in writing, together with any issues arising out of the form of order following this judgment.

**Conclusion**

100.    The amendments in the RBS and Broughton actions will be allowed.  The application to strike out or stay the Broughton action will be dismissed. The application to discharge the anti-suit injunction will be dismissed.  The application to vary the anti-suit injunction will be allowed to permit applications in support of proceedings in this country under USC 1782, subject only to the condition that 7 days' prior notice is given to any respondent to such an application of the intention to issue proceedings under that statute; and to make it clear for the avoidance of doubt that assistance to Mill Financial is not caught by the injunction.  NESV will be joined as a party to the Broughton action.  The application for permission to serve Investment out of the jurisdiction is dismissed as unnecessary.